**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**
**SOUTHWESTERN DIVISION**

| | | |
|---|---|---|
| North Dakota, | ) | **ORDER GRANTING IN PART AND** |
| | ) | **AND DENYING IN PART PLAINTIFFS'** |
| Plaintiff, | ) | **MOTION TO COMPEL** |
| | ) | |
| vs. | ) | |
| | ) | |
| United States of America, | ) | Case No. 1:12-CV-125 |
| | ) | (Lead Case) |
| Defendant. | ) | |
| _____ | ) | |
| | ) | |
| Billings County, et. al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 1:12-CV-102 |
| vs. | ) | (Consolidated Case) |
| | ) | |
| United States of America, | ) | |
| | ) | |
| Defendant. | ) | |

## I.   BACKGROUND

### A.   Introduction

Case No. 1:12-CV-125 is an action filed by the State of North Dakota seeking to quiet title

to its claim of section line rights-of-way within the Little Missouri National Grassland, the Sheyenne

National Grassland, and the portion of the Cedar River National Grassland located in North Dakota -

all of which are a part of the Dakota Prairie Grasslands administered by the United States Forest

Service, which is an agency of the United States Department of Agriculture ("USDA").  Case No.

1:12-CV-102 is an action by four North Dakota counties (Billings, McKenzie, Slope, and Golden

Valley - collectively referred to herein as the "Counties") seeking to quiet title to the claimed section

line rights-of-way in just the Little Missouri National Grassland as well as six individual roads claimed by McKenzie County. The two actions have been consolidated with the State of North Dakota's action being the "lead case" and the action by the four counties being the "consolidated case."

Before the court now is a joint motion to compel discovery by North Dakota and the Counties. Before turning to the motion, some understanding of what overall is in dispute is important.

### B.     Plaintiffs' quiet title claims

#### 1.     Revised Statute 2477

In 1866, Congress provided for public access across unreserved public domain lands by granting rights-of-way for the construction of highways by the passage of a statute that is commonly referred to as "R.S. 2477," which read in its entirety as follows:

> The right of way for the construction of highways over public lands, not reserved for public uses, is hereby granted.

Act of July 26, 1866, ch. 262, § 8, 14 Stat. 251, 253, codified at 43 U.S.C. § 932, repealed by Federal Land Policy and Management Act of 1976, Pub. L. No. 94-579, Title VII, § 706(a), 90 Stat. 2743, 2793.

On October 21, 1976, Congress abandoned its prior approach to public lands and instituted a preference for retention of lands in federal ownership, with an increased emphasis on conservation and preservation, by its enactment of the Federal Land Policy and Management Act of 1976 ("FLPMA"). Among other things, the FLPMA repealed R.S. 2477 but preserved "any valid" right-of-way "existing on the date of approval of this Act." Pub. L. No. 94-579, §§ 701(a), 706(a),

90 Stat. at 2786, 2793; see Southern Utah Wilderness Alliance v. Bureau of Land Mgmt., 425 F.3d 735, 740 (10th Cir. 2005).

> **2.  Plaintiffs' primary claim of right-of-way based on North Dakota's section line law**

The primary claim of North Dakota and the Counties is that every section line within or adjacent to the Forest Service lands identified above is subject to a 66' wide public right-of-way running along and extending 33' on either side of the section lines. Plaintiffs contend this right-of-way burdens the Forest Service lands regardless of whether a road has been constructed or there is evidence of use of the section lines for public travel. Plaintiffs' claim rests upon an 1871 Dakota Territory law and successor versions enacted after statehood that plaintiffs contend, and the North Dakota Supreme Court agrees, was an "acceptance" of the purported open-ended grant of right-of-way for highways under Revised Statute 2477. E.g., Small v. Burleigh County, 225 N.W.2d 295 (N.D. 1974) ("Small"); Faxon v. Lallie Civil Twp., 163 N.W. 531, 532 (N.D. 1917).

The law enacted by the Dakota Territory in 1871, stated that "[h]ereafter all section lines in this territory shall be and are hereby declared public highways as far as practicable[.]" Id. After North Dakota achieved statehood in 1889, the statute was amended in 1895 without substantial change to the relevant portion quoted above. N.D. Revised Code § 1050 (1895). Since then, it has been revised from time-to-time and whether any of these changes are material may be subject to some dispute.[1] The present version is codified at N.D.C.C. § 24-07-03 (2013) and reads as follows:

---

[1]  Because of the particular wording of succeeding versions of the statute as well as additional statutes governing highways, questions arose over the scope of the statute, including whether action was required by township or county officials before there could be a public highway. See, e.g., Small, supra (discussing the history of North Dakota's section line law and the court's prior decisions construing it). The North Dakota Supreme Court ultimately concluded that all section lines outside of incorporated cities are open for public travel without the necessity of any prior action of township or county officials. 225 N.W. at 300.

**§ 24-07-03. Section lines considered public roads open for public travel--Closing same under certain conditions.**

In all townships in this state, outside the limits of incorporated cities, and outside platted townsites, additions, or subdivisions recorded pursuant to sections 40-50.1-01 through 40-50.1-17 or recorded prior to July 1, 1987, under former chapter 40-50, the congressional section lines are considered public roads open for public travel to the width of thirty-three feet [10.06 meters] on each side of the section lines.

\* \* \* \*

Without getting too deep into the merits of plaintiffs' primary claim of right-of-way, the position of the United States in opposition is twofold. The United States first points out that R.S. 2477, by its very language, does not apply to lands that were reserved for public use and states that some of the section lines at issue lie within or along reserved lands.[2] Second, the United States contends that the grant of right-of-way pursuant to R.S. 2477 was only for highways that were actually constructed and not a present grant of right-of-way for possible future highway construction. Consequently, according to the United States, no right-of-way now exists along the sections lines of unreserved lands if a highway was not actually constructed prior to the repeal of R.S. 2477 in 1976.[3] According to the United States, section lines themselves are not highways,

---

[2] What reserved lands were within the meaning of the statute and at what time the lands had to have been reserved may become issues in this case. For example, one reading of R.S. 2477 might suggest that, even for those public domain lands that passed into private ownership, the failure to construct a road prior to the reacquisition of the lands by the United States for specific purposes extinguished whatever right of opportunity of constructing a highway may have burdened the lands.

[3] While the dispute in this case is limited to the section lines within the National Forest Service lands previously identified, a decision adverse to the United States may call into question the status of the section lines within other federal lands in North Dakota, including the Theodore Roosevelt National Park and the several federal wildlife refuges. On the other hand, a decision adverse to the plaintiffs may call into question a claim of public right-of-way over all section lines within the state where a road was not constructed or the section line was not subject to regular public travel prior to the repeal of R.S. 2477 in 1976, except, perhaps, for those lands that are (or at one point prior to 1976 were) in state or political subdivision ownership, such that an argument could be made that the declaration of public right-of-way attached to the 33 feet abutting the section lines of those parcels, and, perhaps, for those specific section lines that have been the subject of a prior state court decision. Cf. Small, supra (concluding in a dispute not involving federal lands that the section line was public right-of-way because North Dakota's section line law constituted an acceptance of the grant of right-of-way pursuant to R.S. 2477); Hillsboro Nat. Bank v. Ackerman, 189 N.W. 657, 659 (N.D. 1922) (same).

rather they are simply geographic lines, and a mere declaration by a state that they are highways cannot trump what it contends was the clear purpose and meaning of R.S. 2477 any more than if the State had chosen to declare quarter-quarter lines or, perhaps more broadly, township lines as highways.

### 3.    McKenzie County's additional claims

In addition to this primary claim of "section line" right-of-way, McKenzie County seeks to quiet title to several specific roads within the Forest Service grasslands that do not necessarily follow the section lines. The claims with respect to these roads are based entirely, or in substantial part, on things other than the State's section line law. And, since Mckenzie County has not argued why it needs discovery of the material that is the subject of the motion to compel with respect these claims, they will be ignored for purposes of the decision here.[4]

### C.    <u>The Motion to Dismiss by the United States</u>

The United States has filed a motion to dismiss, contending that plaintiffs' complaints are deficient because they fail to describe with particularity the land in question and also that, in any event, plaintiffs' claims are barred by the 12-year limitation period for commencing an action under the Quiet Title Act ("QTA"), which is jurisdictional. Following the filing of this motion, the parties agreed that discovery limited to the issues raised by the motion to dismiss would be conducted and a briefing schedule was established for supplemental briefing on a renewed motion to dismiss following the completion of discovery.

---

[4] Theoretically, plaintiffs could claim an entitlement to right-of-way over some of the same 66' wide strips of land that they have put at issue in this case based on actual construction of roads or, perhaps, even regular public travel, prior to the repeal of R.S. 2477. However, it does not appear plaintiffs are making such claims given the lack of pleading of specific facts and circumstances in their complaints that would give rise to them, except, perhaps, for portions of the handful of roads claimed by McKenzie County.

**D.    Plaintiffs' joint motion to compel discovery**

Before the court now is a joint motion to compel discovery brought by plaintiffs in both actions (Doc. No. 73).  The motion seeks to compel disclosure of two categories of documents that the United States claims are privileged.

The first category are documents that set forth, reference, or otherwise relate to opinions issued by two attorneys within the USDA's Office of General Counsel - Morris Hankins and James Wood - that relate to R.S. 2477 and/or North Dakota's section line law.  Hankins issued his principal opinion in 1962 and Wood issued his opinions in 1980.  More specifically plaintiffs seek an order compelling the following withheld or redacted documents:  USA74919, 75171, 76370, 76417, 76422, 76452, 76983, 77004, 77034, 77037, 77038, 77039, 77047, 77050, 77056, 77058, 77064, 77065, 77074, 77078, 77167, and 77170.

The second category of documents that plaintiffs seek are title opinions rendered to the Forest Service that may identify and address the same issues with respect to specific sections lines. The title opinions that plaintiffs seek are:  USA75212, 75257, 75265, 75320, 75339, 75379, 75391, 75408, 75447, 75470, 75484, 75507, 75535, 75554, 75586, 75626, 75652, 75658, 75681, 75749, 75907, 75942, 75990, 76102, 76301, 76310, 76327, and 76992.

The United States makes two arguments for why the motion to compel should be denied. First, the United States contends that the documents are irrelevant to the court's consideration of its motion to dismiss on jurisdictional grounds, *i.e*, that the documents are irrelevant to the complained lack of specificity in the complaints and, more importantly, to whether plaintiffs' QTA claims are untimely.  Hence, the United States urges the court to defer consideration of the motion to compel

until after the motion to dismiss is ruled on.  Second, the United States argues that the documents need not be disclosed because they are all attorney-client privileged.[5]

After an initial consideration of the motion papers, the court ordered the United States to produce the documents for *in camera* review.  Unfortunately, after a review of all the material, the arguments being made with respect to lack of relevance, whether the attorney-client privilege applies to some or all of the withheld documents, and whether the attorney-client privilege has been waived are all particularly thorny and complex.  Recognizing that the decision set forth below may very well not be the last word on the subject, all of the issues will be addressed in turn so that those who may take them up later will have the benefit of the undersigned's analysis, for whatever that might be worth.

## II.    THE RELEVANCY OBJECTION

### A.    Introduction

The court is well aware of the standards for discovery set forth in Fed. R. Civ. P. 26(b)(1) as well as the court's discretion in terms of the timing of discovery.  If the court was to conclude that the withheld documents are irrelevant at this stage, the court would be well within its power to defer consideration of the motion to compel until after the ruling on the motion to dismiss, despite plaintiffs' argument to the contrary.

Because the relevancy objection of the United States requires the court to delve into the merits of its statute-of-limitations issue - at least to some extent, it is helpful first to consider the applicable statutes of limitation.

---

[5]  In its privilege log, the United States also contended that many of the withheld documents were predecisional and subject to a "deliberative process privilege."  However, the United States has not advanced that argument in its briefing here, so the court deems it to have been abandoned.

**B.      The QTA's statute-of-limitations**

The QTA is a limited waiver of the sovereign immunity of the United States from suit.  E.g., Block v. North Dakota ex rel. Bd. of Univ. & Sch. Lands, 461 U.S. 273, 280 (1983) ("Block"); Spirit Lake Tribe v. North Dakota, 262 F.3d 732, 737 (8th Cir. 2001).  For that reason, the prevailing view (including most importantly that of the Eighth Circuit) is that satisfaction of the QTA's statute of limitations provisions is jurisdictional.  Spirit Lake Tribe, 262 F.3d at 738.  ("[T]he QTA statute of limitations acts as a jurisdictional bar unlike most statutes of limitations, which are affirmative defenses.").

When the QTA was enacted in 1972, it contained a 12-year statute of limitations that applied to all QTA actions and read as follows:

> Any civil action under this section shall be barred unless it is commenced within twelve years of the date upon which it accrued.  Such action shall be deemed to have accrued on the date the plaintiff or his predecessor in interest knew or should have known of the claim of the United States.

Block, 461 U.S. at 275 n.1 (quoting Act of Oct. 25, 1972, Pub. L. No. 92-562, 86 Stat. 1176, codified at 28 U.S.C. § 2409a(f)).

In 1983, the Supreme Court held in Block that this limitations period applied even to claims brought by states.  Because of dissatisfaction with this result, Congress amended the QTA in 1986. For claims brought by persons or entities other than states, the limitations period, including when it accrues, remained the same and is presently codified as follows:

> Any civil action under this section, except for an action brought by a State, shall be barred unless it is commenced within twelve years of the date upon which it accrued.  Such action shall be deemed to have accrued on the date the plaintiff or his predecessor in interest knew or should have known of the claim of the United States.

28 U.S.C. § 2409a(g). For claims asserted by states, however, new provisions were added that, among other things, limit the reach of the 12-year limitations period to only certain lands of the United States and, for some types of lands, provide a new test for when a claim accrues.

In terms of this case, to the extent there is now a statute of limitations that applies to North Dakota's claim, it lies with the following statutory provisions - at least for those claims that accrued after the 1986 amendments became effective:

> (i) Any civil action brought by a State under this section with respect to lands, other than tide or submerged lands, on which the United States or its lessee or right-of-way or easement grantee has made substantial improvements or substantial investments or on which the United States has conducted substantial activities pursuant to a management plan such as range improvement, timber harvest, tree planting, mineral activities, farming, wildlife habitat improvement, or other similar activities, shall be barred unless the action is commenced within twelve years after the date the State received notice of the Federal claims to the lands.
> * * * *
> (k) Notice for the purposes of the accrual of an action brought by a State under this section shall be--
>> (1) by public communications with respect to the claimed lands which are sufficiently specific as to be reasonably calculated to put the claimant on notice of the Federal claim to the lands, or
>> (2) by the use, occupancy, or improvement of the claimed lands which, in the circumstances, is open and notorious.

28 U.S.C. § 2409a(i)&(k).

What appears to have not been definitively decided is what statutory provisions apply to North Dakota's claim if it accrued prior to the 1986 amendments. The United States takes the position that the old "knew or should have known" provisions, which the Supreme Court upheld as to the states in Block, still apply for some older claims by states. For purposes of the present motion to compel, the possibility of there being two tests that may apply to the claim of North Dakota, depending upon when it accrued, has some materiality with respect to the argument by the United States as to lack of relevancy, although it does not change the result.

To the extent the Counties have separate claims in this case (*i.e.*, claims not subject to the control of the State), there is authority holding they are subject to the "knew or should have known" standard that applied to all claimants prior to the 1986 amendments and now applies to non-state plaintiffs based on the conclusion that a political subdivision of a state is not a "state" for purposes of the 1986 amendments to the QTA. <u>Calhoun County, Tex. v. United States</u>, 132 F.3d 1100, 1103 (5th Cir. 1998).

C.     **Discussion re the relevancy objection**

1.     **Plaintiffs' argument that the withheld material is relevant to the issue of abandonment**

Unfortunately, it may not be possible to resolve the question of whether plaintiffs' lawsuits are timely in complete isolation of all other issues. This is because the Eighth Circuit and some other courts have held that, if the United States at any point "clearly and unequivocally abandons" a property interest which is purportedly in conflict with that claimed by a plaintiff, "the government's outright abandonment effectively removes the cloud on a plaintiff's title and extinguishes his obligation to file a quiet title action within 12 years." <u>Spirit Lake</u>, 262 F.3d at 739. Then, if the government later reasserts the claim (and putting aside whether any claim could at that point be revived), "the reasserted claim is properly regarded as a new claim and a new 12-year period begins in which a plaintiff may file his QTA action against the government." <u>Id.</u>

In this case, plaintiffs surmise, based upon what the Unites States has disclosed, that James Wood,[6] an OGC attorney in the Billings regional office, issued one or more opinions in 1980 to the effect that North Dakota's statutes governing sections lines (as well as its territorial predecessors)

---

[6] In a number of documents, the United States refers to "James Woods" but the correct spelling of his last name is "Wood," according to the documents he authored.

constituted a valid acceptance of a § 2477 grant and that, as a consequence, every section line on the bulk of the Forest Service's lands in question is a public highway, regardless of whether any road has ever been constructed. Plaintiffs further surmise that the Wood opinions were contrary to those that may have been issued earlier by OGC attorney Morris Hankins in the 1960s. Plaintiffs argue that the undisclosed Wood opinions would be evidence of the Forest Service's abandonment of any claim of *full* title (*i.e*, title unburdened by any claim of right-of-way by plaintiffs) or, at the very least, would lead to the discovery of other evidence relevant to an abandonment argument.

In response, the United States contends that it takes a lot to prove the United States actually abandoned its interest, that plaintiffs have offered nothing to suggest any real possibility of an abandonment, and that there is nothing in the withheld documents that will get them there. The United States cites to the Eighth Circuit's decision in Spirit Lake as well as other authority for what it claims is required for an actual abandonment by the United States of an interest in property. See, e.g., Royal Indem. Co. v. United States, 313 U.S. 289, 294 (1941) (Subordinate officers of the United States lack the power to dispose of real property belonging to the United Sates, unless such power "has been conferred upon them by Act of Congress or is to be implied from other powers so granted."); Cheyenne Arapaho Tribes of Okla. v. United States, 558 F.3d 592, 597-98 (D.C. Cir. 2009); Kingman Reef Atoll Investments, L.L.C. v. United States, 541 F.3d 1189, 1199 (9th Cir. 2008) ("It is well established that the United States does not abandon its claims to property by inaction."); Rio Grande Silvery Minnow v. Bureau of Reclamation, 599 F.3d 1165, 1187 (10th Cir. 2010) ("Rio Grande") ("'[I]ntra-office memoranda,' and similar intra-governmental communications 'do not bind the government,' such that they can effect an abandonment of property and stop the QTA's limitations clock.") (quoting Spirit Lake, 262 F.3d at 742); Spirit Lake, 262 F.3d at 739-44.

Plaintiffs suggest in reply that the authority the United States relies upon for its argument of a very high threshold for abandonment only applies when the United States is abandoning its total interest in property and that less is required when the United States is simply giving way to a claim that represents a burden on its interest, such as plaintiffs' claim of public right-of-way in this case. Plaintiffs cite to Shultz v. United States Dep't of Army, 886 F.2d 1157, 1161 (9th Cir. 1989) and Middle Fork Holding Co., Inc. v. United States, 2010 WL 107380, at *4 (D. Idaho Jan. 7, 2010).

The cases plaintiffs rely upon, however, appear to be distinguishable. Whether the United States could abandon its claim to *full* title, unburdened by an adverse claim of right-of-way, by not enforcing its rights in full knowledge of activity inconsistent with its claim on a discrete tract of land is not the situation here. Rather, the purported abandonment that plaintiffs are attempting to argue involves the United States giving way to thousands of miles of section line right-of-way affecting tens of thousands of acres of Forest Service land in North Dakota alone. There is nothing in the case law cited by plaintiffs that would suggest that the mid- to lower-level USDA officials involved in the withheld documents in this case had the authority to make such an abandonment.[7]

Also, putting aside the question of authority, there is nothing in the withheld material which would support a "clear and unequivocal" abandonment by the United States to its claim of unfettered title. In fact, what appears clear from both the withheld and the disclosed information is

---

[7]   Plaintiffs have not attempted to argue that any opinion issued by Wood would itself constitute an abandonment nor could they given his obvious lack of authority and the fact that any opinions he issued would not constitute formal agency action. See, e.g., Rio Grande, 599 F.3d at 1186-87 (informal agency pronouncements, including "opinion letters," lack the force of law and are not sufficient to constitute abandonment); Spirit Lake, 262 F.3d at 740-43 (memorandum from a deputy solicitor of the Department of Interior expressing the opinion that the Devils Lake Sioux Tribe owed the lake bed of Devils Lake was not binding upon the United States and did not constitute an abandonment of its interest). An abandonment of interests of the magnitude claimed by plaintiffs most likely would require at least a decision by the Secretary of Agriculture if not actual Congressional action.

that the Wood opinions were not followed to any significant degree and it was soon decided instead to rely upon older OGC opinions absent clarification from higher-ranking OGC counsel in Washington.

Finally, with respect to any argument that disclosure of the withheld material might lead to the discovery of relevant evidence of abandonment, plaintiffs were aware from what was disclosed by the United States that there may have been differing opinions expressed by OGC counsel at different times with respect to the scope of § 2477 and the application of North Dakota's section line law. In fact, plaintiffs argued as part of their motion to compel that the United States's failure to redact information in one or more intra-agency communications suggesting that there was a conflict in the opinions amounted to a waiver of the privilege. Consequently, armed with that knowledge, plaintiffs have been free to pursue discovery with respect to any claim of abandonment, and there is nothing in the withheld material the court has reviewed that points to other possible relevant evidence of abandonment - much less evidence that could not have been pursued with the knowledge plaintiffs already possessed.

In short, if plaintiffs only need for the withheld material was to support or develop a claim of actual abandonment, the undersigned  might  be inclined to deny the motion. See Cheyenne Arapaho Tribes of Okla. v. United States, 558 F.3d at 597-98 (affirming denial of continuance to conduct discovery because the materials sought "would not demonstrate abandonment of the United States' interest in the land").[8]

---

[8] To be clear, the only thing that has been addressed is whether the motion to compel should be granted based on plaintiffs' desire to pursue their abandonment arguments. While the undersigned is highly skeptical of plaintiffs' chances of success with respect to its argument of en masse abandonment by the United States of its interests free of the burden of plaintiffs' claims of right-of-way, no ruling is being made on the merits of the abandonment argument itself, so there is no need to seek review of this decision simply to preserve the issue.

### 2.    Relevancy re timeliness of plaintiffs' QTA claims

#### a.    Introduction

The United States contends that the withheld material is also not relevant with respect to resolving whether plaintiffs' lawsuits were timely brought with respect to their principal QTA claims.  As noted earlier, what triggers the accrual with respect to the State's claim (at least for a certain part of the period in question), is whether the State received a public communication of the position of the United States or there was some use, occupancy, or improvement by the United States of the property in question adverse to the State's claims.  The United States argues that the withheld material is irrelevant to these elements because obviously there was no communication to the State of the material that has been withheld and that use, occupancy, or improvement are objective actions that were either sufficient on their face to trigger the accrual or were not, and the withheld material would have no bearing with respect to that.  And, with respect to the "knew or otherwise should have known" standard that otherwise may apply to the QTA claims of the Counties and possibly also to that of the State depending upon when it accrued, the United States contends that what plaintiffs did not know about likewise would be of no relevance.

Plaintiffs disagree.  They contend the withheld documents are relevant in at least two respects.  They contend the evidence is necessary and relevant to their being able to rebut the evidence proffered by the United States relating to certain proposed initiatives by the Forest Service for maintaining the pristine character of some of the lands in question by prohibiting new roads and/or vehicular traffic, which, for shorthand reference here, will be referred to collectively as the "roadless" proposals.  They also contend the evidence is relevant to whether the United States in fact had any position with respect to their claims of section line rights-of-way during the time periods

in question such that plaintiffs knew or should have known that it might contest their claimed rights-of-way. These arguments will be addressed in turn followed by some additional observations regarding relevancy.

**b.      Relevant to rebutting evidence of "roadless" proposals**

The United States contends that the various "roadless" proposals advanced by the Forest Service prior to September 16, 2000 (twelve years prior to the earliest filing of the two complaints in this action) amounted to a communication of its position that it deemed plaintiffs' section line right-of-way claims to be without merit if no road had been constructed prior to the repeal of R.S. 2477 as well as evidence of what plaintiffs "knew or should have known" about the position of the United States. Although these "roadless" proposals apparently never explicitly addressed the question of section line rights-of-way, the United States contends this was not necessary for purposes of its statute of limitations arguments because the proposals were so obviously in conflict with plaintiffs' claims.

Plaintiffs, on the other hand, contend there was no obvious conflict. They argue, among other things, that there never was a realistic possibility the mere existence of the rights to use the section lines for possible construction of roads would actually result in the construction of roads on every mile, in each direction, on the lands subject to the "roadless" proposals given several things. One is that some of the lands are so remote and the areas surrounding them so thinly populated that mere economics would prohibit widespread construction of new roads. In addition, for some of the lands, the terrain is so rugged along the section lines their use for roads is impracticable and, once there would be a need to deviate from the section lines, the United States would be able to exert control as a practical matter. Still another is that the State and Counties likely would agree that

some of the lands should remain roadless in order maintain their relatively pristine character and would cooperate with the Forest Service. Viewed from this framework, plaintiffs contend that a realistic and plausible construction of the "roadless" proposals is merely that no roads would be permitted where there were not already established rights to construct roads, including no new roads within the interior of the sections of land in the proposed "roadless" areas.

Turning to the possible relevancy of the withheld evidence, plaintiffs contend the real reason why the "roadless" proposals did not specifically address the question of section line roads was likely because of concerns that plaintiffs' claims of right-of-way were valid, or at least might be, and not because "roadless" obviously referred to all roads as the United States contends. Plaintiffs contend the withheld evidence could be at least circumstantial evidence of this concern and the reason for silence. If so, plaintiffs contend the withheld evidence would assist in their being able to rebut the argument that the "roadless" proposals were a communication by the United States of its position that plaintiffs' section line right-of-way claims were without merit as well as what plaintiffs reasonably should have gleaned from the proposals.

While it may very well be that the United States has more than enough evidence demonstrating plaintiffs were aware of its position without having to resort to the "roadless" proposal evidence, the United States has nevertheless offered the evidence and it is only fair that plaintiffs be given the opportunity to fully respond. And, at that this point, the undersigned is not prepared to conclude that the withheld evidence would be of no relevance to rebutting the "roadless" proposal evidence proffered by the United States.

### c. Relevant to whether the United States had a position that plaintiffs "knew or should have known" was contrary to their section line right-of-way claims

Plaintiffs' second and more granular argument is that the withheld evidence is relevant generally to whether it can be demonstrated they "knew or should have known" of the United States's position. In their brief, plaintiffs frame the argument this way:

> [I]t is illogical to demand the Plaintiffs should have known the position of the Defendant if there was no position, or if the position at the time was contrary to what the Defendant now argues Plaintiffs should have understood.

(Doc. No. 78, p. 5).

In the abstract, the logic of this argument seems inescapable. And, if there was conflicting OGC counsel advice with respect to the matters at issue, that might be circumstantial evidence for the lack of a position or there having been a position contrary to what the United States now claims.

That being said, having reviewed the withheld material, the undersigned has substantial doubts as to whether it will be of any practical benefit to plaintiffs in advancing this argument. If anything, it is more likely that the withheld evidence will provide the United States with a more complete explanation for why material that has been disclosed and is likely to be relied upon by plaintiffs may not have the significance they believe it has once it is put in context by the withheld material. Nevertheless, this assessment goes to the weight of the withheld evidence, and the undersigned is not prepared to conclude it is of no relevance to plaintiffs' second point.

### d. Additional observations re relevancy

Further complicating the question of relevancy is the fact the United States is not content to demonstrate that plaintiffs' claims had accrued as of September 16, 2000, which is twelve years prior to the earliest filing of the two complaints in this action. Rather, the United States is also

claiming that plaintiffs' claims accrued decades earlier. And, with respect to those arguments, the relevance of the withheld evidence must be assessed as of those earlier points in time. So, for example, what was going on in the early 1980s may have been more relevant to whether any of plaintiffs' claims accrued then as opposed to later, say in the late 1990s and 2000 time frame when what occurred in 1980 may have less relevance.

Finally, the United States' lack-of-relevancy arguments ring hollow when the United States has itself affirmatively relied on evidence of the same subject matter as the first category of withheld evidence to prove that plaintiffs had notice of its claims, including particularly the "Gippert memorandum." This is discussed in more detail later in connection with whether the United States waived its claim of attorney-client privilege as to some of the withheld documents.

## III.    THE CLAIMS OF ATTORNEY-CLIENT PRIVILEGE

### A.    Introduction

The United States contends that the withheld material is protected by the attorney-client privilege. Plaintiffs disagree. They contend the withheld material is likely not subject to the privilege based on their limited knowledge of its contents gleaned from the United States's privilege log. In the alternative, plaintiffs contend the privilege was waived before suit was commenced and again after.

### B.    Governing law

#### 1.    Federal common law governs the claim of privilege in this case

All evidentiary privileges asserted in federal court are governed, in the first instance, by Federal Rule of Evidence 501, which reads as follows:

**Rule 501.  Privilege in General**

The common law--as interpreted by United States courts in the light of reason and experience--governs a claim of privilege unless any of the following provides otherwise:
  • the United States Constitution;
  • a federal statute; or
  • rules prescribed by the Supreme Court.
But in a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision.

In this case, the court will look to federal common law given that the claim of privilege at issue is made by the United States and relates primarily to questions of federal law.  See, e.g., In re Grand Jury Subpoena Duces Tecum, 112 F.3d 910, 915 (8th Cir. 1997).

### 2.        The claim of attorney-client privilege by a governmental entity

The attorney client privilege "is the oldest of the privileges for confidential communications known to the common law."  Upjohn Co. v. United States, 449 U.S. 383, 389 (1981).  It exists "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice."  Id.  It is "perhaps, the most sacred of all legally recognized privileges, and its preservation is essential to the just and orderly operation of our legal system."  United States v. Bauer, 132 F.3d 504, 510 (9th Cir. 1997).

That being said, until perhaps more recently, there has been some question as to when the privilege can be claimed by a governmental entity given the competing desires for open, accessible, transparent, and honest government.  See, e.g., In re County of Erie, 473 F.3d 413, 418-19 (2d Cir. 2007); In re Grand Jury Subpoena Duces Tecum, 112 F.3d 910, 917-21 (8th Cir. 1997).  In the case of a governmental entity, these competing values are in addition to that of the public's right to "every man's evidence," which is compromised anytime a claim for privilege is honored.  See, e.g., Jaffee v. Redmond, 518 U.S. 1, 9 (1996).

19

Despite the additional considerations that arguably come into play when a governmental entity claims the attorney-client privilege, the Supreme Court recently suggested in <u>United States v. Jicarilla Apache Nation</u>, __ U.S. __, 131 S.Ct. 2313 (2011) ("<u>Jicarilla</u>") that a governmental entity enjoys the same attorney-client privilege in civil litigation as private litigants.  In particular, the Court stated:

> The objectives of the attorney-client privilege apply to governmental clients.  "The privilege aids government entities and employees in obtaining legal advice founded on a complete and accurate factual picture."  1 Restatement (Third) of the Law Governing Lawyers § 74, Comment *b*, pp. 573-574 (1998).  Unless applicable law provides otherwise, the Government may invoke the attorney-client privilege in civil litigation to protect confidential communications between Government officials and Government attorneys.  <u>Id.</u>, at 574 ("[G]overnmental agencies and employees enjoy the same privilege as nongovernmental counterparts").

131 S.Ct. at 2320-21.

Prior to <u>Jicarilla</u>, the Second Circuit had staked out the same position and elaborated more fully upon the reasons why as follows:

> The attorney-client privilege accommodates competing values; the competition is sharpened when the privilege is asserted by a government.  On the one hand, non-disclosure impinges on open and accessible government.  <u>See</u> <u>Reed v. Baxter</u>, 134 F.3d 351, 356-57 (6th Cir.1998).  On the other hand, public officials are duty-bound to understand and respect constitutional, judicial and statutory limitations on their authority; thus, their access to candid legal advice directly and significantly serves the public interest:
>
> > We believe that, if anything, the traditional rationale for the [attorney-client] privilege applies with special force in the government context.  It is crucial that government officials, who are expected to uphold and execute the law and who may face criminal prosecution for failing to do so, be encouraged to seek out and receive fully informed legal advice.  Upholding the privilege furthers a culture in which consultation with government lawyers is accepted as a normal, desirable, and even indispensable part of conducting public business.  Abrogating the privilege undermines that culture and thereby impairs the public interest.
>
> <u>In re Grand Jury Investigation</u>, 399 F.3d at 534.  Access to legal advice by officials responsible for formulating, implementing and monitoring governmental policy is fundamental to "promot[ing] broader public interests in the observance of law and administration of justice," <u>Upjohn</u>, 449 U.S. at 389, 101 S.Ct. 677.  At least in civil litigation between a government agency and private litigants, the government's claim to the protections of the attorney-client privilege is on a par with the claim of an individual or a corporate entity.

In re County of Erie, 473 F.3d at 418-19.  Likewise, the American Law Institute in its Restatement (Third) of the Law Governing Lawyers (which the Supreme Court relied upon in Jicarilla) essentially took the same position in § 74, stating as its rationale for doing so:

> *b.* Rationale.  The objectives of the attorney-client privilege (see § 68, Comment c), including the special objectives relevant to organizational clients (see § 73, Comment b), apply in general to governmental clients.  The privilege aids government entities and employees in obtaining legal advice founded on a complete and accurate factual picture.  Communications from such persons should be correspondingly privileged.
>
> A narrower privilege for governmental clients may be warranted by particular statutory formulations.  Open-meeting and open-files statutes reflect a public policy against secrecy in many areas of governmental activity.  Moreover, unlike persons in private life, a public agency or employee has no autonomous right of confidentiality in communications relating to governmental business.
>
> Nonetheless, the legal system has recognized the strategic concerns of a public agency or officer in establishing and asserting public legal rights.  Even public legal rights are contingent at their boundaries and subject to argumentation and dispute as to their precise extent.  Members of the public who assert legal interests against a public agency or officer act not in the general public interest but in their private interest or in what they assert is the public interest.  The public acting through its public agencies is entitled to resist claims and contentions that the agency considers legally or factually unwarranted.  To that end, a public agency or employee is entitled to engage in confidential communications with counsel to establish and maintain legal positions.  Accordingly, courts generally have construed open-meeting, open-files, whistle-blower, and similar statutes as subject to the attorney-client privilege, recognizing that otherwise governments would be at unfair disadvantage in litigation, in handling claims and in negotiations.
>
> A privilege that would cover only litigation, including claims or investigations, would be a plausible alternative.  Rule 502(d)(6) of the Revised Uniform Rules of Evidence proposed a governmental-client privilege thus limited, but most states rejected that limitation.  Another alternative would be a general but qualified privilege protecting confidential communications unless a tribunal found good cause to require disclosure.  The privilege for the government could also be limited to a stated period of time (compare § 77, Reporter's Note to Comment c).  More particularized rules may be necessary where one agency of government claims the privilege in resisting a demand for information by another.  Such rules should take account of the complex considerations of governmental structure, tradition, and regulation that are involved.
>
> This Section, however, states the generally prevailing rule that governmental agencies and employees enjoy the same privilege as nongovernmental counterparts.  In any event, information covered by the privilege would, in some situations, be protected from disclosure by such rules as executive privilege or state secrets.  Of course, a legislative determination of a need for less confidentiality, for example in a statute that limits attorney-client confidentiality in areas outside of litigation, would prevail over the common-law rule stated in this Section.

Restatement (Third) of the Law Governing Lawyers § 74, comment *b* (2000) ("Rest. 3d Law Gov. Lawyers").

On the other hand, there are cases where courts have rejected or narrowly applied a claim of privilege by a governmental entity in part because of the competing values that are unique to a claim of privilege by a governmental entity. See generally Rest. 3d Law Gov. Lawyers § 74, Reporter's Notes to comment *b*. The court will return to this subject more specifically later since plaintiffs in this case rely upon several of these cases.

C.   **Plaintiffs' argument that the claims of attorney-client privilege fail because the withheld documents do not directly or indirectly reveal any confidential communications to defendant's attorneys**

Plaintiffs contend that it is unlikely that any confidential agency information was communicated (1) to OGC attorneys Hankins and Wood when their opinions were sought regarding the meaning of R.S. 2477 and North Dakota's section line statute with respect to the first category of withheld documents, or (2) to the attorneys who prepared the title opinions that are the subject of the second category of withheld documents. But, even if confidential information was communicated to Hankins, Wood, or the title attorneys, plaintiffs contend that the withheld documents are unlikely to disclose either directly or indirectly what any such *client* confidential communication may have been. Plaintiffs argue that, if the court concludes either of these are the case after an *in camera* review, the documents are not subject to the attorney-client privilege. In support, plaintiffs cite to cases that take a narrow approach to the attorney-client privilege as it pertains to attorney opinions and communications by the attorney to the client.

1.      **The differing approaches to attorney opinions and communications**

If the only justification for the attorney-client privilege is to encourage full disclosure of information by the client to the attorney as some have suggested, an argument could be made that only what is communicated by the client in confidence to the attorney should be treated as privileged and not vice-versa.  See, e.g., 1 McCormick on Evidence § 89 (5th ed. 1999).  However, today most courts would consider privileged at least some communications from an attorney to a client with the principal disagreement being over to what extent.  It has been suggested that the cases addressing this subject have taken one of three approaches:

•      The most narrow approach is that communications from the attorney to the client are privileged only if they reveal a confidential communication from the client to the attorney or, slightly more broadly, do so circumstantially.  An example of a case discussing this approach is United States v. Silverman, 430 F.2d 106 (2d Cir. 1970), where the Second Circuit stated:

> The privilege as commonly formulated refers to a confidential communication from the client to the attorney.  8 Wigmore, Evidence § 2292 (McNaughton rev. ed. 1961); compare Uniform Rule of Evidence 26 ('between lawyer and his client').  Wigmore states that the reason for bringing communications from the attorney to the client within the privilege is to prevent adopted admissions or inferences of the tenor of the client's communication. 8 Wigmore, Evidence 2320 (McNaughton rev. ed. 1961). The purpose of the privilege, the encouragement of full disclosure to the attorney in procuring legal advice, implies that a communication from an attorney is not privileged unless it has the effect of revealing a confidential communication from the client to the attorney.

Id. at 122.

•      Another approach, which is deemed by some to be an "intermediate" one, is that attorney communications are privileged if they are based on confidential information

provided by the client.  A case often cited for this approach is <u>Schlefer v. United States</u>, 702 F.2d 233 (D.C. Cir. 1983), where the court stated:

> The attorney-client privilege in federal courts protects communications from attorney to client to avoid the risk of inadvertent, indirect disclosure of the client's confidences.  <u>Mead Data</u>, <u>supra</u>, 566 F.2d at 254 n. 25.  The privilege operates when 1) the communication from attorney to client is confidential, and 2) communication is based on confidential information provided by the client.  <u>Id.</u> at 254.

<u>Id.</u> at 245 (footnote omitted); <u>see</u> <u>also</u> <u>State of Maine v. United States Dept. of Interior</u>, 298 F.3d 60, 70-72 (1st Cir. 2002).   While this approach does not require that the attorney communication disclose or tend to disclose a confidential client communication to be privileged, it arguably adds a new point of emphasis in terms of its requirement that "confidential information" must have been provided to the attorney and not just a "confidential communication."  <u>See</u>, <u>e.g.</u>, <u>Yankee Atomic Electric Co. v. United States</u>, 54 Fed. Cl. 306, 313-16 (Ct. Fed. Cl. 2002) (discussing the difference).

- The broadest approach is that  attorney opinions and communications are privileged if made or rendered during the course of giving legal advice, irrespective of any relationship to a confidential communication by the client or the client having provided confidential information.  A case frequently cited for a discussion of this approach is the Third Circuit's decision in <u>United States v. Amerada Hess Corp.</u>, 619 F.2d 980 (3d Cir. 1980).  In that case, the Third Circuit stated:

> Legal advice or opinion from an attorney to his client, individual or corporate, has consistently been held by the federal courts to be within the protection of the attorney-client privilege. [citations omitted]. Two reasons have been advanced in support of the two-way application of the privilege. The first is the necessity of preventing the use of an attorney's advice to support inferences as to the content of confidential communications by the

client to the attorney.  8 Wigmore on Evidence s 2320 (McNaughton Rev. 1961).  The second is that, independent of the content of any client communication, legal advice given to the client should remain confidential. [citation omitted].  To the extent that the trial court predicated its ruling on the general inapplicability of the privilege to communications from the attorney to the client we disapprove of it.

Id. at 986.

See, e.g., Stovall v. United States, 85 Fed. Cl. 810, 814-15 (Ct. Fed. Cl. 2009) ("Stovall") (discussing the three approaches); Potts v. Allis-Chalmers Corp., 118 F.R.D. 597, 602-03 (N.D. Ind. 1987); Federal Testimonial Privileges § 2:13 (2d ed. Westlaw database updated Nov. 2014) (same); C. Wright & K. Graham, 24 Federal Practice and Procedure:  Evidence § 5491 (1986) ("Wright & Graham") (discussing the three approaches but cautioning that the opinions are more diverse than this categorization suggests); Edna Epstein, The Attorney-Client Privilege and the Work-Product Doctrine pp. 76-86 (5th ed. 2007) ("Epstein") (discussing the narrower and broader approaches).

In Sedco International, S.A. v. Cory, 683 F.2d 1201 (8th Cir. 1982)("Sedco"), the Eighth Circuit observed the tension in the cases when it remarked:

Legal advice is clearly privileged to some degree.  Compare 8 J. Wigmore, Wigmore on Evidence s 2320 (McNaughton ed. 1961) and Fed.R.Evid. 503 advisory committee note (full privilege) with In re Fischel, 557 F.2d 209, 211 (9th Cir. 1977) and United States v. United Shoe Machinery Corp., 89 F.Supp. 357, 358-59 (D.Mass.1956) (privileged to extent necessary to prevent disclosure of client's confidential communication).

Id. at 1205.  Then, without adopting a particular approach, the Eighth Circuit concluded in Sedco that the trial court had not erred in upholding the privilege since the advice given by counsel in that case might have tended to reveal the client's confidential communications.  Id. at 1206-07.

The parties have not cited to an Eighth Circuit case expressly adopting one of the three approaches.  However, as discussed later, it appears the Eighth Circuit has at least  implicitly adopted the broadest approach.

## 2. The materiality of plaintiffs' argument as to the scope of the privilege as it pertains to attorney communications

As already alluded to, plaintiffs have urged the court to follow one of the narrower approaches to attorney communications and reject the claims of privilege made by the United States. In this case, the differences in approach could be material to what attorney opinions and communications are subject to the privilege, keeping in mind that the mere request for an opinion and the general purpose for the request may not be confidential in many instances. See, e.g., Diversified Industries, Inc. v. Meredith, 572 F.2d 596, 603 (8th Cir. 1977); Colton v. United States, 306 F.2d 633, 636 (2d Cir. 1962); 7 Rest. 3d Law Gov. Lawyers § 69, comment *g*.

More particularly, it may be a close question whether disclosure of one or more of the 1962 and 1980 OGC opinions would tend to disclose any client communication that would be considered *confidential*. The opinions themselves appear to be based upon the wording of the relevant statutes and, to a certain extent, prior administrative and court decisions and not upon any confidential information that was communicated by the agency to the attorneys.

The same may also very well be true for some or all of the title opinions. The United States contends that the title opinions are based on confidential client communications because the attorneys issuing the opinions were provided with (1) title insurance commitments or final title policies, which the United States contends are confidential, and (2) agency staff's views regarding exceptions to title listed in the title insurance documents as well as other issues of title that may not have been identified in the public records. While it may be that documents expressing agency staff's views about certain title matters may fall with the scope of a confidential client communication, it does not appear from what the court has reviewed that this sort of communication exists for very many of the title opinions at issue, much less whether such communications were ever intended to

confidential. The court is also skeptical that title insurance commitments and final policies are confidential for purposes of the attorney-client privilege since they involve a commercial transaction with a third party title insurer.

Because of the conclusion set forth below that the broadest approach to the privilege applies, the court need not undertake a detailed analysis for each of the attorney opinions at issue whether the disclosure of the opinion would tend to reveal any client communication that truly was confidential or whether it based on confidential client information.

### 3. The broadest approach likely now applies as a matter of federal common law for purposes of Rule 501

It appears the Eighth Circuit and, more importantly the United States Supreme Court, would follow the broadest approach to the attorney-client privilege - if they have not done so already. In other words, they would treat confidential communications from an attorney as privileged if made for the purpose of rendering legal advice, regardless of whether they would tend to reveal a confidential communication from the client to the attorney and regardless of whether they were "based upon" a such communication of confidential information. The court reaches this conclusion for a number of reasons.

First, the broadest approach is by no means new and appears to have been the approach taken by Wigmore. J. Wigmore, 8 <u>Wigmore on Evidence</u> § 2320 (McNaughton rev. 1961); <u>see</u> 24 <u>Wright & Graham</u> at § 5491 (discussing Wigmore's approach); <u>Rest. 3d Law Gov. Lawyers</u> § 69, Reporters Notes to comment *i* (same).[9]

---

[9] <u>Wright & Graham</u> states, in relevant part, the following:

    Wigmore tells us that it has always been assumed that the attorney-client privilege applied to the attorney's communications to the client. He concedes that no incentive is required to encourage the lawyer to speak to the client inasmuch as that is what he is paid to do, but argues that the policy of the privilege supports its extension to attorney communications because these might reveal the

Second, the broadest approach has gaining in acceptance. Notably, it has been adopted by the Uniform Rules of Evidence, the American Law Institute in its Third Restatement of the Law Governing Lawyers, and a number of state evidence codes. See Rest. 3d Law Gov. Lawyers § 69, comment *i* and accompanying Reporter's Notes.[10] This is relevant given that the Supreme Court in Jaffee held that Congress's adoption of Fed. R. Evid. 501 did not freeze the law governing privileges to the time of its adoption or to any earlier time. The Court stated:

> Rule 501 of the Federal Rules of Evidence authorizes federal courts to define new privileges by interpreting "common law principles . . . in the light of reason and experience." The authors of the Rule borrowed this phrase from our opinion in Wolfle v. United States, 291 U.S. 7, 12, 54 S.Ct. 279, 280, 78 L.Ed. 617 (1934), which in turn referred to the oft-repeated observation that "the common law is not immutable but flexible, and by its own principles adapts itself to varying conditions." Funk v. United States, 290 U.S. 371, 383, 54 S.Ct. 212, 216, 78 L.Ed. 369 (1933). See also Hawkins v. United States, 358 U.S. 74, 79, 79 S.Ct. 136, 139, 3 L.Ed.2d 125 (1958) (changes in privileges may be "dictated by 'reason and experience'"). The Senate Report accompanying the 1975 adoption of the Rules indicates that Rule 501 "should be understood as reflecting the view that the recognition of a privilege based on a confidential relationship . . . should be determined on a case-by-case basis." S.Rep. No. 93-1277, p. 13 (1974) U.S.Code Cong. & Admin.News 1974, pp. 7051, 7059. The Rule thus did not freeze the law governing the privileges of witnesses in federal trials at a particular point in our history, but rather directed federal courts to "continue the evolutionary development of testimonial privileges." Trammel v. United States, 445 U.S. 40, 47, 100 S.Ct. 906, 910, 63 L.Ed.2d 186 (1980); see also University of Pennsylvania v. EEOC, 493 U.S. 182, 189, 110 S.Ct. 577, 582, 107 L.Ed.2d 571 (1990).

518 U.S. at 8-9 (footnotes omitted).

---

client's communication to the attorney and thus erode the client's incentive to speak. Although other writers have echoed Wigmore's assessment, it is apparent that the common law courts were split on this question. Some state privilege statutes were limited to client communications, though these were sometimes interpreted to apply to attorney communications as well. The earlier codifications were also split. Some followed the Rejected Rule in making all attorney communications privileged, while others limited the privilege to the lawyer's advice to the client. The Advisory Committee gave no indication of its reasons for rejecting narrower formulations of the privilege.
Wright & Graham at § 5491 (footnotes omitted).

[10] It is somewhat surprising that the State and the Counties have advocated here for the narrower approach since North Dakota appears to have made the policy choice of treating as privileged all confidential communications by an attorney to a client if made for the purpose of rendering professional legal services in N.D. R. Evid. 502.

Third, as observed by the Eighth Circuit in Sedco, the broadest approach was the one taken by the Proposed Fed. R. Evid. 503, which the Supreme Court approved and submitted to Congress for approval in 1972 along with rules addressing other testimonial privileges.[11] And, while acknowledging that the proposed rules are not binding since they were never adopted, the Eighth Circuit, as well as other federal courts, have looked to the proposed rules for guidance as to what the federal common law is or should be on the subject. See, e.g., United States v. Ghane, 673 F.3d 771, 782 (8th Cir. 2012) (The proposed rules are a useful starting point since "the Supreme Court, and this court, too, has looked to these proposed standards to inform the definition of the federal common law of privileges, despite the failure of Congress to enact such a detailed article on privileges."); In re Grand Jury Investigation, 399 F.3d 527, 532 (2d Cir. 2005) (same); In re Grand Jury Investigation, 918 F.2d 374, 380 (3d Cir. 1990) (same); In re Bieter Co., 16 F.3d 929, 935 (8th Cir. 1994) (Rule 503 is "'an accurate definition of the federal common law of attorney-client privilege.'") (quoting 2 Jack Weinstein, et al., Weinstein's Evidence ¶ 503[02], at 503-17 (1975)).

Fourth, while the Supreme Court may not have addressed the issue explicitly, what the Court had to say about the privilege in Upjohn supports an argument that it has already recognized the broadest approach, consistent with its earlier approval of the Proposed Rule 503. This includes the

---

[11]  As recounted by the Supreme Court in Jaffee:

> In 1972 the Chief Justice transmitted to Congress proposed Rules of Evidence for United States Courts and Magistrates. 56 F.R.D. 183 (hereinafter Proposed Rules). The Rules had been formulated by the Judicial Conference Advisory Committee on Rules of Evidence and approved by the Judicial Conference of the United States and by this Court. Trammel v. United States, 445 U.S. 40, 47, 100 S.Ct. 906, 910, 63 L.Ed.2d 186 (1980). The Proposed Rules defined nine specific testimonial privileges, including a psychotherapist-patient privilege, and indicated that these were to be the exclusive privileges absent constitutional mandate, Act of Congress, or revision of the Rules. Proposed Rules 501-513, 56 F.R.D., at 230-261. Congress rejected this recommendation in favor of Rule 501's general mandate. Trammel, 445 U.S., at 47, 100 S.Ct., at 910.

518 U.S. at 8 n.7; see generally Wright & Graham § 547.

following sentence from the Court's discussion in Upjohn where it rejected the view that the attorney-client privilege should only extend to communications from an attorney to the "control group" of a corporation:

> Such a view, we think, overlooks the fact that the privilege exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice.

449 U.S. at 390; see Stovall, 85 Fed. Cl. 815 n. 6 (stating that the broadest approach finds support in the above passage from Upjohn); Epstein at 82-83 (quoting this passage from Upjohn as reflective of the broadest approach).

Likewise, for many of the same reasons, it can be argued that the Eighth Circuit has implicitly adopted the broadest approach since it has not suggested any limitation on the privilege as it applies to attorney communications in the opinions where such communications have been referenced. See, e.g., PaineWebber Group, Inc. v. Zinsmeyer Trusts Partnership, 187 F.3d 988 (8th Cir. 1999) ("PaineWebber"); In re Bieter Co., 16 F.3d 929 (8th Cir. 1994). For example, the court stated the following in PaineWebber:

> The Supreme Court confirmed that the privilege applies broadly to communications made by corporate employees to counsel to secure legal advice from counsel. Id. at 394, 101 S.Ct. 677. We have likewise applied the privilege to communications to and from corporate attorneys investigating their client's possible violations of federal securities law. See Diversified Indus., Inc. v. Meredith, 572 F.2d 596, 600-01 (8th Cir. 1977), followed in In re Bieter Co., 16 F.3d 929, 935-36 (8th Cir. 1994). These cases confirm that PaineWebber had a reasonable basis for asserting that the attorney/client privilege, and perhaps the work product doctrine, protected from discovery in the arbitration at least some internal communications to and from the PaineWebber attorneys who conducted the investigation of Reik's trading activities.

187 F.3d at 991-92.

Fifth, the reasons for adopting the broadest approach are persuasive and include the following:

- The broadest approach may be somewhat easier to administer.  <u>See</u>, <u>e.g.</u>, <u>Epstein</u> at 81 ("In practice, the theoretical separation alluded to by the strict-construction line of cases between those attorney communications that do and those that do not reveal the confidential confidence, is hard to maintain."); <u>Wright & Graham</u> at § 5491 n.46 ("Unless the court is going to take the lawyer's word for it, it is hard to see how the court can determine whether revelation of the lawyer's advice would be a revelation of client communications without looking at all of the communications between them.  If the test is whether the lawyer's advice is "based on" the client's communication, this will either leave a large element of subjectivity in trial court rulings or require the development of some standards for making this determination.").

- Arguably, the broadest approach is also more predictable for the participants when, like here, an organization is involved, because it does not require that the participants be aware of the full scope of the communications by agency personnel to the attorney to be able to judge whether a particular attorney communication will be privileged. The Supreme Court in <u>Jaffee</u> reinforced the importance of predictability when it stated:

> As we explained in <u>Upjohn</u>, if the purpose of the privilege is to be served, the participants in the confidential conversation "must be able to predict with some degree of certainty whether particular discussions will be protected.  An uncertain privilege, or one which purports to be certain but results in widely varying applications by the courts, is little better than no privilege at all."  449 U.S., at 393, 101 S.Ct., at 684.

518 U.S. at 17-18.

- The communication by the attorney to the client can often be manipulated to invoke the narrower approaches by structuring the communication to reflect an underlying request for legal advice based on purported client confidential information. "The fact that such artificial manipulations are possible or necessary, however, calls into question the validity of the narrow view of the privilege." Epstein at p. 82.

- Finally, and most importantly, there are sound policy reasons for the broadest approach. Wigmore believed the mere uncertainty as to whether an attorney's advice might be revealed would inhibit clients from speaking freely. Wright & Graham, at § 5491. In addition, the broadest approach "provides assurance to lawyers to be forthcoming in giving candid advice." Rest. 3d Law Gov. Lawyers at § 69 Reporter's Notes to comment *i*. Elaborating more on this point, one leading author on the subject has stated:

> The broader application of the privilege to attorney communication is consistent with the concept that the purpose of the privilege is to encourage *two-way* communication in the context of an attorney-client relationship. Under this broader view of the privilege, it is just as important that a client receive candid legal advice as it is desirable that a client be forthcoming with the lawyer. Indeed, the very purpose of encouraging the client to be forthcoming is so that the client may receive candid legal advice. Accordingly, under the broader view, both kinds of communications are protected from disclosure — a client's communication to an attorney and an attorney's communication to the client.

Epstein at 82.

### 4. Whether the broadest approach should apply when the claim of privilege is by a governmental entity

Perhaps more difficult is the question of whether the broadest approach should apply when the claim of privilege is asserted by a governmental entity given the additional competing values that come into play as noted earlier. There are cases where courts have either taken the position or

continue to recite in *dicta* that the privilege only applies when the communication or opinion by a governmental attorney would reveal directly or indirectly the substance of a confidential communication from the agency client or, in some cases, was more broadly based upon such a communication. See, e.g., Coastal States Gas Corp. v. Dep't of Energy, 617 F.2d 854, 863 (D.C. Cir. 1980) ("Coastal States"); Oasis Int. Waters, Inc. v. United States, 110 Fed. Cl. 87, 98 (2013); Rest. 3d Law Gov. Lawyers § 74, Reporter's Notes to comment *c*.

One of the most frequently cited of these cases relied upon by plaintiffs here is the D.C. Circuit's 1980 decision in Coastal States. In that case, the D.C. Circuit addressed whether memoranda from the DOE's regional counsel providing interpretations of department regulations to auditors working in the DOE's field offices were privileged. The D.C. Circuit concluded that they were not and one of the reasons why was lack of evidence indicating the attorney opinions were based on the communication of confidential agency information to the attorneys. The court stated:

> Like all privileges, however, the attorney-client privilege is narrowly construed and is limited to those situations in which its purposes will be served. The Supreme Court has stated that the privilege "protects only those disclosures necessary to obtain informed legal advice which might not have been made absent the privilege." Fisher v. United States, 425 U.S. 391, 403, 96 S.Ct. 1569, 1577, 48 L.Ed.2d 39 (1976). We have difficulty in perceiving any purpose which would be served by applying the attorney-client privilege in this case. While it is clear that an agency can be a "client" and agency lawyers can function as "attorneys" within the relationship contemplated by the privilege, this does not seem to be such a case. It is hard to imagine the "confidential information" which an auditor might have communicated to the regional counsel. The factual situations the auditor communicates to the attorneys are encountered in the course of auditing third parties, the companies. They do not contain private information concerning the agency. Rather than "counseling," intended to assist the agency in protecting its interests, the memoranda here seem to be neutral, objective analyses of agency regulations. They resemble, in fact, question and answer guidelines which might be found in an agency manual.

617 F.2d at 862-63. In reaching this conclusion, the D.C. Circuit was obviously applying one of the narrower approaches to a claim of attorney-client privilege as it relates to attorney communications and opinions. This is evident from the court's focus upon whether any "confidential information"

had been communicated to the regional attorneys as well as the court's description of the privilege that preceded the above discussion where the court stated:

> While its [the attorney-client privilege's] purpose is to protect a client's disclosures to an attorney, the federal courts extend the privilege also to an attorney's written communications to a client, to ensure against inadvertent disclosure, either directly or by implication, of information which the client has previously confided to the attorney's trust.

Id. at 862.[12]

The fact that Coastal States is at odds with the broadest approach to the privilege was the subject of an extended discussion by the New Jersey Superior Court in Pfaff v. Division of Law, 988 A.2d 1239 (N.J. Super. Ct., App. Div. 2010). What was at issue in Pfaff were unpublished Administrative Agency Advice ("AAA") letters issued by the New Jersey Attorney General's Office through its Division of Law to client agencies providing interpretations of statutes and regulations that the agencies were required to enforce. Apparently, the AAA letters would not often contain or tend to disclose confidential agency information.

The New Jersey appellate court in Pfaff concluded that the AAA letters were subject to the protection of the attorney-client privilege under New Jersey law and, in the process of so deciding, rejected what it characterized as the "miserly view" of the privilege by the D.C. Circuit in Coastal States as well as in another one of its cases, Tax Analysts v. Internal Revenue Service, 117 F.3d 607

---

[12] Plaintiffs in their brief contend Coastal States stands for the proposition that "the attorney-client privilege does not protect memoranda that provide 'neutral, objective analyses of agency regulations' or that resemble 'question and answer guidelines which might be found in an agency manual.'" However, in advancing this argument, plaintiffs have arguably taken what the court stated out-of-context. The court in Coastal States never concluded that the garden-variety advice rendered was not privileged because of it nature. Rather, as discussed above, the court concluded that the attorney communications in that case were not privileged because no confidential agency information had been imparted to the attorneys seeking the advice. In addition, as a separate grounds for rejecting the claim of privilege, the court concluded the communications were not privileged because their dissemination was not limited to members "of the organization who are authorized to speak or act for the organization in relation to the subject matter of the communication." 617 F.2d at 863 (quotation omitted). Arguably, however, the latter is in conflict with the Supreme Court's decision a year later in Upjohn rejecting the "control group" test - at least to the extent that a governmental is entitled to essentially the same privilege as nongovernmental entities as suggested by the Court in Jicarilla.

(D.C. Cir. 1997). Because <u>Pfaff</u> does a good job of highlighting the competing policy choices at stake when the claim of privilege is made by a governmental entity, the court's discussion is set forth at length as follows:

> The Division counters plaintiff's argument by contending that AAAs are privileged because they are confidential legal advice, and not merely objective analyses of the law, as was the case in <u>Tax Analysts</u> and <u>Coastal States</u>. The Division relies on our decision in <u>Board of Education of West Windsor–Plainsboro Regional School District v. Board of Education of Delran</u>, where we held that the AAA at issue in the case "was not a binding opinion, nor was it an administrative determination, but advice by the Attorney General to a client, which the client could accept or reject." 361 N.J.Super. 488, 493, 825 A.2d 1215 (App. Div. 2003), <u>certif.</u> <u>denied</u>, 178 N.J. 454, 841 A.2d 92 (2004).
>
> We agree that the AAAs are exempt from disclosure under OPRA because they are protected by the attorney-client privilege, but we reach that conclusion by a different path than the one urged by the Division. In particular, on the present state of the record we are unable to determine whether the Division is correct when it asserts that client confidences permeate the AAAs. For that reason, we do not consider the AAAs to be privileged on such grounds.
>
> Instead we conclude that state agencies requesting legal advice from their attorneys concerning the exercise of the statutory responsibilities they are required by law to discharge are entitled to receive legal advice from their attorneys on a confidential basis. In <u>Grand Jury Subpoenas</u>, <u>supra</u>, 241 N.J.Super. at 28, 574 A.2d 449, as we have already noted, we "ha[d] no hesitancy in holding that the privilege is fully applicable to communications between a public body and an attorney [who] represent[s] it." We held that the privilege applied even to the portion of the attorneys' work that "contain[ed] a thorough review of the State statutes and regulations" that govern the functioning of a County Adjuster's office. <u>Id.</u> at 22, 30, 574 A.2d 449. So long as the attorney is providing "confidential communications" to an administrative agency client "within the context of the strict relation of attorney and client," a "shield of secrecy" protects that legal advice from disclosure. <u>Id.</u> at 30, 574 A.2d 449.
>
> As is evident, we drew no distinction in <u>Grand Jury Subpoenas</u> between an attorney's role in "formulat[ing] the law to be applied to others"—which was the basis for the District of Columbia Court of Appeals' rejection of the claimed privilege in <u>Tax Analysts</u>, <u>supra</u>, 117 F.3d at 619—and the more traditional role of an attorney who represents a client in a litigated matter. Unlike the <u>Tax Analysts</u> court, we did not carve out an exception to the attorney-client privilege for legal opinions that interpret the statutes the agency is required to enforce. Although the lawyer "rendering the legal opinion in effect is making law," <u>ibid.</u>, we did not view that circumstance as a basis for stripping such attorney-client communication of the protection of the privilege. Nothing in the decisional or statutory law of this State would support the miserly view of the attorney-client privilege that the D.C. Circuit adopted in <u>Tax Analysts</u> and <u>Coastal States</u> when it held that an attorney's opinion interpreting statutes and regulations is not protected by the attorney-client privilege.
>
> Although our courts have recognized that the attorney-client privilege must be "construed strictly" because privileges "hav[e] a tendency to prevent the full disclosure of the truth," <u>Selser</u>, <u>supra</u>, 15 N.J. at 406, 105 A.2d 395, New Jersey's jurisprudence supports

a more generous view of the privilege than that adopted by the District of Columbia Court of Appeals in <u>Tax Analysts</u> and <u>Coastal States</u>. So long as the attorney is "providing legal advice *in some form*," the privilege will apply. <u>Payton</u>, <u>supra</u>, 148 N.J. at 550, 691 A.2d 321 (emphasis added). As we observed in <u>Grand Jury Subpoenas</u>, our law rejects the sort of two-tiered classification of clients that the Court of Appeals ultimately embraced in <u>Tax Analysts</u>, <u>supra</u>, 117 F.3d at 619, when it held that the legal advice provided to a government client is not afforded the benefit of the attorney-client privilege when such advice concerns the interpretation of the statutes and regulations that the agency is responsible for enforcing.

Unlike the federal court, we held, in the public sector context, that "sound legal advice . . . serves public ends . . . ." <u>Grand Jury Subpoenas</u>, <u>supra</u>, 241 N.J.Super. at 27, 574 A.2d 449. We recognized in <u>Grand Jury Subpoenas</u> that a public agency has the same need for legal advice on the interpretation of the statutes that control its relationship with the public as does a corporation when the corporation seeks legal advice about the impact of a statute on its dealing with the public. <u>Id.</u> at 29, 574 A.2d 449.

Thus, unlike the District of Columbia Court of Appeals, we are satisfied that an administrative agency or other public body is entitled to maintain the confidentiality of the legal advice it receives from its attorney concerning the interpretation of the very statutes and regulations that the agency is responsible for enforcing. We see no reason to conclude that such legal advice is any less deserving of the protection afforded by the attorney-client privilege than the advice provided by corporate counsel to its clients. We thus part company with the District of Columbia Court of Appeals and choose not to adopt its <u>Coastal States</u> or <u>Tax Analysts</u> holdings.

988 A.2d at 1248-50. Echoing these observations in <u>Pfaff</u> is what the Second Circuit had to say in the passage from <u>In re County of Erie</u> quoted earlier about the rationale for extending the attorney-client privilege to governmental entities as well as its conclusion that the district court had erred in that case in concluding the emails in question were not privileged . <u>In re County of Erie</u>, 473 F.3d at 418-423.

While the matter is not without doubt, the court believes the Supreme Court and the Eighth Circuit would conclude that the reasons for applying the broadest approach to claims of privilege by a governmental entity outweigh the considerations for not doing so, keeping in mind that Congress has the authority to decide differently for some or all attorney opinions and communications. As noted by New Jersey Superior Court and the Second Circuit, these reasons include the commonsense notion that governmental decisions based on sound legal advice advance the public interest and that the broadest approach facilitates this by not only encouraging public

officials to seek legal advice but also by encouraging governmental attorneys to respond with frank, candid advice.

**D.    Plaintiffs' argument that the 1960's and 1980's OGC opinions are not privileged because they form the basis of federal policy**

Plaintiffs contend that the opinions by OGC attorneys Hankins and Wood are not privileged because they form the basis of federal policy with respect to the application of R.S. 2477.  Plaintiffs cite to <u>National Council of La Raza v. Department of Justice</u>, 411 F.3d 350 (2d Cir. 2005).  In <u>La Raza</u>, the United States Attorney General had repeatedly and publically made reference to an Office of General Counsel memorandum as authority for why state and local law enforcement could lawfully enforce the civil provisions of immigration law.  The Second Circuit rejected the government's claim of attorney-client privilege with respect to the memorandum on two grounds. The one material to the discussion here is the court's conclusion that the privilege does not extend to attorney opinions that are adopted or incorporated by reference into the agency's policy, which the court concluded happened in that case.  <u>Id.</u> at 360.

Even if the Eighth Circuit would follow <u>La Raza</u>, it has no application here.  There is no evidence the Forest Service represented to the public that the particular OGC opinions in question represented the official Department of Agricultural policy (as opposed to, perhaps, indicating that guidance needed to be obtained from the OGC) - much less someone with the level of authority comparable to the Attorney General in <u>La Raza</u>.  In fact, it appears clear from what plaintiffs have tendered in support of their motion to compel and the material the court has reviewed separately *in camera* that even the mid- to lower-level Forest Service officials who are involved in the documents

in question did not blindly follow every opinion issued by the OGC and that ultimately Forest Service supervisory personnel decided not to follow the 1980 opinions.[13]

### E. **Plaintiffs' argument that title opinions are not privileged**

Plaintiffs argue that the title opinions they seek are not privileged because typically title opinions "review information from public records and reach conclusions regarding title and burdens on that title" and do not normally contain confidential client communications. In making this argument, plaintiffs rely primarily upon the narrower approaches to the attorney-client privilege that are rejected above. When the broadest approach to the privilege is applied, there is no reason why title opinions should be treated any differently from other attorney opinions, so long as the title opinions have been kept confidential, which appears to have been the case here.

### F. **Plaintiffs' arguments that the United States has waived the attorney-client privilege**

#### 1. **Governing law**

##### a. **Waivers governed by Fed. R. Evid. 502(a)**

The pathway to resolving plaintiffs' claims of intentional waiver after commencement of this case is governed by Fed. R. Evid. 502(a), which reads as follows:

**Rule 502. Attorney-Client Privilege and Work Product; Limitations on Waiver**

The following provisions apply, in the circumstances set out, to disclosure of a communication or information covered by the attorney-client privilege or work-product protection.

---

[13] The court also notes that the issue here is of greater magnitude than, for example, the question of whether a particular applicant has met Forest Service requirements for obtaining a grazing permit. Even within the USDA, the scope of R.S. 2477 as it applies to those states that have attempted to declare geographic lines a road is huge given the amount of land it impacts. Absent some official adoption or publication by the USDA, it is absurd to think that an opinion by a line attorney within a regional office of the USDA, OGC could be taken as representing its policy with respect to R.S. 2477.

**(a) Disclosure Made in a Federal Proceeding or to a Federal Office or Agency; Scope of a Waiver.** When the disclosure is made in a federal proceeding or to a federal office or agency and waives the attorney-client privilege or work-product protection, the waiver extends to an undisclosed communication or information in a federal or state proceeding only if:

> (1) the waiver is intentional;
>
> (2) the disclosed and undisclosed communications or information concern the same subject matter; and
>
> (3) they ought in fairness to be considered together.

What is notable about Rule 502(a) is its requirement that "fairness" be a consideration in terms of whether any waiver of the privilege should extend to undisclosed information of the same subject matter. To understand what is meant by "fairness," one must look to the Rule's advisory committee notes, which state in part:

> **Subdivision (a).** The rule provides that a voluntary disclosure in a federal proceeding or to a federal office or agency, if a waiver, generally results in a waiver only of the communication or information disclosed; a subject matter waiver (of either privilege or work product) is reserved for those unusual situations in which fairness requires a further disclosure of related, protected information, in order to prevent a selective and misleading presentation of evidence to the disadvantage of the adversary. See, e.g., In re United Mine Workers of America Employee Benefit Plans Litig., 159 F.R.D. 307, 312 (D.D.C. 1994) (waiver of work product limited to materials actually disclosed, because the party did not deliberately disclose documents in an attempt to gain a tactical advantage). Thus, subject matter waiver is limited to situations in which a party intentionally puts protected information into the litigation in a selective, misleading and unfair manner. It follows that an inadvertent disclosure of protected information can never result in a subject matter waiver. See Rule 502(b). The rule rejects the result in In re Sealed Case, 877 F.2d 976 (D.C.Cir. 1989), which held that inadvertent disclosure of documents during discovery automatically constituted a subject matter waiver.
>
> The language concerning subject matter waiver--"ought in fairness"--is taken from Rule 106, because the animating principle is the same. Under both Rules, a party that makes a selective, misleading presentation that is unfair to the adversary opens itself to a more complete and accurate presentation.
>
> To assure protection and predictability, the rule provides that if a disclosure is made at the federal level, the federal rule on subject matter waiver governs subsequent state court determinations on the scope of the waiver by that disclosure.

Fed. R. Evid. 502 advisory committee note subd. (a).

In short, for voluntary disclosures governed by Rule 502(a), there will be a subject matter waiver only when the waiving party has disclosed the confidential information in order to gain a tactical advantage.

### b. Extrajudicial waivers not governed by Fed. R. Evid. 502(a)

In addition to claiming that the United States waived the privilege after the commencement of this case, plaintiffs are also making claims of prior extrajudicial waiver. Fed. R. Civ. 502(a), by its very terms, does not extend to these claims, except when the disclosure was in a federal proceeding or to a federal office or agency. For claims of intentional waiver that lie outside Rule 502(a), the court must look to federal common law for the rules that govern.

For cases arising prior to the adoption of Rule 502(a), the Eighth Circuit has held that a voluntary and intentional disclosure of attorney-client communications waives the privilege and that the waiver extends to any information directly related to what was disclosed. See, e.g., United States v. Davis, 583 F.3d 1081, 1090 (8th Cir. 2009); PaineWebber, 187 F.3d at 992 ("The attorney/client privilege is waived by the voluntary disclosure of privileged communications, and courts typically apply such a waiver to all communications on the same subject matter."). A number of the federal courts have held that, in addition to these generally accepted principles, "fairness" must also be considered in determining whether the waiver should extend to nondisclosed material of the same subject matter, comparable to what Rule 502(a) now explicitly provides for waivers during judicial proceedings and to federal agencies. See, e.g., Wi-LAN, Inc. v. Kilpatrick Townsend & Stockton LLP, 684 F.3d 1364 (Fed. Cir. 2012) ("Wi-LAN"); In re von Bulow, 828 F.2d 94, 101-02 (2d Cir. 1987).

One of the more recent cases addressing the subject is the Federal Circuit's decision in Wi-LAN, where the court was required to decide the scope of an express extrajudicial waiver under Ninth Circuit law. In addressing the scope issue, the Federal Circuit concluded the Ninth Circuit would require consideration of "fairness" in terms of whether the waiver should apply only to the matter disclosed or whether it should also extend to other material of the same subject matter. In reaching that conclusion, the Federal Circuit cited cases from the First, Fifth, Sixth, Eleventh, and the D.C. Circuit courts that it viewed as supporting the use of "fairness" as a consideration and opined the Ninth Circuit would likely follow this "heavy weight of current authority." The court stated:

> In deciding whether Ninth Circuit law bars or mandates fairness considerations when determining the scope of an express extrajudicial waiver of the attorney-client privilege, we note that the Ninth Circuit is not averse to looking to other circuits for guidance on new issues of law. Am. Vantage Cos., Inc. v. Table Mountain Rancheria, 292 F.3d 1091, 1098 (9th Cir. 2002) ("[A]lthough we are by no means compelled to follow the decisions of other circuits, there is virtue in uniformity of federal law as construed by the federal circuits.") (internal quote marks omitted). We thus think the Ninth Circuit would appreciate the heavy weight of current authority that comes down on the side of employing fairness considerations to decide the scope of waivers. E.g., XYZ Corp. v. United States (In re Keeper of the Records), 348 F.3d 16, 24 (1st Cir. 2003); von Bulow, 828 F.2d at 103; Conkling v. Turner, 883 F.2d 431, 434 (5th Cir. 1989); In re Grand Jury Proceedings Oct. 12, 1995, 78 F.3d 251, 256 (6th Cir. 1996); Cox v. Adm'r U.S. Steel & Carnegie, 17 F.3d 1386, 1417-18 (11th Cir. 1994), modified, 30 F.3d 1347 (11th Cir. 1994); United States v. White, 887 F.2d 267, 271 (D.C. Cir. 1989); see also Paul R. Rice, 2 Attorney-Client Privilege in the United States § 9:81 & n. 2 (2011 ed.) (citing fairness as the driving consideration in assessing scope of waiver); Imwinkelried, supra, § 6.12.7 n. 613 (with accompanying text) (arguing that fairness considerations would mitigate for limited waiver in extrajudicial disclosure situations). We think the Ninth Circuit would align itself with the substantial weight of authority.
>
> As between the two directions put forward by the parties—one requiring fairness balancing for extrajudicial discloses, the other barring it—we conclude that the Ninth Circuit's cases support the former far better than the latter. The Ninth Circuit has repeatedly endorsed fairness balancing in a variety of circumstances; more to the point it has never set forth, either expressly or inherently, any rule barring fairness's application to extrajudicial disclosures. Nor do the Ninth Circuit's cases suggest any policy reason why the fairness protections available for express disclosures in litigation should be unavailable to those who waive privilege pre-litigation. Such a rule, which LG promotes in this appeal, seems to us bad policy, and we decline to adopt it on the Ninth Circuit's behalf.

For the foregoing reasons, we conclude that the district court erred by rejecting considerations of fairness—i.e., whether LG would be unfairly prejudiced by Wi-LAN's assertion of privilege against discovery into attorney-client communications beyond the four corners of the Townsend letter—when assessing the scope of waiver here. None of the orders considering scope of waiver in this case applied such a test. However, we decline the parties' invitation to evaluate fairness ourselves in the first instance. We therefore vacate the magistrate and district court's orders concerning the scope of Wi-LAN's waiver and remand for further proceedings.

Wi-LAN, 684 F.3d at 1373.

Notably absent from the authority cited by the Federal Circuit in Wi-LAN is any Eighth Circuit case expressly addressing the issue, and the parties here have not cited to an Eighth Circuit case in their briefs. Nevertheless, there is no reason to believe the Eighth Circuit would not follow Wi-LAN and the precedent cited therein - particularly now with the adoption of Fed. R. Evid. 502(a).

c.        Determining the scope of a subject matter waiver

As noted above, the Eighth Circuit has stated cases in predating Fed. R. Evid. 502 that the scope of a voluntary waiver extends to privileged material that is of the same subject matter. Rule 502(a) similarly limits the scope of the waiver when "fairness" requires that it extend beyond the disclosed material, but also appears to authorize the use of "fairness" considerations to determine how far within the outer boundary of "same subject matter" the waiver should extend in any particular case. There is also authority for this approach that predates Rule 502(a). See generally Epstein at 586-94.

The court here will be guided by what the Federal Circuit has said on the subject:

The widely applied standard for determining the scope of a waiver of attorney-client privilege is that the waiver applies to all other communications relating to the same subject matter. Genentech, Inc. v. U.S. Int'l Trade Comm'n, 122 F.3d 1409, 1416 (Fed.Cir. 1997); In re Grand Jury Proceedings, 78 F.3d 251, 255 (6th Cir. 1996); In re Cont'l Ill. Sec. Litig., 732 F.2d 1302, 1314 n. 18 (7th Cir. 1984). The waiver extends beyond the document initially produced out of concern for fairness, so that a party is prevented from disclosing communications that support its position while simultaneously concealing communications

that do not. Weil v. Inv./ Indicators, Research & Mgmt., Inc., 647 F.2d 18, 24 (9th Cir. 1981) (quoting VIII J. Wigmore, Evidence § 2291, at 636 (McNaughton rev.1961) for the proposition that fairness dictates that a privilege holder "cannot be allowed, after disclosing as much as he pleases, to withhold the remainder"); Abbott Labs. v. Baxter Travenol Labs., Inc., 676 F.Supp. 831, 832 (N.D.Ill. 1987). There is no bright line test for determining what constitutes the subject matter of a waiver, rather courts weigh the circumstances of the disclosure, the nature of the legal advice sought and the prejudice to the parties of permitting or prohibiting further disclosures. See In re Keeper of the Records XYZ Corp., 348 F.3d 16, 23 (1st Cir. 2003) (stating that case law is of limited assistance in determining the scope of a waiver because of the fact-intensive nature of the issues presented); Eco Mfg. LLC v. Honeywell Int'l, Inc., No. 1:03-cv-0170, 2003 WL 1888988, at *2, 2003 U.S. Dist. LEXIS 7257, at *5 (S.D.Ind. Apr. 11, 2003) (citing U.S. v. Skeddle, 989 F.Supp. 917, 919 (N.D.Ohio 1997)).

Fort James Corp. v. Solo Cup Co., 412 F.3d 1340, 1349-50 (Fed. Cir. 2005) ("Fort James Corp.");

accord Shukh v. Seagate Technology, LLC, 872 F. Supp. 2d 851, 854 (D. Minn. 2012).

### 2. The manner of redaction of USA Document Nos. 76370, 76417, 77004, 77039, 77058, 77065, and 77170

Plaintiffs argue that the United States intentionally waived the privilege with respect to the opinions of OGC attorneys Hankins and Wood relating to R.S. 2477 and North Dakota's section line laws, as well as documents discussing the opinions, by redacting portions of the disclosed documents discussing the opinions but leaving unredacted portions that plaintiffs believe effectively discloses the contents of the opinions - particularly when combined with the descriptions in the United States's privilege log. Plaintiffs direct the court's attention to the following documents attached as exhibits to their motion: Ex.7a, USA76370 (Doc. No. 74-8, p. 3); Ex. 7b, USA76417 (Doc. No. 74-8, pp. 5-6); Ex. 7e, USA77004 (Doc. No. 74-8, pp. 17-19); Ex. 7f, USA77039 (Doc. No. 74-8, pp. 21-24); Ex. 7h, USA77058 (Doc. No. 74-8, pp. 28-33); Ex. 7i, USA77065 (Doc. No. 74-8, pp. 35-43), Ex. 7l, USA77170 (Doc. No. 74-8, pp. 53-54).

The court has reviewed the redacted and unredacted versions of the above documents as well as the United States's privilege log. For the most part, they are communications between Forest

Service officials that either describe the OGC opinions or, in some instances, have copies of the opinions attached to them. What has been redacted is either the summarization of the contents of the opinions or the opinions themselves. What has been left unredacted are discussions about actions or positions the Forest Service should take and, in one case, a discussion of the guidelines for title-curative action.

For the most part, it does not appear that the disclosed material is attorney-client privileged. Even though it may be possible to guess from what has been disclosed what the OGC opinions were, this is not the equivalent of disclosure of either the content of the opinions or the opinions themselves. Hence, there does not appear to have been any wholesale waiver of the privilege by the manner in which the foregoing documents have been redacted and/or identified in the privilege log.

Moreover, even if this conclusion is wrong with respect to a particular document, the United States did no more than make a good faith attempt to narrowly confine its claim of attorney-client privilege to what it believed was clearly privileged and avoid getting the parties (along with this court) embroiled over difficult and time-consuming arguments about where exactly to draw the line as to what should be produced and what must be withheld. Further, it does not appear the United States has attempted to gain a litigation advantage over plaintiffs by its redaction efforts, despite plaintiffs' claims to the contrary. Consequently, "fairness" would not require further disclosure if this was plaintiffs' only argument for waiver and further disclosure.

### 3. Hankins October 20, 1965 letter

Plaintiffs also claim the United States has waived the privilege by the fact it produced without redaction a letter written by OGC attorney Hankins, dated October 20, 1965. (USA077070-71, Doc. No. 74-8, pp. 40-41). In the letter, Hankins responds to an inquiry by a private citizen as

to whether certain lands acquired by the United States for conservation purposes were open for travel along the section lines even if there is no road and tells the private citizen the reasons why the Forest Service would consider the section lines closed. In writing the letter, Hankins was not providing confidential advice to the Forest Service, but rather was acting as a representative of the agency in responding to the question posed by a member of the public.

Consequently, since the document was not an attorney-client communication, there was no waiver by its disclosure, particularly since Hankins did not reference any prior OGC opinions or suggest what his advice to the government had been on the subject. That being said, the letter may have some relevance to the "fairness" determination the court is required to make later with respect to other material that has been disclosed.

### 4.     Custer NF Supervisor September 12, 1980 memorandum

Another document that plaintiffs claim constitutes a waiver is a September 12, 1980, memorandum from the Forest Supervisor of the Custer National Forest to the Regional Forester. In relevant part, the memorandum reads:

> We request a formal review of the question of right-of-way along section lines in North Dakota. In essence confusion on this issue results from conflicting legal opinions tendered by OGC between 1962 and 1980 suggesting first that the State does not have legal right-of-way but more recently that they do.
>
> This is a critical issue to the Custer in view of the numerous roads being constructed to access oil and gas development.
>
> Our Lands Staff Officer, Gary Wetzsteon, has assembled a chronological situation summary which is included along with his summary of the record and his assessment of its implications. A formal review at this time would be timely because of anticipated challenges to our position which is based on the 1962 opinion.

(Doc. No. 74-10). According to the United States, this document was produced in this case by the State from the files and records of North Dakota Game & Fish Department. The United States

claims it was unable to find a copy of the document in any of its files and has no knowledge as to how it may have gotten in the State's possession.

It is debatable whether the reference in the memorandum to the 1962 and 1980 OGC decisions together with the suggestion as to their ultimate conclusions in fact constitutes a waiver. There is some authority that the mere reference to an ultimate conclusion of an attorney is not a waiver so long as the actual content of the attorney's confidential communication is not disclosed. Rauh v. Coyne, 744 F. Supp. 1181, 1185 (D.D.C. 1990) ( "The privilege was not waived merely because defendants' [sic] disclosed counsel's conclusion that the investigation could not determine the truth of Bottalico's allegations.") (citing other cases); Bose Corp. v. Linear Design Labs, Inc., No. 71 Civ. 3103, 1975 WL 21399, at *1 (S.D.N.Y. Mar. 10, 1975) (agreeing that client's "letter contain[ing] nothing more than the ultimate conclusion that the action brought by plaintiff was without merit" did not constitute a waiver); see Guidiville Rancheria of California v. United States, No. 12-cv-1326, 2013 WL 6571945, at *6 (N.D. Cal. Dec. 13, 2013).

But, even if there was a waiver, fairness would not require disclosure of the 1962 and the 1980 opinions and other related documents simply on account of this memorandum, at some point prior to the commencement of this case, having found its way into the public domain. While in order to maintain the confidentiality of attorney communications the government has an obligation to take reasonable steps to protect the confidentiality of the material, it undoubtedly is difficult, as a practical matter, to prevent against disclosures like this in an organization as large as the federal government. Further, when this document found its way into the public domain, there is no indication it was for the purpose of gaining a tactical advantage for purposes of later litigation, and it does not appear the United States has relied upon it so far. That being said, this is another

example of a document that may have some bearing with respect to the "fairness" determination that follows later.

### 5.     "Stewart document" (USA020106-020107)

More troubling for the United States in terms of wavier is a two-page document that appears to have been prepared by a Mary Stewart and lists ten points upon which she had solicited advice from the OGC.  She purports to set forth in bold the response from OGC and, while for some of the numbered items she may have set forth verbatim responses, there are other matters set forth in bold that appear to be, at least in part, her characterization of the advice, including the response to item 4, which is at issue here.

It is not clear why the "Stewart document" was prepared or to whom it was distributed.  The United States produced this document as part of its discovery without redaction because it was contained in the administrative record for the Land and Resource Management Plan for the Dakota Prairie Grasslands and Final Environmental Impact Statement.  In relevant part, the "Stewart document" reads as follows:

**FOR OFFICIAL USE ONLY--NOT FOR DISTRIBUTION--OGC ADVICE**

Items needing response from OGC:

**Ken Capps gave me the highlighted written responses in February 2000.**

\* \* \* \*

4.  How do we deal with pre-existing rights-of-way - not section lines roads?  This issue is coming up in ND.  OGC has told us how to address state "section line road" laws, but we have been getting interest in ND about "pre-existing rights of way."  We are not sure what the legal definition is or how we should interpret it.  **OGC is reviewing the ND Attorney General's opinion on section line law.  We have a copy of this in our record.  ROW's cannot be addressed generically. Tell them it is a case-by-case evaluation. On acquired lands as opposed to reserved, we took title subject to existing ROW's of record. OGC position is that RS 2477 Rights-of-way pertain to public domain lands, where roads were "constructed and available for public use" prior to 1910. National grasslands are acquired lands, not public domain and generally speaking, section lines do not have**

**"constructed roads" that existed prior to 1910. As OGC looks at this, they will need to look at the date of the state section line statutes and the wording within the statute, but likely the USFS position is that RS 2477 ROW's do not pertain to national grasslands. Ken said that this will probably have to be litigated to get a court precedent on national grassland section line ROW's.**

**\* \* \* \***

(Doc. No. 74-17) (bold text in original).

The "Stewart document" goes much further than the prior documents in terms of disclosing the content of OGC advice, and the United States in its brief does not attempt to argue it was not a confidential attorney-client communication. Rather, it contends that any wavier should not be extended to other documents based on "fairness." Again, if this was the only instance of disclosure of the content of an OGC opinion with respect to section line rights-of-way, the undersigned would be inclined to agree for the reasons articulated above with respect to the documents previously considered. However, as discussed next, it is not the only instance.

### 6. The "Gippert memorandum"

#### a. Background

Finally, there is the one-page memorandum dated March 10, 1999 from Michael Gippert, Acting Associate General Counsel for the Natural Resources Division of the USDA's OGC office in Washington, D.C., to Gloria Manning, Acting Deputy Chief for the National Forest Service System. (Doc. No. 74-11). The memorandum was on USDA, OGC printed letterhead. Given the persons involved, it clearly was a high-level communication for purposes of the Forest Service.

Attached to the "Gippert memorandum" was a written statement prepared by the Solicitor of the Department of Interior ("DOI") to a Senate Committee about pending legislation that would address R.S. 2477 claims of right-of-way. Apparently, the pending legislation was an attempt to restate and clarify claims of highway pursuant to R.S. 2477, and the DOI was concerned that the

48

particular wording of the proposed legislation would breathe life into claims that section lines were highways without actual construction of a highway by virtue of state section line laws, which claims, in DOI's view, had no validity under R.S. 2477. In the attached statement, the DOI's Solicitor discussed at length why giving life to the state section lines laws would negatively impact millions of acres of DOI supervised federal land, including National Parks and National Wildlife Refuges. Interspersed within his extended discussion were a number of statements reflecting DOI's legal view of section line rights-of-way where no roads had actually been constructed, including the following:

- "Some state laws claim rights-of-way where no construction has occurred, contradicting the plain words of the statute [R.S. 2477]."

- "[T]he Department has denied the validity of section line laws for nearly a century. See 26 I.D. 446 (1898)."

- "The Department believes that state law has a role to play in federal determinations about the existence and extent of R.S. 2477 rights, so long as the state law was in effect prior to the 1976 repeal of R.S. 2477 and is consistent with the terms of R.S. 2477 (that is, so long as it requires the actual construction of a genuine highway over unreserved public land)."

(Doc. No. 74-11).

The "Gippert memorandum" to which the statement of the Solicitor of the DOI was attached read as follows:

March 10, 1999

**MEMORANDUM FOR**          **GLORIA MANNING**
                                              **ACTING DEPUTY CHIEF**
                                              **NATIONAL FOREST SYSTEM**

**FROM:**                            Michael J. Gippert [signature omitted]
Acting Associate General Counsel
Natural Resources Division

**SUBJECT:**                  State Section Line Laws and RS 2477

This is in response to your request for an opinion interpreting the validity of certain state laws which purport to establish highways on all section lines within a state and whether they are recognized under Section 8 of the Mining Act of 1866, otherwise referred to as "RS 2477," which was repealed by the Federal Land Policy and Management Act (FLPMA) in 1976.

As you may know, this is a complicated issue that involves interpretations of state and federal laws. It also involves the land managing agencies of the Department of the Interior as well as the Forest Service. Interpretations on these complex legal issues have differed considerably over time and the law remains unsettled. As a result, we are reluctant to analyze this issue unless there is a discrete and identifiable controversy which requires resolution.

However, in order to be responsive to your request, attached to this memorandum is a copy of testimony provided by John Leshy, Solicitor of the Department of the Interior, in 1996 which set forth the Administration's views on, among other things, the validity of state section line laws. To our knowledge, the position reflected in Mr. Leshy's testimony is still the position of the Administration at this time.

If you have any further questions, please feel free to contact Vicki Breman or Eric Olson on my staff. They can be reached at (202) 720-7121.

Attachment

cc: B. Gillam

(Doc. No. 74-11) (bold text in original).

### b.    The disclosure of the "Gippert memorandum" was a waiver of the attorney-client privilege by the USDA

According to the United States, it produced the "Gippert memorandum" during discovery because the document had previously been disclosed as part of the administrative record that was the subject of the Forest Service's Off-Highway Vehicle ("OHV") Decision, which previously was the subject of a suit in this court in <u>Billings County v. Veneman</u>, Civ. No. A1-01-045. It also

appears from the discovery in this case that the "Gippert memorandum" was supplied by Forest Service personnel to the McKenzie County state's attorney in 1999.

Clearly, the "Gippert memorandum" is an attorney communication, and the United States does contend otherwise. Rather, it argues that any waiver should be limited to its contents and not be extended to documents of the same subject matter on "fairness" grounds, contending plaintiffs have made no showing the disclosure was selectively made for the purpose of obtaining a tactical advantage.

> **c.** **Why the waiver should extend to the 1962 and 1980 OGC opinions and the documents plaintiffs seek that reference them**

It may be that, when the federal government is involved, a court should be extra cautious about concluding that a waiver of the privilege should extend to other documents involving the same subject matter given: its size and complexity; the difficulty of individual government employees focused on one mission being able to appreciate the consequences of disclosure with respect to what may be broader governmental interests; questions of authority of the person disclosing the material to waive the privilege; and other like considerations. But, even if so, "fairness" requires here that the waiver occasioned by the disclosure of the "Gippert memorandum" should extend to the 1962 and the 1980 OGC opinions by Hankins and Wood, as well as the other documents referencing them.

The reasons why include the following:

- Under the most narrow application of the "same subject matter" test, the 1962 and 1980 OGC opinions clearly fall within the scope of the waiver in that, like the "Gippert memorandum," they address whether the mere declaration by a state law enacted prior to the repeal of R.S. 2477 that a right-of-way exists along section lines was sufficient to create section line rights-of-way on certain federal lands without

anything more having to be shown, such as the construction of a highway or evidence that the section line was regularly used for public travel.

- The reason for the inclusion of the "Gippert memorandum" in the Forest Service's OHV Decision most likely was to support the ultimate decision being made. In any event, the United States has failed to demonstrate that its disclosure then was inadvertent. Likewise, the same is true for its disclosure to the McKenzie County state's attorney in 1999.

- The affirmative use by the United States of the "Gippert memorandum" in this case to gain a tactical advantage, notwithstanding its disingenuous suggestion to the contrary. In particular, the United States included the "Gippert memorandum" as an exhibit in support of its original motion to dismiss. See Ex. A, Amended Declaration of Ronald W. Jablonski, Jr., Attach. 25o. Then, more recently (and after filing its response to the motion to compel suggesting the disclosure had not been for tactical advantage), the United States asserted the following in its memorandum in support of its second motion to dismiss on statute of limitations grounds:

> In a March 10, 1999 memorandum, the U.S. Department of Agriculture, Office of General Counsel ("OGC"), responded to the Forest Service's requests for "an opinion interpreting the validity of certain state laws which purport to establish highways on all section lines within a state and whether they are recognized under . . . R.S. 2477[.]" See Ex. A, Attach. 25o at p. 1. Although the OGC declined to analyze the legal issue, the memorandum attached the congressional testimony of then-Solicitor of the U.S. Department of Interior, John D. Leshy, explaining, "[t]o our knowledge, the position reflected in Mr. Leshy's testimony is still the position of the Administration at this time." Id. In his March 14, 1996 "Statement Before the Senate Committee on Energy and Natural Resources on S. 1425," Solicitor Leshy explained that "the Department [of the Interior] has denied the validity of section line laws for nearly a century." Id. at p. 4 (citation omitted). Solicitor Leshy explained that "state law has a role to play in federal determinations about the existence and extent of R.S. 2477 rights, so long as the state law was in effect prior to the 1976

repeat of R.S. 2477 and is consistent with the terms of R.S. 2477 (that is, so long as it requires the actual construction of a genuine highway over unreserved public land)." <u>Id.</u> at p. 5. The McKenzie District Ranger provided McKenzie County State's Attorney, Dennis Johnson, with a copy of this memorandum in the Spring of 1999. <u>See</u> Johnson Dep. 185:21-186:2, 239:9-242:2; Ex. R, Attach. 1. Mr. Johnson, in turn, forwarded this memorandum to the McKenzie County Commissioners. <u>See</u> Ex. R, Attach. 1.

(Doc. No. 90, pp. 80-81). Obviously, one of the purposes for the use of the "Gippert memorandum" in the above passage was to attempt to demonstrate what the position of the USDA (and not just that of the DOI) was with respect to R.S. 2477 at the critical point in time, just prior to the 12-year period leading up to the commencement of this action, and that its position was made known to McKenzie County. It also appears that another purpose was to use the memorandum along with the attached testimony of DOI's solicitor to support an overall argument that the United States (including the USDA) had taken a position adverse to the claims of all the plaintiffs not just in 1999, but extending back nearly a century.

- Any harm to the United States of extending the waiver to the 1962 and 1980 opinions, as well as most of the documents that reference them, will be minimal. From what has already been disclosed, plaintiffs have been able to surmise that one or more of the opinions issued in 1980 by regional OGC attorney Wood conflicted with other earlier OGC opinions and that this created confusion for a period of time within this region for line Forest Service personnel. (<u>E.g.</u>, Doc. No. 74-10). Armed with this knowledge, plaintiffs have already contended that what has been disclosed supports an inference that the position of the USDA during the critical time in question was that the state section line laws were a valid acceptance of the grant of

right-of-way by R.S. 2477 or, at a minimum, the USDA did not have an actual position.  At this point, full disclosure of the 1962 and 1980 opinions, and perhaps more importantly the redacted references to them in the withheld intra-agency communications, will allow putting what has already been disclosed in its proper context.  (E.g., USA077039-077040).[14]

- Full disclosure is unlikely to reveal much in the way of confidential client information that would otherwise be protected by the attorney-client privilege.  The 1962 and 1980 OGC opinions themselves rely only on the statutory language of R.S. 2477 and the state section line laws, as well as published administrative and court decisions, and the references in the opinions to the fact an opinion was sought do not include any confidential agency information provided for the purpose of assisting OGC counsel in rendering their advice.  The same also appears to be true for the documents that reference the 1962 and 1980 OGC opinions.   In fact, in one of the few instances where a colorable argument might have been made that a document was part of a chain of confidential client communications to counsel, the United States disclosed the contents of the document except for the one portion that explicitly discussed one of the prior OGC opinions.  (E.g., USA, 077049 & 077004).[15]

---

[14]  In fact, from what the undersigned has reviewed, the disclosure is likely to benefit the United States in terms of being able to avoid certain inferences being drawn from an incomplete record that may otherwise be unwarranted.

[15]  USA77004-77005 is an intra-agency communication from a lands specialist dated September 10, 1980, to the Forest Supervisor of the Custer National Forest suggesting what would be an appropriate application of R.S. 2477 in relation to the section lines of the states of North Dakota and South Dakota.  It appears this document was likely forwarded to OGC in support of a request for a further opinion.  (USA077049 & 076422; Doc No. 74-10, Ex. 9).  As noted above, the United States disclosed the document in its entirety, save for the small portion that explicitly discussed a prior OGC opinion, and did not attempt to argue the entire document was privileged.

- The disclosure of the 1962 and 1980 opinions and the intra-agency documents that reference them is unlikely to chill the giving of frank advice by OGC counsel in the future since it is only the particular circumstances of this case that compel disclosure, which could have been avoided by a more careful handling of the "Gippert memorandum" in the past and, perhaps, a different litigation strategy in this case.

- Finally, while the waiver of the privilege by the "Gippert memorandum" and its use in this case are likely sufficient as a matter of "fairness" to extend the waiver to the 1962 and 1980 OGC opinions and the documents that reference them, there are additional factors that also support this conclusion. First, there are the documents which already are in the public domain that reference prior OGC advice on the subject, including the previously discussed September 12, 1980 memorandum by the Custer National Forest Supervisor and the "Stewart document." While the disclosure of these documents may not have been enough by themselves to support extending any waiver of the privilege to other documents of the same subject matter, they do support requiring disclosure as a matter of "fairness" in light of the use of the "Gippert memorandum." Second, there is also the 1965 Hankins letter to the private citizen that is also in the public domain. It appears that Forest Service personnel relied upon what Hankins wrote in that letter and his 1962 opinion interchangeably. (E.g., USA077064 & 077065-077073).

### d. The waiver does not extend to the title opinions

Although the waiver should extend to the 1962 and 1980 OGC opinions and the documents that reference them, the same is not true for the title opinions that are the subject of plaintiffs' motion to compel.

For one thing, most of the title opinions do not mention section line rights-of-way specifically. Hence, these opinions are clearly outside the scope of the waiver. And, for the few title opinions that do reference section line rights-of-way, there is: (1) no mention of the "Gippert memorandum" or the 1962 and 1980 OGC opinions; (2) no reference to R.S. 2477; and (3) no discussion about why the mere declaration of section line rights-of-way by a state statute would give rise to rights-of-way on certain federal lands without having to show anything more. Arguably, these opinions too are beyond the scope of the waiver.

Morever, "fairness" does not require disclosure of the few title opinions that reference section line rights-of-way. In large part, this is because the references appear to be more for the purpose of limiting the opinion as to what title is being acquired or conveyed than expressing an opinion as to the ultimate merits of the existence of the rights-of-way that may burden the title. In fact, from what the court has reviewed, the references to section line rights-of-way may very well have been driven by what the title insurers were willing to insure.[16] But, even if that was not the case, it may very well have been that the attorneys issuing the title opinions (none of whom were Hankins or Wood) simply were simply being cautious and made reference to the section line rights-of-way because they *might* be a burden on the title.

---

[16] The title opinions at issue were based primarily upon preliminary title commitments or final title policies in lieu of an actual examination of the public records.

Consequently, any inferences that plaintiffs may want to draw from the references to section line rights-of-way in the couple of title opinions that address them with respect to the general question of whether North Dakota's section line law has created valid rights-of-way pursuant to R.S. 2477 without the actual construction of a road or evidence of regular public travel would be too tenuous. Also, any unfairness resulting from the affirmative use of the "Gippert memorandum" will be righted by the other disclosures that are ordered.

G.    **Summary re the claims of attorney-client privilege**

In summary, the court concludes that the 1962 and 1980 OGC opinions, together with most of the redacted information in the other documents referencing those opinions, are attorney-client privileged,[17] but that the privilege has been waived for the first category of documents. The court's specific rulings as to the first category of documents are set forth in a supplemental order filed contemporaneously herewith.

With respect to the title opinions that are the subject of the second category of documents, the court concludes these opinions are also privileged and that any waiver of the privilege does not extend to these documents.

IV.    **ORDER**

Based on the foregoing, plaintiffs' joint motion to compel (Doc. No. 73) is **GRANTED IN PART** and **DENIED IN PART** as follows:

---

[17] There were a couple of instances in which the redacted material appeared not to be attorney-client privileged. For example, in USA074919, the redacted handwritten notes above the date 11/3/80 do not appear to be attorney-client privileged because there is no showing they were made as a result of any communication with counsel. Also, it does not appear that USA077056 is privileged because the mere fact that an opinion has been sought or received is likely not privileged for reasons discussed earlier.

1.    The United States will not be required to produce the title opinions that are the subject of the motion to compel.

2.    The United States shall within fifteen days of the date of this order produce the documents set forth in the supplemental order issued contemporaneously herewith unless the United States has within that time period sought review from District Judge Hovland, in which case compliance is stayed until Judge Hovland has issued his ruling.

**IT IS SO ORDERED**.

Dated this 25th day of November, 2014.

*/s/ Charles S. Miller, Jr.*
Charles S. Miller, Jr., Magistrate Judge
United States District Court