# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NORTH DAKOTA

North Dakota, ex rel. Wayne Stenehjem, )
Attorney General for the State of )
North Dakota, )
                         )
          Plaintiff, )
                         )
   vs. )
                         )
United States of America, )
                         )
          Defendant. )

**ORDER GRANTING DEFENDANT'S MOTIONS TO DISMISS NORTH DAKOTA'S AMENDED COMPLAINT AND TO DISMISS COUNTIES' FIRST CAUSE OF ACTION IN THIRD AMENDED COMPLAINT**

Case No. 1:12-cv-125
(lead case)

---

Billings County, North Dakota; )
Golden Valley County, North Dakota; )
McKenzie County, North Dakota; and )
Slope County, North Dakota, municipal )
entities, )
                         )
          Plaintiffs, )
                         )
   vs. )
                         )
United States of America, )
                         )
          Defendant. )

Case No. 1:12-cv-102
(consolidated case)

---

Before the Court are two motions filed on behalf of the Defendant United States of America: "The United States of America's Amended Motion to Dismiss North Dakota's Amended Complaint for Lack of Jurisdiction" filed on September 26, 2014 (Docket No. 88), and "The United States of America's Motion to Dismiss the First Cause of Action in the Counties' Third Amended and Supplemental Complaint for Lack of Jurisdiction" filed on December 9, 2015 (Docket No.

169).[1] Plaintiff North Dakota filed a response in opposition to the motions of the United States on January 27, 2015. See Docket No. 104. Plaintiffs Billings County, Golden Valley County, McKenzie County, and Slope County similarly filed a response in opposition to the motions on January 28, 2015. See Docket No. 141. The United States then filed a reply brief in support of its motions to dismiss on April 30, 2015. See Docket No. 148. The Plaintiffs jointly filed a surreply on May 28, 2015. See Docket No. 152. On June 8, 2015, the United States filed a response to the Plaintiffs' surreply. See Docket No. 154. For the reasons set forth below, the Defendant United States' motions to dismiss for lack of jurisdiction are granted.

## I.     PROCEDURAL & FACTUAL BACKGROUND

On July 30, 2012, Billings County, McKenzie County, Slope County, and Golden Valley County initiated an action against the Defendant United States of America ("United States") to quiet title to their claims of section line rights-of-way in the Little Missouri National Grassland as well as six individual roads claimed by McKenzie County. See Docket No. 1 (Case No. 1:12-cv-102). The State of North Dakota then filed a complaint on September 14, 2012, against the Defendant United States to quiet title to its claim of section line rights-of-way within the Little Missouri National Grassland, the Sheyenne National Grassland, and the portion of the Cedar River National Grassland located in North Dakota, all which are a part of the Dakota Prairie Grasslands. See Docket No. 1 (Case No. 1:12-cv-125). On April 16, 2013, the Court consolidated the two

---

[1] The United States previously filed a motion to dismiss the first cause of action in the Counties' Second Amended Complaint on September 26, 2014. See Docket No. 89. However, The Court granted the Counties' leave to file a subsequent Third and Supplemental Complaint on November 3, 2015. See Docket Nos. 162 and 163. The United States then renewed its motion to dismiss the first cause of action as alleged in the Counties' Third and Supplemental Complaint.

actions, with North Dakota's action designated as the lead case (Case No. 1:12-cv-125) and the action by the Counties as the consolidated case (Case No. 1:12-cv-102).  See Docket No. 24.[2]

The Plaintiffs' claims arise from a controversy surrounding the public's rights-of-way along section lines within the Dakota Prairie Grasslands in North Dakota.  At the heart of both complaints is the contention all section lines in North Dakota, including those within the Dakota Prairie Grasslands, are subject to right-of-way for travel by the public.  The Plaintiffs allege the public's right to travel along such section lines arises from North Dakota's acceptance of the grant for construction of public highways offered by federal statute, known as R.S. 2477.  However, the Plaintiffs allege the United States refuses to recognize the existence of such public rights-of-way along section lines on lands managed by the United States Forest Service ("Forest Service").  Accordingly, the Plaintiffs request the Court quiet title to the public's right-of-way along section lines within those lands managed by the Forest Service (i.e. Little Missouri National Grassland, the Sheyenne National Grassland, and the portion of the Cedar River National Grassland located in North Dakota).

In the motions before the Court, the United States seeks to dismiss the complaints of North Dakota and the Counties for lack of subject matter jurisdiction because the claims are untimely under the Quiet Title Act, 28 U.S.C. § 2409a.  The United States argues the Plaintiffs' claims are untimely because both North Dakota and the Counties had sufficient notice of the United States' position that North Dakota had not accepted the R.S. 2477 grant to create rights-of-way for public travel along the section lines, specifically within the Dakota Prairie Grasslands in North Dakota.

---

[2] Plaintiff North Dakota and Plaintiffs Billings County, McKenzie County, Slope County, and Golden Valley County are collectively referred to by the Court as "Plaintiffs."  When referring to Plaintiff North Dakota individually, the Court uses the terms "North Dakota" or "State." When the Court refers to Plaintiffs Billings County, McKenzie County, Slope County, and Golden Valley County inclusively, but exclusive of Plaintiff North Dakota, the Court uses the term "Counties."

The Plaintiffs disagree and contend their quiet title claims were timely filed and consequently the Court has jurisdiction over this matter.

###     A.     Claims of North Dakota

In its complaint, North Dakota alleges three (3) claims against the United States.  See Docket No. 17, pp. 17-20.  In its first cause of action, North Dakota seeks "to quiet title to all section line easements" managed by the Forest Service within the Little Missouri National Grasslands, with the exception of those section lines on lands "(1) located within the Theodore Roosevelt National Park; (2) managed by the U.S. Army Corps of Engineers; (3) managed by the Bureau of Land Management; and (4) within the Theodore Roosevelt National Park Elkhorn Ranch Site." See Docket No. 17, p. 17.  In its second cause of action, North Dakota seeks to quiet title to all section line easements" managed by the Forest Service within the Sheyenne National Grassland, excluding those section line easements on lands (1) managed by the U.S. Corps of Engineers; and (2) land managed by the Bureau of Land Management." See Docket No. 17, pp. 18-19.  In its third cause of action, North Dakota seeks to quiet title to all section line easements managed by the Forest Service within the Cedar River National Grassland, with the exclusion of sections lines on those lands "(1) managed by the U.S. Army Corps of Engineers; and (2) lands managed by the Bureau of Land Management." See Docket No. 17, pp. 19-20.

According to North Dakota's complaint, the United States has unlawfully interfered with section line easements in the Little Missouri National Grassland, Sheyenne National Grassland, and Cedar River National Grassland "[b]y failing to recognize the state's valid and existing rights in the easement over the 33 feet of federal land abutting section lines in the Dakota Prairie

Grasslands, and by failing to abide by the reservation and exception in the conveyances by which it reacquired title. . . ." See Docket No. 17, pp. 18-20.

North Dakota alleges its claim arises from Forest Service decisions in 2001 and 2002, in which the Forest Service "rejected and no longer intended to recognize the [S]tate's valid and existing right to section line easements in the National Grasslands." See Docket No. 17, p. 9. Specifically, in 2001, the Forest Service issued a Record of Decision prohibiting off-highway motor vehicle travel in the Little Missouri National Grassland. Based upon this Record of Decision, the Forest Service then issued an order that "closed to motorized uses all non-system roads or trails on National Forest System land in the Dakota Prairie Grasslands that had not been previously traveled." Id. Then, in the Dakota Prairie Grasslands Land and Resource Management Plan from 2002, the Forest Services expressed that North Dakota "could not accept the R.S. 2477 grant by establishing highways pursuant to state laws that did not satisfy federal requirements, such as construction of the road." See Docket No. 17, p. 10.

The controversy regarding section lines has been amplified by recent oil and gas development on lands owned by North Dakota to support state schools, with the State owning both the subsurface and surface estate. These "state school lands" are scattered throughout the Little Missouri National Grassland. The State also has a reserved mineral interest in additional lands located within the Little Missouri National Grassland. In its complaint, North Dakota alleges lessees of the State's mineral interest in state school lands, as well as other lands in which the State holds a mineral interest, have sought to access such lands by way of section lines. These lessees have been informed by the Forest Service "it does not recognize the state's section line rights-of-way and that using the 33-feet on the USFS side of a section line is prohibited." See Docket No. 17, p. 10. Consequently, in order to develop these State-owned minerals, North Dakota has

permitted lessees to build access roads completely on state-owned lands, instead of utilizing the thirty-three feet on the Forest Service's side of section lines.

North Dakota's complaint also includes allegations outlining the consequences because Forest Service refused to recognize section line right-of-way within the Dakota Prairie Grasslands:

> 105.    Had the USFS recognized the section line rights-of-way and not opposed building roads on the section lines described in the preceding paragraphs, the burdens of the roads would not fall entirely on the state school land and its previously-unencumbered surface estate and would have remained in the already existing easements.
>
> 106.    Had the USFS recognized the section line rights-of-way and not opposed building roads on the section lines described in the preceding paragraphs, the state would have avoided the entire responsibility for overseeing road reclamations when the purposes for which the roads were built terminate.
>
> 107.    Had the USFS recognized the section line right of way and not opposed Frank's Creek Road realignment along the section lines, the state would not have incurred the time and expense of administering road construction.

See Docket No. 17, p. 16.

### B.    Claims of Counties

In their Third Amended and Supplemental Complaint, the Counties allege several causes of action against the United States.  In the first cause of action, the Counties "seek to quiet title to the rights-of-way for all of the section lines within the [Little Missouri National Grassland] managed by the United States Forest Service within the Counties' boundaries."  See Docket No. 163, p. 18.  The Counties do not seek to quiet title as to section line easements:  "(1) located within the Theodore Roosevelt National Park; (2) managed by the U.S. Army Corps of Engineers; (3) managed by the Bureau of Land Management; and (4) within the Theodore Roosevelt National Park Elkhorn Ranch Site."  Id.

Like North Dakota, the Counties allege their quiet title claim accrued when the Forest Service issued a Record of Decision in January of 2001, prohibiting off-highway motor vehicle travel and limiting travel to existing roads and trails within the Little Missouri National Grasslands. Id. at pgs. 12-13.  Based upon this Record of Decision, the Forest Service closed "all non-system roads or trails" not previously traveled in the Dakota Prairie Grasslands to motorized travel.  Id. The Counties further allege that in a Record of Decision issued on July 31, 2002, the Forest Service "expressed it position that the state could not accept the R.S. 2477 grant by establishing highways pursuant to state law that did not satisfy federal requirements, such as construction of a road." Id. at 13.

C.    **Revised Statute 2477 & North Dakota 'Section Line Laws'**

In 1866, Congress provided for public access across unreserved public domain lands by granting rights-of-way for the construction of highways by the passage of a statute that is commonly referred to as "R.S. 2477." R.S. 2477 read in its entirety as follows:  "The right of way for the construction of highways over public lands, not reserved for public uses, is hereby granted." Act of July 26, 1866, ch. 262, § 8, 14 Stat. 251, 253, codified at 43 U.S.C. § 932, repealed by Federal Land Policy and Management Act of 1976, Pub. L. No. 94-579, Title VII, § 706(a), 90 Stat. 2743, 2793.  See also Kane Cnty. v. United States, 772 F.3d 1205, 1209 (10th Cir. 2014). R.S. 2477 remained in effect for 110 years and many transportation routes in the western part of the United States were established under its authority.  S. Utah Wilderness Alliance v. Bureau of Land Mgmt., 425 F.3d 735, 740 (10th Cir. 2005).  The establishment of a R.S. 2477 right-of-way required no administrative formalities:  "no entry, no application, no license, no patent, and no deed on the federal side; no formal act of public acceptance on the part of the state or localities in

whom the right was vested." Id. at 741.  During this time, "congressional policy promoted the development of the unreserved public lands and their passage into private productive hands." Id. at 740.

In 1976, Congress "abandoned its prior approach to public lands and instituted a preference for retention of the lands in federal ownership, with an increased emphasis on conservation and preservation," by its enactment of the Federal Land Policy and Management Act of 1976 ("FLPMA"). Id. at 741.  The FLPMA repealed R.S. 2477, but preserved "any valid" right-of-way "existing on the date of approval of this Act." Pub. L. No. 94-579, §§ 701(a), 706(a), 90 Stat. at 2786, 2793; see also S. Utah Wilderness Alliance, 425 F.3d at 741.

Plaintiffs' claims rest upon an 1871 Dakota Territory law, and successor versions enacted after statehood, that Plaintiffs contend, and the North Dakota Supreme Court agrees, was an "acceptance" of the purported open-ended grant of rights-of-way for highways under R.S. 2477. E.g., Small v. Burleigh Cnty., 225 N.W.2d 295 (N.D. 1974); Faxon v. Lallie Civil Tp., 163 N.W. 531, 532 (N.D. 1917).  Primarily, the claim of North Dakota and the Counties is that every section line within or adjacent to Forest Service lands is subject to a sixty-six feet wide public right-of-way running along and extending thirty-three feet on either side of section lines.  Plaintiffs contend this right-of-way burdens the lands of the Dakota Prairie Grasslands regardless of whether a road has been constructed or there is evidence of use of the section line for public travel.

The law accepting the R.S. 2477 grant was enacted by the Dakota Territory in 1871 and stated that "[h]ereafter all section lines in this territory shall be and are hereby declared public highways as far as practicable . . . ." Small, 225 N.W.2d at 297.  After North Dakota achieved statehood, the statute was amended in 1895 without substantial change to the relevant portion

quoted above. N.D. Revised Code § 1050 (1895). Since then, it has been revised, with the present version codified at N.D.C.C. § 24-07-03 and reads as follows:

> In all townships in this state, outside the limits of incorporated cities, and outside platted townsites, additions, or subdivisions recorded pursuant to sections 40-50.1-01 through 40-50.1-17 or recorded prior to July 1, 1987, under former chapter 40-50, the congressional section lines are considered public roads open for public travel to the width of thirty-three feet [10.06 meters] on each side of the section lines.

> The board of county commissioners, if petitioned by a person having an interest in the adjoining land or a portion thereof, after public hearing and a finding by the commissioners of public benefit, may close section lines or portions thereof which are not used for ten years, are not traveled due to natural obstacles or difficulty of terrain, are not required due to readily accessible alternate routes of travel, or are intersected by interstate highways causing the section line to be a deadend, providing the closing of the dead-end section line does not deprive adjacent landowners access to the landowners' property. After the section lines are closed, they may be used to the benefit of the adjacent landowners. However, survey or property reference monuments may not be disturbed, removed, or destroyed. If drainage is interfered with due to the farming operations, alternate means of drainage must be provided for by the landowners or tenants farming the lands.

N.D.C.C. § 24-07-03.

The Plaintiffs allege the territorial law of 1871, along with the subsequent codification and revisions, establishes that all section lines in North Dakota are subject to a public right-of-way and served as a valid acceptance of the R.S. 2477 grant. The Plaintiffs further allege that because North Dakota's law was a valid acceptance of the R.S. 2477 grant and such acceptance occurred prior to the FLMPA enactment, such grant was preserved as a valid existing public right-of-way.

### D.    The Dakota Prairie Grasslands in North Dakota

The current dispute between the Plaintiffs and the United States regarding section line rights-of-way encompasses the lands within the Dakota Prairie Grasslands in North Dakota. The Dakota Prairie Grasslands in North Dakota consist of three distinct grasslands: (1) the Little

Missouri National Grassland, (2) the Sheyenne National Grassland, and (3) the Cedar River National Grassland. Most of the lands within the now-Dakota Prairie Grasslands in North Dakota were settled in the late 1800s through the 1920s for agricultural purposes under the Homestead Act. <u>See</u> Docket No. 90, Ex. A, Attach. 23a, pg. 8. However, some lands which now make-up the Dakota Prairie Grasslands were not settled during this time, but instead remained in the public domain.

By the 1930s, extensive drought, along with plowing of sub-marginal farm land caused the loss of the lands' protective cover. The lands quickly lost fertility and the soil blew, causing "dustbowl" conditions and significant crop failure. As a result, farmers were forced to abandon their land. <u>See</u> Docket No. 90, Ex. A, Attach. 19a, pgs. 24-25. To remedy the situation and re-establish grasses on the land, the federal government sought to reacquire these sub-marginal lands. To this end, the United States Department of Agriculture ("Department of Agriculture") initiated the Land Utilization Program to purchase and develop sub-marginal lands and then transfer lands to their most suitable use. <u>See</u> Docket No. 90, Ex. H, pg. 8. Through the Land Utilization Program, the United States purchased several hundred thousand acres of land in North Dakota and South Dakota. <u>Id.</u> at pg. 30.

Eventually, the Land Utilization Program was supplemented by the Bankhead-Jones Farm Tenant Act ("BJFTA"), which was passed in 1937 to provide "a more permanent status for the land utilization program." <u>Id.</u> at pg. 19. Under the BJFTA, the Secretary of Agriculture was to:

> [d]evelop a program of land conservation and land utilization, including the retirement of lands which are submarginal or not primarily suitable for cultivation, in order thereby to correct maladjustments in land use, and thus assist in controlling soil erosion, reforestation, preserving natural resources, mitigating floods, preventing impairment of dams and reservoirs, conserving surface and subsurface moisture, protecting the watersheds of navigable streams, and protecting the public lands, health, safety, and welfare.

Bankhead-Jones Farm Tenant Act, ch. 517, sec. 31, 50 Stat. 522, 525 (1937).  Pursuant to Title III

of the Act, the Secretary of the Agriculture was specifically authorized "[t]o acquire by purchase,

gift, or devise" submarginal land and land not primarily suitable for cultivation.  Bankhead-Jones

Farm Tenant Act, ch. 517, sec. 32, 50 Stat. 522, 526 (1937).  Such property "may be acquired

subject to any reservations, outstanding estates, interests, easements, or other encumbrances which

the Secretary determines will not interfere with the utilization of such property for the purposes of

this title."  Id.  In 1937, reacquired lands and public domain lands that would later become the

Dakota Prairie Grasslands in North Dakota were withdrawn from "settlement, location, sale or

entry, and reserved and set apart for use and development by the Department of Agriculture for

soil erosion control and other land utilization activities," subject to valid existing rights.  Exec.

Order No. 7673, 2 Fed. Reg. 1512 (July 19, 1937).

By 1939, the Department of Agriculture reacquired an estimated nine million acres of lands

by purchase or condemnation for $46,277,273.00, and had options to buy additional land.

Elizabeth Howard, *Management of the National Grasslands*, 78 N.D. L. Rev. 409, 418 n. 72

(2002).  Between 1936 and 1953, the Department of Agriculture transferred a portion of the lands

acquired under the Land Utilization Program to other federal agencies, including the National Park

Service, Bureau of Indian Affairs, and Fish and Wildlife Service.  See Docket No. 90, Ex. H at

pg. 32.  From 1938 to 1953, the Soil Conservation Services managed most of the submarginal

agricultural lands not transferred to other federal agencies.  See Docket No. 90, Ex. H at pg. 20.

Then, in 1954, the Secretary of Agriculture transferred management of nearly nine (9) million

acres, including those lands that would later became National Grasslands, to the Forest Service.

See Docket No. 90, Ex. H at pg. 36.  The Secretary of Agriculture designated nearly four (4)

million acres of the project lands as National Grasslands. See Docket No. 90, Ex. H at pp. 39-40; Howard, *supra, at* 425.

In 1998, the Forest Service established the Dakota Prairie Grasslands to separate their management from the administration of the Custer National Forest. See Docket No. 90, Ex. A, Attach. 24e, p. 3. As discussed above, the Dakota Prairie Grasslands includes the Little Missouri National Grassland, the Sheyenne National Grassland and the Cedar River National Grassland. Little Missouri National Grassland consists of roughly 1,026,000 acres in McKenizie, Billings, Slope, and Golden Valley Counties. See Docket 17, Ex. 1 (conventionally filed). Of those lands within the Little Missouri National Grassland, roughly 923,700 acres were lands reacquired by the United States, and roughly 101,700 acres are reserved public domain lands. See Docket No. 90, Ex. A, Attach. 2.

The Sheyenne National Grassland is comprised of roughly 71,000 acres in Ransom and Richland Counties. See Docket 17, Ex. 2 (conventionally filed). Of those lands within the Sheyenne National Grassland, roughly 70,200 acres were reacquired by the United States and 40 acres are reserved public domain lands. See Docket No. 90, Ex. C, Attach. 2.

The Cedar River National Grassland consists of roughly 6,800 acres and is located within Grant and Sioux counties. See Docket 17, Ex. 3 (conventionally filed). All the lands within the Cedar River National Grassland were reacquired by the United States. See Docket No. 90, Ex D., Attach. 2.

Against this backdrop, the Court now turns to consider the current motion by the United States to dismiss North Dakota's amended complaint and the Counties' first cause of action in their third amended complaint. In its motion, the United States requests the Court dismiss the

Plaintiffs' Quiet Title Act claims because the time for the Plaintiffs to bring their claims has run, divesting the Court of jurisdiction to hear the case.

## II.    STANDARD OF REVIEW

The United States requests the Court dismiss North Dakota's amended complaint as well as the first cause of action ("Quiet Title to Section Lines") of the Counties' Third Amended and Supplemental Complaint pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure. When considering a motion to dismiss, the Court must generally construe the complaint liberally and assume all factual allegations to be true. Eckert v. Titan Tire Corp., 514 F.3d 801, 806 (8th Cir. 2008). Dismissal will not be granted unless it appears beyond a reasonable doubt that the plaintiff can prove no set of facts that would entitle plaintiff to relief.

Rule 12(b)(1) of the Federal Rules of Civil Procedure governs challenges to subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). Here, the United States asserts a factual challenge to the Court's jurisdiction. In such a factual 12(b)(1) motion, the trial court's jurisdiction – its very power to hear the case – is at issue, and the trial court is "free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." Osborn v. United States, 918 F.2d 724, 730 (8th Cir. 1990). As a result, "no presumptive truthfulness attaches to the plaintiff's allegations" and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims. Spirit Lake Tribe v. North Dakota, 262 F.3d 732, 744 (8th Cir. 2001). The burden is on the plaintiff to demonstrate jurisdiction exists. Id.

### III.　　**LEGAL ANALYSIS**

The complaints of North Dakota and the Counties were brought pursuant to the Quiet Title Act, 28 U.S.C. § 2409a.  In summary, the complaints seeks to quiet title to a public easement for travel within the thirty-three feet on each side of the section lines within the Little Missouri National Grassland, Sheyenne National Grassland, and Cedar River National Grassland in North Dakota.[3]  The United States requests the Court dismiss North Dakota's amended complaint as well as the first cause of action of the Counties' third amended and supplemental complaint pursuant to Rule 12(b)(1) of the Federal Rule of Civil Procedure because the Plaintiffs' claims are untimely and, consequently, this Court lacks jurisdiction over the matter.  The Plaintiffs contend their claims are timely as their complaints were filed within the twelve (12) year statute of limitations of the Quiet Title Act and the Court has jurisdiction over the matter.

The United States is immune from suit absent a waiver of sovereign immunity.  Hart v. United States, 630 F.3d 1085, 1088 (8th Cir. 2011).  The Quiet Title Act ("QTA") provides a limited waiver of sovereign immunity:

> The United States may be named as a party defendant in a civil action under this section to adjudicate a disputed title to real property in which the United States claims an interest, other than a security interest of water rights.

28 U.S.C. § 2409a(a).  The QTA is the exclusive means by which an adverse claimant can challenge the United States' title to real property.  Block v. North Dakota *ex rel.* Bd. of Univ. & Sch. Lands, 461 U.S. 273, 286 (1983).  "Because the QTA waives the government's sovereign immunity from suit, a plaintiff must comply with the limitations period to effectuate that waiver.

---

[3] The Complaint of the Counties alleges seven causes of action.  In the first cause of action, the Counties seek to quiet title to the public easement for travel within the thirty-three feet on each side of the section lines of the Little Missouri National Grassland within the boundaries of the Counties.  See Docket No. 163, p. 18.  The remaining six causes of action seek to quiet title to several particular counties roads.  See Docket No. 163, pp. 19-46.  The claims which seek to quiet title to specific county roads are not encompassed by the United States' motion to dismiss.

Hence the QTA statute of limitations acts as a jurisdictional bar unlike most statutes of limitations, which are affirmative defenses." Spirit Lake Tribe, 262 F.3d at 737-38 (internal citations omitted).[4]

When the QTA was enacted in 1972, it contained a 12-year statute of limitations that applied to all QTA actions and reads as follows:

> Any civil action under this section shall be barred unless it is commenced within twelve years of the date upon which it accrued. Such action shall be deemed to have accrued on the date the plaintiff or his predecessor in interest knew or should have known of the claim of the United States.

Block, 461 U.S. at 275 n.1 (quoting Act of Oct. 25, 1972, Pub. L. No. 92-562, 86 Stat. 1176, codified at 28 U.S.C. § 2409a(f)). In 1983, the Supreme Court concluded in *Block* this limitation period applied to claims brought by the states. Id. at 290. Dissatisfied with the result in *Block*, Congress amended the Quiet Title Act in 1986. The amendment did not modify the statute of limitations for claims brought by persons or entities other than the states, but added new provisions to limit the reach of the 12-year limitations period to only certain lands of the United States and, for some types of lands, provide a new test for when a claim accrues.

Current subsection (g) of 28 U.S.C. § 2409a, describes the statute of limitations applicable to claims brought by persons or entities other than the states:

> Any civil action under this section, except for an action brought by a State, shall be barred unless it is commenced within twelve years of the date upon which it accrued. Such action shall be deemed to have accrued on the date the plaintiff or

---

[4] Some circuit courts of appeal have questioned whether the QTA's limitations period serves as a jurisdiction bar. In *Irwin v. Dep't of Veteran Affairs*, the United States Supreme Court concluded the statute of limitations in an employment discrimination action against the United States was subject to equitable tolling. 498 U.S. 89, 95-96 (1990). Courts have interpreted *Irwin* to imply a statute of limitations does not function as a jurisdictional bar for claims against the United States. See e.g., Wisconsin Valley Improvement Co. v. United States, 569 F.3d 331, 334 (7th Cir. 2009). For example, in *Schmidt v. United States*, the Eighth Circuit concluded the statute of limitations in the Federal Tort Claims Act is not jurisdictional pursuant to the Supreme Court's holding in *Irwin*. 933 F.2d 639, 640 (8th Cir. 1991). Nonetheless, absent an express contrary manifestation by the Eighth Circuit or the United States Supreme Court, this Court follows the Eighth Circuit's determination in *Spirit Lake Tribe* that the QTA's statute of limitations serves as a bar to the district court's jurisdiction. See 262 F.3d at 737-38

his predecessor in interest knew or should have known of the claim of the United States.

28 U.S.C. § 2409a(g).  In contrast, current subsection (i) of 28 U.S.C. § 2409a, outlines the limitations period applicable to claims brought by a state:

> Any civil action brought by a State under this section with respect to lands, other than tide or submerged lands, on which the United States or its lessee or right-of-way or easement grantee has made substantial improvements or substantial investments or on which the United States has conducted substantial activities pursuant to a management plan such as range improvement, timber harvest, tree planting, mineral activities, farming, wildlife habitat improvement, or other similar activities, shall be barred unless the action is commenced within twelve years after the date the State received *notice* of the Federal claims to the lands.

28 U.S.C. §2409a(i) (emphasis added).

The Court is now tasked with determining whether North Dakota and the Counties complied with the limitations period of the Quiet Title Act to effectuate a waiver of sovereign immunity by the United States.  Because North Dakota instituted its action on September 14, 2012, its attempt to quiet title is barred if the State received notice of the United States' adverse claim by September 14, 2000.  See Docket No. 17 (Case No. 1:12-cv-125).  The Counties attempt to quiet title is barred if they knew or should have known of the United States' adverse claim by July 30, 2000, as the Counties instituted their action on July 30, 2012.  See Docket No. 1 (Case No. 1:12-cv-102).  The Court first examines whether North Dakota timely brought its action, and then examines whether the Counties timely brought their action.

### A.    QTA Statute of Limitations and North Dakota's Claims

North Dakota filed its complaint on September 14, 2012.  See Docket No. 1.  In its motion to dismiss, the United States contends North Dakota's amended complaint should be dismissed because North Dakota cannot prove their claims are timely under the QTA.  To determine whether

North Dakota's claims were timely brought pursuant to the QTA, the Court looks to 28 U.S.C. § 2409a(i), which provides:

> Any civil action brought by a State under this section with respect to lands, other than tide or submerged lands, on which the United States or its lessee or right-of-way or easement grantee has made substantial improvements or substantial investments or on which the United States has conducted substantial activities pursuant to a management plan such as range improvement, timber harvest, tree planting, mineral activities, farming, wildlife habitat improvement, or other similar activities, shall be barred unless the action is commenced within twelve years after the date the State received notice of the Federal claims to the lands.

28 U.S.C. § 2409a(i).[5]  For the purposes of the accrual of an action brought by a state pursuant to subsection (i), "notice" shall be:

> (1)     By public communications with respect to the claimed lands which are sufficiently specific as to be reasonably calculated to put the claimant on notice of the Federal claim to the lands, or
> (2)     By the use, occupancy, or improvement of the claimed lands which, in the circumstances, is open and notorious.

28 U.S.C. § 2409a(k).  Before the Court can determine whether the limitations period in Section 2409a(i)'s precludes North Dakota's claim, the Court must first decide whether Section 2409a(i) applies to the lands at issue.

## 1.     <u>Applicability of 28 U.S.C. § 2409a(i) Limitation Period</u>

As outlined above, the twelve (12) year statute of limitations proscribed in subsection (i) *only* applies to lands "on which the United States or its lessee or right-of-way or easement grantee": (1) has made substantial improvements or substantial investments or on which the United States (2) has conducted substantial activities in accordance with a management plan, such as range improvement, timber harvest, tree planting, mineral activities, farming, wildlife habitat

---

[5] The parties do not contend the 12-year statute of limitations language ("knew or should have known") in the QTA prior to the 1986 amendment applies to North Dakota's claims.  Nonetheless, because of the jurisdictional nature of the QTA limitation period, the Court must give due consideration to the applicability of the "knew or should have known" standard as to actions that may constitute notice prior to the time of the 1986 amendment.

improvement, or other similar activities. 28 U.S.C. § 2409a(i). Both parties dedicate substantial space in their briefing to the issue of whether the concerned lands here are of the type of lands to which 28 U.S.C. §2409a(i) applies. The United States posits that the twelve (12) year limitations period of Section 2409a(i) applies because the Soil Conservation Service as well as the Forest Service and its permitees have made substantial improvements within the Dakota Prairie Grasslands, including improvements to the thirty-three feet on each side of sections lines. See Docket No. 90, pp. 42-49. According to North Dakota, the lands at issue are not of the type contemplated within Section 2409a(i) because any improvements or investments by the Soil Conservation Service or the Forest Service and its permitees' are not substantial activities for the purposes of Section 2409a(i) and are not significantly related to the section line right-of-way. See Docket No. 104, pp. 42-49.

In its brief, the United States describes many distinct improvements and investments made to the Dakota Prairie Grasslands, including (1) improvements to combat dustbowl conditions and prevent soil erosion in the 1930s and 1940s, (2) range improvements, (3) oil and gas development, and (4) public recreation. Although many of the improvements and investments described by the United States were made within the Dakota Prairie Grasslands, the Court looks only to those improvements and investments made within the thirty-three feet on each side of the section lines of the Dakota Prairie Grasslands, to determine whether the United States, or its lessee or right-of-way or easement grantee, made substantial improvements or investments or conducted substantial activities in accordance with a management plan. See 28 U.S.C. § 2409a(i). In its first amended complaint, North Dakota explicitly and specifically requests the Court to "quiet title to the public easement that provides a right-of-way for public travel on the thirty-three feet on each side of section lines in North Dakota, regardless of whether a visible road or trail exists." See Docket No.

17.  In particular, the State seeks to quiet title to this easement on land acquired by the United States in the 1930s, 1940s, and 1950s that is currently administered and managed through the Department of Agriculture by the Forest Service.  Id.  Accordingly, the scope of this quiet title action is limited to the lands within the thirty-three feet on each side of section lines, as presented by the State in its complaint.  The question for the Court to then consider is whether Section 2409a(i) applies to the thirty-three feet on each side of the section lines within the Little Missouri National Grassland, Sheyenne National Grassland, and Cedar River National Grassland.

Neither party has directed the Court to a decision by any court that meaningfully analyzes whether any improvement, activity, or investment by the United States' is considered 'substantial' to determine the applicability of Section 2409a(i).  Moreover, after a thorough review of QTA actions across the country, the Court was unable to identify any well-developed case law outlining what particular improvements, activities, or investments are "substantial" when the concerned land consists of a right-of-way for public travel within the 33 feet on each side of section lines.  The sole decision in which the Court finds guidance is the Tenth Circuit's decision of *San Juan County v. United States*, which addressed whether the QTA limitations period barred Utah's claim to a right-of-way to use a road with the Canyonlands National Park. 754 F.3d 787, 790 (10th Cir. 2014).

In *San Juan County v. United States*, the Tenth Circuit addressed the applicability of Section 2409a(i) and determined reservation of land as a national park, reconstruction of the park's access road, repair and maintenance of the disputed road to ensure it remained usable by vehicles, and restoration of the disputed road after floods were "substantial activities" conducted by the United States sufficient to trigger the application of Section 2409a(i).  Id. at 795.  However, the *San Juan* Court did not expound on its reasoning for determining these activities were "substantial activities" conducted by the United States.  With only this guidance, the Court turns to examine

investments, improvements, and activities of the United States, as well as its lessees or right-of-way or easement grantees, within the thirty-three feet on each side of the section lines in the Dakota Prairie Grasslands.

In its brief, the United States identifies several improvements, activities, and investments made to the Dakota Prairie Grasslands, including (1) improvements to combat dustbowl conditions and prevent soil erosion in the 1930s and 1940s, (2) range improvements, (3) oil and gas development, and (4) public recreation. As previously discussed, the Soil Conservation Service managed most of the submarginal agricultural lands in the Land Utilization Project. These lands eventually became part of the National Grasslands, including the Dakota Prairie Grasslands. Improvements made by the Soil Conservation Service to these lands include the following:

> [G]eneral land treatment, structural improvements, provision of transportation facilities, control of erosion, flood control, water storage, and development for forestry, recreation, and wildlife. Buildings and fences were removed; old roads no longer needed were blocked up; new roads were built where needed; suitable areas were seeded to grass or planted in trees; forest stands were improved and protected from fire; gullies were stopped; terraces, stock ponds and dams were built; and stream channels were widened and cleaned.

See Docket No. 90, Ex. H, pg. 25. The record is unclear whether these improvements were made within the thirty-three feet of the section lines in the Dakota Prairie Grasslands. However, the United States enumerates several specific improvements made within the thirty-three feet of the section lines of the Dakota Prairie Grasslands. For instance, the Soil Conservation Service planted many trees during its management of the land. See Docket No. 90, Ex. C, ¶ 20. In two locations, the tree plantings are large enough to block motorized travel the entire sixty-six feet (thirty-three feet on each side) of the section line. Several other tree plantings are within thirty-three feet of section lines. Id.

Certain lands within the National Grasslands have also been made available to ranchers for grazing through cooperative grazing associations. The Forest Service issues permits to local grazing associations, allowing the associations to graze livestock on the lands. Pursuant to management programs for the grasslands, grazing associations are required to facilitate public grazing on the lands through conservation practices, which include construction of fences, cattle guards, and water supply improvements. The cost of these projects completed by grazing associations is then subtracted from the annual fee charged by the Forest Service for grazing on the lands. The Forest Service estimates 54 stockwater tanks, 35 dams, 2 dugouts, 25 water wells, 7 spring developments, 8 windmills, 4 corrals, 1,309.29 miles of fence, and 227.89 miles of stockwater pipeline, constructed through conservation practices, are located within or across the thirty-three feet on either side of the sections lines within the Dakota Prairie Grasslands. See Docket No. 90, Ex. B, ¶ 32, and Ex. C, ¶ 16. In addition, at least ten exclosures (fences designed to exclude livestock and/or wildlife from certain areas) constructed by the Forest Service cross section lines.

Within the Dakota Prairie Grasslands, the Forest Service and the Bureau of Land Management ("BLM") cooperatively manage the leasing and drilling of federal minerals, such as oil and gas, under federal surface estates. According to its brief, the United States "owns the mineral rights for approximately 79% of the National Forest System lands within the Little Missouri National Grassland." See Docket No. 90, p. 40. For federal mineral interests, the BLM enters into a mineral lease upon receiving authorization to do so from the Forest Service, after the Forest Service completes a leasing analysis. The lessee of the mineral interest must then request a permit to drill on an oil or gas lease. Before commencing operations, the lessee must have both

an approved surface use plan of operations from the Forest Service as well as an approved permit. See 30 U.S.C. § 226(g).

The United States identified forty-one (41) oil and gas well sites (including associated well pads) in the Dakota Prairie Grasslands located within thirty-three feet of a section line or across a section line. See Docket No. 90, Ex. A, ¶ 19, and Ex. B, ¶ 20. Of those forty-one leases, thirty-eight (38) involve the leasing of federal mineral interests. See Docket No. 148, Ex. F, ¶ 7 and Ex. G, ¶ 7. Of those well sites located within thirty-three feet of a section line or across a section line, the first was drilled in 1980. See Docket No. 90, Ex. A, ¶ 19. The Forest Service also grants permits to operators of special use facilities (e.g. compressor stations and trucking stations) to support oil and gas development. In the Little Missouri National Grassland alone, five special use facilities are located within thirty-three feet of a section line.[6] See Docket No. 90, p. 40.

The Forest Service maintains numerous campgrounds, recreational trails, and other facilities throughout the Dakota Prairie Grasslands. The boundaries of five campgrounds (Burning Coal Veil Campground, Buffalo Gap Campground, Summit Campground, Elkhorn Campground, and Civilian Conservation Corps Campground) are within thirty-three feet of a section line. The first, Burning Veil Campground, is located approximately ten miles northwest of Amidon, North Dakota. Burning Veil Campground was once a dispersed camping area, but was developed into a campground during the 1960s. Current facilities at the Burning Veil Campground include: eight campsites, a hand-operated water pump, an informational kiosk, site markers and directional signs, open areas between and around campsites, and graveled roads. Each campsite includes "graveled

---

[6] In its brief, the United States claims "[t]hirty-six special use facilities have been approved [on] Nation Forest System lands in the Little Missouri National Grassland, four of which are within thirty-three feet of a section line and one of which is located entirely within the claimed section line right-of-way." See Docket No. 90, p. 40. The United States directs the Court to two declarations (Jablonski and Frederick) in support of its claims. Upon thorough review of those declaration, the Court is only able to determine that four special use facilities are within thirty-three feet of a section.

parking areas and graveled pads with a table and fire ring." See Docket No. 90, Ex. A, ¶ 52. The southern trailhead to the Maah Daah Hey Trail, which is within thirty-three feet of a section line, is also incorporated into the campground.

Buffalo Gap Campground is located approximately seven (7) miles west of Medora, North Dakota. Buffalo Gap Campground was first developed during the 1960s, but was closed to the public for several years in the 1990s due to substandard road conditions. The current facilities at Buffalo Gap Campground include:

> [B]oundary fence, water and wastewater system (storage tanks, pump, water lines, 11 water hydrants, lift station, two drain fields, and a sewer hookup at one of the host sites), two comfort stations with running water and flush toilets, one vault toilet, one shower building with 3 showers, paved day-use parking area, 75-person picnic shelter, paved access road, two paved campground loop roads, 37 campsites (two or which are host sites with electric hookups), site markers and directional signs, garbage cans, information kiosk, pollinator garden with interpretive signs, overlook with paved trail and interpretive signs, and a scenic loop trail.

See Docket No. 90, Ex. A, ¶ 53. Buffalo Gap Campsite covers approximately 190 acres. The Summit campground was similarly constructed in the 1960s, although first constructed as a picnic site. In 2001, the Forest Service upgraded the campground. The current facilities at the Summit Campground, which traverses a section line, include three drive-up campsites with graveled parking areas and graveled pad with picnic tables and fire rings. There are also two walk-in sites accessible by a short trail, each of which has a table and fire ring.

The remaining two campgrounds with exterior boundaries within thirty-three feet of a section line were constructed in the late 1990s and early 2000s. The Civilian Conservation Corps Campground was a well-known dispersed camping site for decades before development as a campground. The current facilities at the Civilian Conservation Corps Campground include a picnic shelter, thirty-two campsites, a host site with electrical and sewer hookups, a hand-operated water pump, site markers, three vault toilets, an informational kiosk, three sets of hitch rails,

graveled roads, directional signs, and a boundary fence.  <u>See</u> Docket No. 90, Ex. B, ¶ 38.  The last

campground within thirty-three feet of a section line is the Elkhorn Campground.  The Elkhorn

Campground is approximately twenty miles north of Medora, North Dakota.  According to Ronald

Jablonski, then District Ranger for the Medora Ranger District:

> Elkhorn Campground was developed soon after the May 2000 decision as part of
> the Maah Daah Hey Overnight Site Project.  Public scoping for the project began
> in June 1999, and the Decision Notice and Finding of No Significant Impact were
> signed in May of 2000.

<u>See</u> Docket No. 90, Ex. A, ¶ 54.  Currently, the facilities at the Elkhorn Campground include ten

campsites, a vault toilet, two hitching rails, a hand-operated water pump, site markers and

directional signs, an informational kiosk, graveled roads, and a boundary fence.  <u>Id.</u>  In addition to

campgrounds, the Forest Service also maintains approximately 250 miles of hiking trails through

the Grasslands.  <u>See</u> Docket No. 148, p. 43.

The United States contends the above-described maintenance of campgrounds and hiking

trails to facilitate public recreation, oil and gas development by its lessees, range improvements in

coordination with grazing associations through conservations practices, and improvements to the

lands by the Soil Conservation Service, constitute substantial improvements, substantial

investments, and substantial activities conducted pursuant to management plans by the United

States within the thirty-three feet on each side of section lines in the Dakota Prairie Grasslands.

<u>See</u> 28 U.S.C. § 2409a(i).  As such, the United States reasons Section 2409a(i) applies to the lands

in dispute (i.e., the thirty-three feet on either side of section lines in the Dakota Prairie Grasslands).

North Dakota, with support from the Counties, claims the lands in dispute fall outside the scope

of Section 2409a(i) because the United States, or its lessees or right-of-way or easement grantees,

have not made substantial improvements, have not made substantial investments, and have not

conducted substantial activities pursuant to a management plan to the lands.

North Dakota first contends any improvements or investments by the Soil Conservation Service were not substantial and not specifically tied to the Dakota Prairie Grasslands or the thirty-three feet on either side of section lines within the Dakota Prairie Grasslands. See Docket No. 104, pp. 59-61. In support of its contention, North Dakota specifically notes the improvements by the Soil Conservation Services are not improvements in the "traditional sense" and the roughly $150 million investment into lands by the United States as part of the Land Utilization program should not be considered by the Court because these costs were likely apportioned unevenly across lands. Further, North Dakota highlights a missing nexus between the improvements (e.g. structural improvements, control of erosion, flood control, water storage, buildings and fences removal, new road construction, tree planting, and dams) by the Soil Conservation Service as part of the land utilization and the lands at issue in this case.

It is undisputed by the parties the United States invested in the lands that later became the Dakota Prairie Grasslands when it acquired the lands. It is also undisputed the Soil Conservation Service improved those same lands through its management of the land utilization program. Nonetheless, the Court agrees with North Dakota the record is unclear whether substantial improvements by the Soil Conservation Service were made within the thirty-three feet of section lines in the Dakota Prairie Grasslands. Even keeping in mind the fact that the Soil Conservation Services planted trees encroaching the thirty-three feet of section lines during its management of the lands, the scope of other similar improvements by the Soil Conservation Service within the thirty-three feet of section lines in the Dakota Prairie Grasslands is unknown.

The Court fully acknowledges the United States made substantial improvements to and substantial investment in the sub-marginal lands of the land utilization program. To define which improvements and what portion of the United States' monetary investment are attributable to the

thirty-three feet on either side of the section lines in the Dakota Prairie Grasslands is an impractical, if not impossible, task. In fact, it is one which the Court need not undertake at this juncture. Even assuming, *arguendo*, improvements and investment attributable to the thirty-three feet on either side of the section lines within sub-marginal lands of the land utilization program (that later became the Dakota Prairie Grasslands) were not substantial, the Court would nonetheless conclude the United States, along with its lessees, made substantial improvements, substantial investments, and has conducted substantial activities within the thirty-three feet on either side of the section lines of the Dakota Prairie Grasslands for the reasons discussed below.

North Dakota next challenges the United States' assertion its oil and gas development and range improvements are substantial investments and improvements to the lands. North Dakota explicitly contends range improvements should not be considered by the Court to determine the applicability of Section 2409a(i) because the improvements were made by grazing associations as permittees and the ownership of such improvements is unknown. Although North Dakota suggests any range improvements to the Dakota Prairie Grasslands constructed through conservation practices should not be considered by the Court because the ownership of the improvements is unknown or ambiguous, the plain language of 28 U.S.C. § 2409a(i) does not require the ownership of an improvement to be vested in the United States, or even known, for such improvement to trigger Section 2409a(i).[7] In addition, North Dakota has not directed the Court to any case law in support of this contention. North Dakota also argues any range improvements were not significant or substantial based upon Forest Service employees' deposition testimony. North Dakota directs the Court to the deposition testimony of several Forest Rangers in which the Forest Rangers discussed whether improvements, investments, and activities were substantial or significant. A

---

[7] The Court notes the ownership of permanent structural range improvements is vested in the United States. 36 C.F.R. 222.9.

review of the Forest Rangers' depositions reveals each discussed his subjective view of whether improvements, investments, and activities within the Dakota Prairie Grasslands were "significant" or "substantial." The Court is not convinced it should rely on individuals' subjective definitions of the terms "substantial" and "significant" as guidance for this Court's legal determination of whether investments, activities, or improvements are "substantial" as used in Section 2409a(i). Under some circumstance it may be appropriate for a Court to give due consideration to a particular individual's view of whether improvements, activities, and investments are substantial; however, doing so here introduces an unnecessary degree of subjectivity into the Court's inquiry and results in a malleable definition, easily shaped by the parties' intentions.

North Dakota also requests the Court not consider range improvements made by grazing associations in its determination of whether 28 U.S.C. § 2409a(i) applies because such range improvements were made by grazing associations as permittees, and were not made by the "United States or its lessee or right-of-way or easement grantee." See 28 U.S.C. §2409a(i). The plain language of Section 2409a(i) limits its application to lands "on which the *United States or its lessee or right-of-way or easement grantee* has made substantial improvements or substantial investments or on which the United States has conducted substantial activities . . ." 28 U.S.C. § 2409a(i) (emphasis added). North Dakota interprets this portion of Section 2409a(i) to exclude its application to lands on which permittees (i.e. grazing associations) of the United States conducted activities or made improvements. However, the grazing associations' relationship with the United States cannot be simply categorized as a permittee of the United States. Instead, the relationship between the United States and local grazing associations is defined by Allotment Management Plans (36 C.F.R. § 222.1(b)(2)), grazing or livestock use permits, as well as association rules. In addition, 36 C.F.R. § 222.7 outlines one of the purposes of grazing associations is to provide a

means for permittees to "share costs for handling of livestock, construction and maintenance of range improvements." See 36 C.F.R. § 222.7(a)(2)(iv). Based upon the Court's thorough review of the record, the historical cooperative relationship between grazing associations and the Forest Service, and the pertinent federal regulations, it is it apparent to the Court that the status of grazing associations, along with their members, is not merely that of a permittee of the United States.

Of course, Section 2409a(i) does not address its applicability to lands on which improvements and investment made pursuant to the unique relationship between grazing associations and the United States. However, Section 2409a(i) directs that the twelve year statute of limitation applies to lands "on which the United States has conducted substantial activities pursuant to a management plan such as *range improvement* . . . ." 28 U.S.C. § 2409a(i) (emphasis added). Section 2409a(i) also lists several other activities that trigger the application of the statute of limitations when conducted by the United States, including "timber harvest, tree planting, mineral activities, farming, and wildlife habitat improvement." Id. Of these enumerated substantial activities outlined in Section 2409a(i), it is not unfathomable to imagine the United States works in conjunction with private individuals, state agencies, or local municipalities to conduct many of these substantial activities, particularly farming, timber harvest, mineral activities, and range improvements on lands. In fact, as discussed later, the United States routinely enters into leases with private individuals to conduct mineral activities.

Given the statutory construction canon of *noscitur a sociis*, which counsels that a word is given more precise content by the neighboring words with which it is associated, the term "range improvements" in Section 2409a(i) is more precisely contextualized by the surrounding terms. See Perez v. Loren Cook Co., 750 F.3d 1006, 1019 (8th Cir. 2014). Inclusion of a list of substantial activities traditionally conducted by the United States, with cooperation, assistance, or work from

others, is a clear indication from Congress that substantial activities conducted by the United States in conjunction with others triggers the applicability of Section 2409a(i). Requiring range improvements to be made exclusively by the United States and not by grazing associations in cooperation with the United States would similarly signal timber harvest, mineral activities, and farming could not be considered in the Court's determination of the applicability of Section 2409a(i) unless conducted solely by the United States. Such statutory construction is inapposite to the purpose of the Quiet Title Act to timely settle claims to free the lands upon which the United States, in conjunction with others, conducts substantial activities pursuant to the management plan from the applicability of the twelve year statute of limitations. See Block v. North Dakota, 461 U.S. 273, 285 (1983). Accordingly, to interpret Section 2409a(i) to apply only when substantial activities are conducted *solely* by the United States, without cooperation, assistance, or work from others, too severely limits the lands to which Section 2409a(i) applies. As discussed above, the Forest Service describes numerous range improvements located within or across the thirty-three feet on either side of section lines, including 54 stockwater tanks, 35 dams, 2 dugouts, 25 water wells, 7 spring developments, 8 windmills, 4 corrals, 1,309.29 miles of fence, and 227.89 miles of stockwater pipeline. See Docket No. 90, Ex. B, ¶ 32, and Ex. C, ¶ 16. The Court concludes these range improvements constitute substantial activities made pursuant to a management plan by the United States to trigger the application of Section 2409a(i) to the lands within the thirty-three feet on either side of the section lines within the Dakota Prairie Grasslands. The Court similarly concludes that Section 2409a(i) applies to these lands because of the United States' mineral activities and improvements to facilitate recreation in the Dakota Prairie Grasslands as discussed below.

North Dakota does not dispute the United States' ownership of mineral rights within the Dakota Prairie Grasslands and does not dispute the fact that the United States, through the BLM, enters into mineral leases with parties which then are permitted to drill for oil and gas. As previously discussed, for federal mineral interests, the BLM enters into a mineral lease upon receiving authorization to do so from the Forest Service. The lessee of the mineral interest must then request a permit to drill on an oil or gas lease. The United States identified thirty-eight (38) oil and gas well sites (including associated well pads) in the Dakota Prairie Grasslands that involve the leasing of federal mineral interest and are located within thirty-three feet of a section line or across a section line. See Docket No. 148, Ex. F, ¶ 7 and Ex. G, ¶ 7. Of the well sites located within thirty-three feet of a section line or across a section line, the first was drilled in 1980. See Docket No. 90, Ex. A, ¶ 19. Although it is true lessees of federal mineral interests, as well as other operators of special use facilities to support oil and gas development, are required to receive permits from both federal and state governments to conduct oil and gas activities, such entities are unquestionably lessees of the United States. These lessees have constructed numerous oil and gas well sites within the thirty-three feet of a section line. Accordingly, the Court concludes such construction and development constitutes "substantial improvements or substantial investments" within thirty-three feet of section lines within the Dakota Prairie Grassland for the purposes of 28 U.S.C. § 2409a(i) by the United States' lessees.

Last, North Dakota notes the Court should not consider recreation areas and activities because these "were only recently improved." See Docket No. 104, p. 66. North Dakota's assertion is unsupported by evidence and contrary to the record. As discussed above, campgrounds in the Dakota Prairie Grasslands were developed as early as the 1960s. In addition, the Forest Service maintains approximately 250 miles of hiking trails through the Grasslands, with some

portion of the trials within or crossing the thirty-three feet on either side of section lines.  See Docket No. 148, p. 43.  Therefore, the Court concludes the development of these recreational facilities constitutes substantial improvement, investment, and activities by the United States within thirty-three feet of section lines within the Dakota Prairie Grassland for the purposes of 28 U.S.C. § 2409a(i).

Upon careful review of the record, the Court concludes as a matter of law that the development of recreational facilities by Forest Service, construction and development of oil and gas well sites by the United States' lessees, and range improvements by the United States in coordination with grazing associations within the thirty-three feet of the section lines within the Dakota Prairie Grasslands satisfy the requirements of 28 U.S.C. § 2409a(i) to trigger its application to the claims brought by North Dakota.  Accordingly, the action brought by North Dakota as to the thirty-three feet on either side of section lines within the Dakota Prairie Grasslands is barred unless the action was commenced "within twelve years after the date the State received notice of the Federal claims to the lands."  28 U.S.C. § 2409a(i).

## 2. <u>Notice of Federal Claims to North Dakota</u>

As the Court has determined 28 U.S.C. § 2409a(i) applies to North Dakota's claims, the Court must now determine whether North Dakota timely brought such claims.  Section 2409a(i) bars actions by a State when the action is "commenced within twelve years after the date the State received notice of the Federal claims to the lands."  28 U.S.C. § 2409a(i).  For the purposes of the accrual of an action brought by a state pursuant to Section 2409a(i), "notice" must be:

> (1)  By public communications with respect to the claimed lands which are sufficiently specific as to be reasonably calculated to put the claimant on notice of the Federal claim to the lands, or

(2)     By the use, occupancy, or improvement of the claimed lands which, in the circumstances, is open and notorious.

28 U.S.C. § 2409a(k).  The trigger to start the QTA limitations period has been described as an "exceedingly light one."  Kane Cnty. v. United States, 772 F.3d 1205, 1215 (10th Cir. 2014) (quoting George v. United States, 672 F.3d 942, 944 (10th Cir. 2012).[8]  Courts have consistently held all that is necessary to trigger the QTA general limitation period in subsection (g) is a "reasonable awareness that the Government claims some interest adverse to the plaintiff's."  Knapp v. United States, 636 F.2d 279, 283 (10th Cir. 1980); see, e.g., Kane Cnty., 772 F.3d at 1215; Michel v. United States, 65 F.3d 130, 131-32 (9th Cir. 1995); and North Dakota ex rel Bd. of Univ. & Sch. Lands v. Block, 789 F.2d 1308, 1313 (8th Cir. 1986).

As with the general limitation period in subsection (g), the only notice sufficient to trigger the subsection (i) limitation period is notice of an *adverse* claim.  San Juan Cnty. v. United States, 754 F.3d at 795-96 (emphasis added).  When the plaintiff claims a non-possessory interest in property, such as an easement, "knowledge of a government claim of ownership may be entirely consistent" with the plaintiff's claim.  Michel, 65 F.3d at 132.  In fact, the public's use of a right-of-way is not always inconsistent with the government's asserted property interest, but the two interests may peaceably coexist.  McFarland v. Norton, 425 F.3d 724, 727 (9th Cir. 2005).  In *McFarland*, the Ninth Circuit further explained this symbiotic relationship:

> The government, in its capacity as the owner of the servient tenement, has the right to reasonable use of its land, and its rights and the rights of easements owners are mutually limiting, though of course easements are burdensome by their very nature, and the fact that a given use imposes a hardship upon the servient owner does not, in itself, render that use unreasonable or unnecessary.  It follows that mild interference with the use of an easement pursuant to the government's own property interests will not start the state of limitations running.

---

[8] In Kane County, the Tenth Circuit described the trigger for the limitations period as an "exceedingly light one" in its discussion of the contours of both the limitations period of Section 2409a(i) applicable to the states and the general limitations period in subsection (g).  See Kane Cnty., 772 F.3d at 1215.

425 F.3d at 727 (internal quotations and citations omitted). Consequently, as several courts have explained, the QTA limitations period is triggered only when the government "denies or limits the use" of the road to which the plaintiff claims a right-of-way. Michel, 65 F.3d at 132; Kane Cnty., 772 F.3d at 1215. See also San Juan Cnty., 754 F.3d at 794; George, 672 F.3d at 946; Park Cnty. v. United States, 626 F.2d 718, 720-21 (9th Cir. 1980).

According to the United States, the Forest Service's management of the Dakota Prairie Grasslands, including its restrictions on travel and road construction, sufficiently put North Dakota on notice of the United States' claim to exclusive control of the thirty three feet on either side of section lines prior to September 14, 2000. As more thoroughly discussed above, the Forest Service has managed the lands of the National Grasslands since 1954. See Docket No. 90, Ex. H at pg. 36. Throughout the past decades, the Forest Services has implemented various plans and policies and issued several Record of Decisions affecting the Dakota Prairie Grasslands. According to the United States, these management activities have sufficiently notified North Dakota - as early as 1974 - of its claim to exclusive control of the thirty three feet on either side of section lines in the Dakota Prairie Grasslands. Specifically, the United States' contends the Forest Service management activities sufficient to put North Dakota on notice include (a) 1974 Badlands Plan and 1975 Rolling Prairie Plan, (b) 1976/1977 Travel Plans for Sheyenne National Grassland and Little Missouri National Grassland, (c) RARE I, RARE II, and the Roadless Rule, (d) 1980 Travel Plan for Sheyenne National Grassland, (e) 1986 Custer Plan & 1987 Record of Decision, (f) the Draft Off-Highway Vehicle Plan, (g) July 2002 Record of Decision for Dakota Prairie Grasslands, (h) Travel Restrictions in the Theodore Roosevelt National Park, and (i) use, occupancy, and Improvements by the Forest Service. The Court discusses whether each of these specific

management activities triggered the limitations period within 28 U.S.C. §§ 2409a(i) and (k) in turn.

### a.     1974 Badlands Plan and 1975 Rolling Prairie Plan

The United States refers to a document entitled "Management Prescription for the Badlands Planning Unit, Little Missouri National Grasslands, Custer National Forest, Environmental Statement" as the "1974 Badlands Plan." See Docket No. 90, Ex. A, Attach. 19a.  The United States refers to a document entitled "Management Plan Rolling Prairie Planning Unit, Little Missouri National Grasslands, Custer National Forest, Final Environmental Statement" as the "1975 Rolling Prairie Plan. See Docket No. 90, Ex. A, Attach. 20.  North Dakota contends these documents are environmental impact statements.  See Docket No. 104, p. 81.  Regardless of nomenclature, these documents provided management direction within the Badlands and Rolling Prairie Planning Units of the Custer National Forest.[9] See Docket No. 90, Ex. A, Attachs. 19a (pg. 19) & 20 (pg. 19).  First, the 1974 Badlands Plan outlines several basic assumptions to apply to "this planning effort and to the Management Prescription":

> a.     Because of the complex and intermingled ownership pattern within the Badlands Planning Unit, the inventories and Management Prescription include land of various private and public ownership.  This in no way is intended to indicate or dictate the use of such lands.  Effective management cannot be achieved without a cooperative private, state and federal approach.
>
> . . .
>
> c.     Existing legal land commitments will be honored.  The legal rights of surface and subsurface land owners and their leaseholders will be respected.

---

[9] The Forest Service only established the Dakota Prairie Grasslands in 1998, to separate their management from the administration of the Custer National Forest.  See Docket No. 90, Ex. A, Attach. 24e, p. 3.

See Docket No. 90, Ex. A, Attach 19a, pg. 53.  In the section discussing management prescription activities, the 1974 Badlands Plan purports to designate areas "for restriction of development", including essentially roadless areas[10]:

C.  The 10 essentially roadless areas, identified on the Management Prescription Map (Figure 5), will be managed for the preservation of their essentially roadless characteristics; 16% of the Planning Unit.  This would not affect grazing under the existing pattern but may limit some improvements.  The following management regulations will apply in the essentially roadless areas:

. . .

1. *Off-road vehicle use will be prohibited except by permit or in case of emergency.*

2. No marked routes or constructed trails will be allowed.

. . .

Id. at 72 (emphasis added).  Additionally, the 1974 Badlands Plan addresses use of off-road vehicles in the Ponderosa Pines Area:

On federal land in the Ponderosa Pines Area, management direction will closely parallel the management direction of essentially roadless areas.  The following management regulations will apply in the Ponderosa Pines Area; 83,880 gross acres (7% of the Planning Unit).  Only about half of this area is federally owned.

1. *Control of off-road vehicle use will be accomplished by a cooperative county-private-federal agreement.*

Id. at 73 (emphasis added).  The 1974 Badlands Plans contemplates that off-road vehicle use is not allowed on the Upland Breaks and River Breaks as well as the ten identified essentially roadless areas and in the Ponderosa Pines Area.  Id. at 79.  The 1974 Badlands Plans also does not allow

---

[10] Within the 1974 Badlands Plan, the term "essentially roadless areas" encompasses areas with "opportunities for solitude or a primitive and unconfined type of recreation" and have "ecological, geological, or other features of scientific, educational, scenic, or historical value."  See Docket No. 90, Ex. A, Attach 19a, pg. 27.  To be classified as an "essentially roadless area" under the 1974 Badlands Plan, the roads inside the essentially roadless area may only consist of parallel wheel tracks, but their use may be well established.  Id. at 28.  However, graded roads are not permissible in these essentially roadless areas.  Id.  An almost identical discussion of "essentially roadless areas" is included in the 1975 Rolling Prairie Plan.  See Docket No. 20, Ex. A, Attach. 20, pg. 30.

for new construction of roads in the ten essentially roadless areas and in the Ponderosa Pines Area. Id. at 76.

Similar to the 1974 Badlands Plan, the 1975 Rolling Prairie Plan is premised on the principle that "[e]xisiting legal land commitments will be honored. The legal rights of surface and subsurface land owners and their leaseholders will be respected." See Docket No. 90, Ex. A, Attach. 20, pg. 53. In the section entitled "Construction of Roads, Pipelines, Powerlines, and Seismic Activity" the 1975 Rolling Prairie Plan states the following principles apply to new construction of roads:

1. Construction of roads . . . in the River Bottom, Upland Grassland (clayey), Upland Breaks, and River Breaks (ecosystems 1, 4a, 7, and 9) will be avoided; 18% of the Planning Unit.
. . .

5. Unneeded roads will be obliterated and the routes rehabilitated after proper coordination.
. . .

7. The construction of roads . . . is not allowed in the 3 essentially roadless areas except those included in statement 6 above [relating to oil and gas development in essentially roadless areas] and except for stock watering systems; 5% of the Planning Unit (47,280 acres).

Id. at 62. Additionally, off-road vehicle use is not allowed on the River Breaks, but may be "authorized by permit or in case of emergency in the Uplands Breaks, in the 3 essentially roadless areas, and in the Blue Buttes . . . ." Id. at 67. Last, the 1975 Rolling Prairie Plan gives discretion to the District Ranger on a case-by-case basis to allow off-road vehicle use in other special interest areas. Id.

According to the United States, the 1974 Badlands Plan and the 1975 Rolling Prairie Plan put the Plaintiffs on notice of the United States' claimed right to exclude the public from the thirty-three feet on either side of the section lines within the Dakota Prairie Grasslands. Although it is

certainly apparent both the 1974 Badlands Plan and the 1975 Rolling Prairie Plan seek to restrict new road construction and limit vehicle use to roads, neither the 1974 Badlands Plan nor the 1975 Rolling Prairie Plan is sufficiently specific regarding the United States' claimed right to exclude the public from the thirty-three feet on either side of the section lines to put North Dakota on notice of the United States' property claim. The language of both plans generally limits vehicle use to "roads" and proscribes construction of new "roads" in certain areas. Despite the ubiquitous use of the term "road" throughout the plans, such term is not defined or well explained. Further, neither the 1974 Badlands Plan nor the 1975 Rolling Prairie Plan mention section lines or whether section lines constitute "roads" within the grasslands. Given the dictate of N.D.C.C. § 24-07-03 that "section lines are considered public *roads* open for public travel," and considering the primitive nature of many roads within the National Grasslands in North Dakota, one may read the 1974 Badlands Plan and 1975 Rolling Prairie Plan to permit vehicle use on roads, including vehicle use along section line roads. Absent any characterization of the term "road" or reference to sections lines roads, both the 1974 Badlands Plan and 1975 Rolling Prairie Plan, at best, create ambiguity as to the United States' property claim, and are certainly not sufficiently specific as to put North Dakota on notice of the United States' claim.

The Court also notes, based upon its thorough review of both 1974 Badlands Plan and the 1975 Rolling Prairie Plan, it is apparent to the Court that the plans provide broad directives as to how the grasslands are to be managed in the future. The plans alone do not discuss explicit implementation procedures of the broader directives. In fact, there is an underlying assumption in the plans that "[t]otal implementation of the Management Prescription[s] obviously cannot be immediate; but land and resources will not be committed to a use which would preclude that future implementation." See Docket No. 90, Ex. A, Attach. 19a (p. 53) and Attach. 20 (pg. 53). Whether

the 1974 Badlands Plans and the 1975 Rolling Prairie Plan are environmental impact statement or forest plans, neither dictates the immediate and imminent restriction of travel along section lines or the immediate restriction of road construction. For example, in the Ponderosa Pines Area, implementation of travel and construction controls were only to be implemented through a "cooperative county-private-federal agreement." See Docket No. 90, Ex. A, Attach 19a, pg. 73. Therefore, the Court finds the 1974 Badlands Plan and 1975 Rolling Prairie Plan are not sufficiently specific as to put North Dakota on notice of the United States' claim to exclusive control of the thirty-three feet on either side of the section lines in the Dakota Prairie Grasslands.

Moreover, even assuming, *arguendo*, the 1974 Badlands Plans and the 1975 Rolling Prairie Plan well defined the term "road" and outlined implementation of travel and construction controls, the Court is doubtful the plans themselves would begin the limitations period clock; but instead the actual restriction (i.e. implementation) of travel and construction along section lines would trigger the limitations period. A claimant is not expected to file suit to protect against the possibility the United States may one day restrict access to a road. See Michel, 65 F.3d at 132.


### 1)      Cooperative Agreement for Ponderosa Pines Area

In an effort to implement the directive of the 1974 Badlands Plan to control travel and construction within the Ponderosa Pines Area, the Forest Service entered into a Cooperative Agreement for Restricted Vehicle Closure ("Cooperative Agreement) with Slope County on June 10, 1975. See Docket No. 90, Ex. A, Attach. 29a. The Cooperative Agreement provided for the restriction of motor vehicle use to "county roads and routes designated by an arrow symbol, except when a permit has been obtained for travel." See Docket No. 90, Ex. P., Attach. 11, p. 2. A public notice was issued by the Custer National Forest and Slope County Commissioners of the agreed

upon restrictions in the Ponderosa Pines area.  See Docket No. 90, Ex. A, Attach. 29b.  Shortly after the Forest Service and Slope County entered into the Cooperative Agreement, ranchers residing in the Ponderosa Pines area brought suit against Slope County, alleging that Slope County Commissioners lacked authority to enter into the Cooperative Agreement.  The state district court found in favor of the ranchers and concluded the Slope County Commissions lacked authority to enter into the Cooperative Agreement.  See Docket No. 90, Ex. P, Attach. 11.  Shortly after the state district court's decision, the Forest Service issued an order "lifting the closure" of the Forest Service lands in the Ponderosa Pines area.  See Docket No. 90, p. 52.

According to the United States, the travel restriction on Forest Service lands in the Ponderosa Pines area by the Forest Service and the simultaneous closure of state and private lands by Slope County Commissioners along with several memoranda, letters, and other communications regarding the lawsuit, demonstrate North Dakota "had actual notice" of the United States' claim to exclusive control over the thirty-three feet on either side of the section lines in the Dakota Prairie Grasslands.  The Court is unpersuaded these 'travel restrictions' and accompanying communications are sufficient to put North Dakota on notice of an adverse claim by the United States.  Primarily, any restrictions in the Ponderosa Pines area were lifted only a few months after the Forest Service and Slope County entered into the Cooperative Agreement.[11] During these months, the validity of the Cooperative Agreement was being litigated in state court and the effect of the lawsuit on the implementation and enforcement of any travel restrictions is unclear.  In fact, as late as October 1975, communications regarding the lawsuit and travel restrictions in the Ponderosa Pines area inquired about the implementation, enforcement, and effect

_____

[11] It is unclear from the record the date travel restriction within the Ponderosa Pines area was lifted by the Forest Service, but the United States submitted a draft release of order lifting the closure dated October 17, 1975.  See Docket No. 90, Ex. A, Attach. 29c.

of travel restrictions.  See Docket No. 90, Ex. Q, Attach. 4.  The travel restriction came and went much like summer in North Dakota, with no one knowing whether it had arrived until it was missed with the arrival of fall.  Under these circumstances, the Court finds such travel restriction in the Ponderosa Pines area by the Forest Service, and the simultaneous closure of state and private lands by Slope County Commissioners along with several memoranda, letters, and other communications regarding the lawsuit, are insufficient notice of an adverse claim by the United States to trigger the QTA limitation period.

### 2)        Cheney Creek Road Relocation

In 1980, the Forest Service, through the McKenzie District Ranger, denied McKenzie County's request to relocate a portion of a county road, Cheney Creek Road, through Cheney Creek Essentially Roadless Area because such construction was inconsistent with the 1975 Rolling Prairie Plan.  See Docket No. 90, Ex. B, Attach 21d.  The proposed rerouted Cheney Creek Road through Forest Service land did not follow any section line, but traversed Forest Service land outside the thirty-three feet on each side of section lines.  In denying the request to relocate Cheney Creek Road, the Forest Service informed McKenzie County the proposed road relocation could only be approved by the Forest Service upon amendment to the land use plan, which required completion of an environmental impact statement.  Id.  The McKenzie District Ranger recommended delaying any action by the Forest Service on McKenzie County's request until a new land use plan was completed, which was likely to occur in 1983 or 1984.  Id.  In response, McKenzie County proposed to relocate Cheney Creek road along the section lines.  See Docket No. 90, Ex. B, Attach 21e.  The McKenzie District Ranger then informed McKenzie County Commissioners, by hand-delivered letter:

It is still the Custer Forest position that those section line [*sic*] with federally owned lands on both sides and no existing roads along them are exempt from the North Dakota Century Code 24:07:03 under the Sovereign State Doctrine. We believe this interpretation is essential for orderly land management under the provision of the National Environmental Policy Act. Although this issue can only be resolved in court any premature deviation from this policy is likely to open a pandor's [*sic*] box. This could well be to the detriment of the people of McKenzie County who are dependant [*sic*] upon the federal lands for this livelihood and to the people of North Dakota who rely on the federal lands for wildlife and recreation opportunities.

See Docket No. 90, Ex. B, Attach 21h, p. 2.

Discussions between the Forest Service and McKenzie County about the relocation of Cheney Creek Road continued for several years. In 1984, in the midst of these discussions, the McKenzie County State's Attorney requested an opinion from the North Dakota Attorney General as to whether a North Dakota county has a right to use a section line on Forest Service land to construct a county road. See Docket No. 90, Ex. Q, Attach. 5. On December 31, 1984, then North Dakota Attorney General Robert Wefald issued an opinion letter in which he concluded North Dakota possessed a right-of-way along section lines over Forest Service land. See Docket No. 90, Ex. Q, Attach. 6, p. 9.

Ultimately, the Forest Service permitted McKenzie County to relocate Cheney Creek Road through Forest Service land in 1985. Nonetheless, the United States views the long-standing controversy between the Forest Service and McKenzie County, accompanying communications, and the 1984 Attorney General Opinion, as evidence North Dakota was aware of the United States' claim to exclusive control of the thirty-three feet on each side of section lines within the Dakota Prairie Grasslands. The Court is not persuaded the controversy or the 1984 Attorney General Opinion demonstrates North Dakota received sufficient notice of the United States' claim.

McKenzie County was not seeking permission from the Forest Service to relocate the portion of Cheney Creek Road along a section line. Instead, McKenzie County was seeking to

relocate the road through Forest Service land outside the thirty-three feet on each side of any section line. Unquestionably, the Forest Service has the power to regulate use of its fee simple land. Upon the Forest Service's denial of McKenzie County's request to construct a road on Forest Service property, McKenzie County advised the Forest Service it may seek to relocate Cheney Creek Road along section lines *if* the Forest Service did not permit the County's proposed road relocation. In response to McKenzie County's proposed section line construction, the McKenzie District Ranger communicated "the Custer Forest" position that there is no right-of-way along section lines with federally owned land on both sides. See Docket No. 90, Ex. B, Attach. 21h. Ultimately, the Forest Service permitted the road to be relocated through Forest Service land. It is unclear whether, after notification of the McKenzie District Ranger's position as to section line rights-of-way, McKenzie County actively sought to reconstruct Cheney Creek Road along section lines. Nothing in the 1984 Attorney General opinion (or the letter from the McKenzie County State's Attorney to the Attorney General) demonstrates North Dakota was on notice of any denial by the Forest Service to reconstruct Cheney Creek Road along section lines. Based upon the record before it, the Court cannot say whether the Forest Service in any way denied or limited McKenzie County's use of the thirty-three feet on each of section lines to reconstruct Cheney Creek Road. See Kane Cnty., 772 F.3d at 1215.

The Court notes that one may reasonably find the hand-delivered letter from the McKenzie District Ranger to the McKenzie County Commissioners may have thwarted any efforts McKenzie County may have taken to relocate Cheney Creek Road along a section line. See Docket No. 90, Ex. B, Attach 21h, p. 2. The Court nonetheless discounts the impact of the McKenzie District Ranger's letter to the McKenzie County Commissioners. In a separate letter to the Forest Supervisor, the McKenzie District Ranger indicated he "may have exaggerated our position on the

section line right of way issue . . . ." Id. at p. 1. Additionally, it is the opinion of the Court that North Dakota cannot be reasonably expected to rely upon a statement in a letter from a local ranger to county commissioners as an "official statement of United States policy." See Utah v. United States, 624 F. Supp. 622, 626 (D. Utah 1983). Accordingly, the Court cannot conclude the controversy between the Forest Service and McKenzie County, as well as any accompanying communications and the 1984 Attorney General Opinion, demonstrate North Dakota was aware of the United States' claim to exclusive control of the thirty-three feet on each side of section lines within the Dakota Prairie Grasslands.[12]

### b. 1976/1977 Travel Plans for Sheyenne National Grassland and Little Missouri National Grassland

The United States next contends 1976/1977 Travel Plans for the Sheyenne National Grassland, Cedar River National Grassland, and Little Missouri National Grassland put North Dakota on notice of the United States' claimed right to restrict or prohibit travel within the Dakota Prairie Grasslands, including on section lines.[13] See Docket No. 90, pp. 47-48. These travel plans were formulated to implement Executive Order 11,644 (Use of Off-Road Vehicles on the Public Lands). See Exec. Order No. 11,644; 37 Fed. Reg. 2877 (Feb. 8, 1972). The 1976/1977 Travel Plan for the Little Missouri National Grassland purports to restrict all motorized vehicles including trail bikes, scooters, trikes, and motorcycles to existing roads within certain portions of the grassland. See Docket No. 90, Ex. A, Attach. 21a, p. 10. The Travel Plan does not restrict

---

[12] The Court notes it would reach the same conclusion, namely that neither the 1974 Badlands Plan and 1975 Rolling Prairie Plan, the Cooperative Agreement for Ponderosa Pines Area, nor the controversy between the Forest Service and McKenzie County regarding Cheney Creek Road are sufficient to trigger the QTA limitations period under the pre-1986 "knew of should have known" standard.

[13] In its brief, the United States notes it was unable to find a copy of a travel plan for the Cedar River National Grassland. See Docket No. 90, p. 60 n. 36. The Court thus focuses its discussion solely on the travel plans for the Sheyenne National Grassland and the Little Missouri National Grassland.

motorized vehicles travel in the remaining portion of the grassland, except during upland bird and big game seasons. See Docket No. 90, Ex. A, Attach. 21a, p. 11. The Travel Plan defines "existing road" as:

> [A] route traveled by four-wheeled vehicles that shows recurring use of more than one year's duration with soil displacement and compaction present to the extend [sic] that vegetation is sparse or absent from wheel tracks.
>
> Use may be temporarily limited on some areas, and roads during periods when use would damage resources or be hazardous. Public notice of temporary restrictions will be given and they will be posted on the ground. Closures or restrictions for roads not shown on the map will be posted on the ground.
>
> These controls do not apply to state or County system roads or to land in other ownership.

See Docket No. 90, Ex. A, Attach. 21e, p. 1. The Situation Statement of the Travel Plan states that "[a]ll applicable laws, regulations, orders, and policies must be complied with" and "State legislation must be considered, and all legal rights of the private landowners must be honored." See Docket No. 90, Ex. A, Attach. 21a, p. 2. Public notice of the travel plan was issued on May 25, 1977. See Docket No. 90, Ex. A, Attach. 21e, p. 1

The Environmental Analysis Report for the Sheyenne National Grassland Travel Plan states the grassland "will be open to public vehicle use;" however, "[w]ithin the restricted area the recommended closure is for travel to be open yearlong, only to foot and horse travel and to motor vehicles on existing routes and snowmobiles operating on snow." See Docket No. 90, Ex. C, Attach. 12a, p. 3. The Environmental Analysis Report also indicates "[t]he proposed management direction will for the first time prohibit vehicle travel off the established roads and trails." Id. at p. 4. In the Sheyenne National Grassland, the Forest Service installed signed were restrictions applied. See Docket No. 90, Ex. C, Attachs. 12c-12e.

North Dakota argues these travels plans and accompanying notice documents are not sufficiently specific as to be reasonably calculated to put North Dakota on notice of the United States' claim to exclusive control over the thirty-three feet on either side of the sections lines within the National Grasslands.  See Docket No. 104, p. 72-74.  North Dakota specifically relies upon the language of the Situation Statement of the Little Missouri National Grassland Travel Plan dictating that "State legislation must be considered, and all legal rights of the private landowners must be honored." See Docket No. 90, Ex. A, Attach. 21a, p. 2.  Pursuant to North Dakota statute, section lines are considered public roads open for public travel to the width of thirty-three feet.  See N.D.C.C. § 24-07-03.  Thus, according to North Dakota, the travel restrictions within the grasslands were subordinate to the public's right to travel section lines and, consequently, the travel plans did not demonstrate exclusive control over the thirty-three feet on either side of section lines.

North Dakota's argument is flawed for several reasons.  Primarily, North Dakota presumes the phrase "state legislation must be considered" is synonymous with the phrase "subject to state law."  Such is not the case.  Both the travel plans for the Little Missouri National Grassland and the Sheyenne National Grassland, integrate North Dakota law prohibiting off-road vehicle travel by hunters.  See Docket No. 90, Ex. A, Attach. 21a, p. 9 and Ex. C, Attach. 12a, p. 3. However, the travel plans make no reference to North Dakota's law on section lines, N.D.C.C. § 24-07-03.

Second, the 1976/1977 Travel Plan for the Little Missouri National Grassland purports to restrict all motorized vehicles including trail bikes, scooters, trikes, and motorcycles to *existing roads* within certain portions of the grassland.  See Docket No. 90, Ex. A, Attach. 21a, p. 10 (emphasis added).  Unlike the 1974 Badlands Plans and the 1975 Rolling Prairie Plan, the 1976/1977 Travel Plan for the Little Missouri National Grassland clearly defined the phrase

"existing road" as "a route traveled by four-wheeled vehicles that shows recurring use of more than one year's duration with soil displacement and compaction present to the extend [*sic*] that vegetation is sparse or absent from wheel tracks." <u>See</u> Docket No. 90, Ex. A, Attach. 21e, p. 1. This definition was not only included in the Travel Plan, but was included in the "Public Notice." <u>See</u> Docket No. 90, Ex. A, Attach. 21e, p. 1. This definition of "existing road" intrinsically serves to exclude travel within the thirty-three feet on either side of section lines when recurring use with soil displacement and compaction are not present. Thus, by defining the phrase "existing road" in this way so as to restrict travel along section lines in certain portions of Little Missouri National Grassland, the Travel Plan, along with the Public Notice, demonstrate the United States' claim to exclusive control over the thirty-three feet on either side of section lines. The Travel Plan and the accompanying public notice are sufficiently specific as to be reasonably calculated to put North Dakota on notice of the United States' claim to exclusive control over the thirty-three feet on either side of section lines in the Little Missouri National Grassland. The Court similarly concludes the 1976/1977 Travel Plan for the Sheyenne National Grassland and accompanying installed signage (where restrictions applied) were sufficiently specific as to be reasonably calculated to put North Dakota on notice of the United States' claim to exclusive control over the thirty-three feet on either side of section lines in the Sheyenne National Grassland. <u>See</u> Docket No. 90, Ex. C, Attachs. 12c-12e. Consequently, such communications triggered the QTA limitation period.[14]

The Court's conclusion comports with the Ninth Circuit's decision in *Park County v. United States, 626 F.2d 718 (9th Cir. 1980).* In *Park County*, several counties sought to quiet title to a right-of-way to a trail/road in the Absaroka National Forest. The counties contended all legal

---

[14] The Court notes it would reach the same conclusion, namely that the 1976/1977 Travel Plans for the Little Missouri National Grassland and the Sheyenne National Grassland, coupled with public notices and signage, triggered the running of the statute of limitations, under the pre-1986 "knew of should have known" standard.

requirements for establishing the road were satisfied. The trails at issue were Forest Service trails, maintained by the Forest Service. When an area which encompassed a portion of the claimed right-of-way was designated as a "Primitive Area," the Forest Service placed a sign at the entrance of the Primitive Area. The sign stated: "Entering Absaroka Primitive Area – Motor Vehicles Prohibited – Gallatin National Forests." 626 F.2d at 720. The Forest Service also placed a rock barrier across the trail in front of the sign. Id. The Ninth Circuit concluded the sign and rock barrier provided notice to the counties that the Forest Service claimed ownership and control over the purported right-of-way and triggered the running of the QTA limitation period. Id. at 721. In the same way a sign and rock barrier in *Park County* put the plaintiffs on notice of the United States' claim to exercise control over the trail, the "Public Notice," signage, and travel plans restricting travel to existing roads discussed above, put North Dakota on notice of the United States' claim to exclusive control over certain portions of the National Grasslands in North Dakota, including the thirty-three feet on either side of the section lines.

The Court is fully aware a sign at the beginning of a trail to serve as notice of a claim to a single trail in *Park County* is factually distinct from a "Public Notice" and signage to serve as notice of a claim that exists along thousands of miles of section lines, which have no identifiable markers or boundaries. Nonetheless, the Court finds the court's reasoning in *Park County* persuasive as the court concluded the United States posted "notice of its interest." Id. Similarly here, the United States posted notice of its interest to exercise exclusive control over the thirty-three feet on either side of section lines by restricting travel to existing roads in certain portions of the national grasslands. Whether that notice applies to one trail or thousands of miles along undefined section lines, notice of the United States' interest was still posted. Such interest of the United States is also unquestionably adverse to the interests of North Dakota because the Public

Notice, Travel Plans, and signage served to foreclose the public's travel along section lines, except if an existing road was present in a portion of the Nation Grasslands in North Dakota. <u>See</u> <u>Michel</u>, 65 F.3d at 131-32. The Court therefore concludes as a matter of law that the 1976/1977 Travel Plans for Sheyenne National Grassland and Little Missouri National Grassland and accompanying "Public Notice" and signage, were sufficiently specific as to be reasonably calculated to put North Dakota on notice of the United States' claim to exclusive control over certain portions of the National Grasslands in North Dakota, including the thirty-three feet on either side of the section lines. <u>See</u> 28 U.S.C. § 2049a(k)(1).[15] North Dakota received notice of such claim more than twelve years prior to the commencement of its action. Consequently, Section 2409a(i) bars North Dakota's claim and divests the Court of jurisdiction over the matter.

Based upon the Court's foregoing conclusion, the Court may be inclined to not address the additional arguments of the parties. Given the significance and import of this matter, as well as the likelihood of appeal in this matter, the Court chooses to proceed and will further analyze whether additional management activities by the Forest Service were sufficient to put North Dakota on notice of the United States' claim.

c.     <u>**RARE I, RARE II, and the Roadless Rule**</u>

In 1967, the Forest Service initiated the Roadless Area Review Evaluation ("RARE I"). RARE I was a "nationwide inventory of the National Forest System to identify areas that could be designated as 'wilderness' pursuant to the Wilderness Act. <u>Wyoming v. United States Dep't of</u>

---

[15] The Public Notice accompanying the 1976/1977 Travel Plans for the Little Missouri National Grassland indicated the restrictions were "effective until December 31, 1978, or unless otherwise extended or rescinded." <u>See</u> Docket No. 90, Ex. A, Attach. 21e, p. 1. It is unclear from the record how long the restrictions were in place. Even such a temporary impairment may trigger the limitations period in the QTA. <u>See</u> <u>Catron Cnty. v. United States</u>, 934 F. Supp. 2d 1298, 1307 (D. N.M. 2013).

Agric., 570 F. Supp. 2d 1309, 1320 (D. Wyo. 2008).  The Forest Service discontinued RARE I after a successful National Environmental Policy Act ("NEPA") challenge to the Forest Service's procedures during the evaluation.  Id. at 1320-21.  In 1977, the Forest Service again began to conduct a Roadless Area Review Evaluation ("RARE II") with the purpose of identifying areas to designate as "wilderness."  Id. at 1321.

During the RARE II process, twelve areas in North Dakota were considered for 'wilderness' designation.  See Docket No. 90, Ex. A, Attach. 22c, p. 19.  The twelve North Dakota areas were not actually included in the RARE II inventory list because they were already "allocated to non-wilderness uses." 42 Fed. Reg. 59688, 59716 (Nov. 18, 1977).  Nonetheless, the wilderness attributes of these areas were to be evaluated concurrently with the evaluation of the inventoried areas.  Id.  In the Final RARE II Environmental Impact Statement, the Forest Service proposed one area – Twin Buttes – to be designated as 'wilderness' in North Dakota.  See Docket No. 90, Ex. A, Attach 22a, p. 367.   RARE II was completed in 1979; however, the Forest Service abandoned RARE II after another successful challenge to the procedures employed by Forest Service in the evaluation process.  See California v. Block, 690 F.2d 753, 758 (9th Cir. 1982).

Almost two decades later, after re-evaluation of its road management policy, the Forest Service adopted an eighteen-month moratorium on road construction in previously inventoried roadless areas.  64 Fed. Reg. 7290, 7290 (Feb. 12, 1999).  The "Interim Roadless Rule" went into effect on March 1, 1999. Id.  In October 1999, then-President Clinton instructed the Forest Service to take actions to protect roadless areas within the national forest system.  The Forest Service then published a Notice of Intent to prepare an Environmental Impact Statement for a nationwide roadless rule.  64 Fed.Reg. 56,306, 56,306 (October 1999).  On May 10, 2000, the Forest Service issued a Draft Environmental Impact Statement along with a proposed rule.  65 Fed. Reg. 30,276

(May 10, 2000). The proposed rule identified 54.3 million acres of inventoried roadless areas or approximately 30% of the land managed by the Forest Service. 65 Fed. Reg. at 30,276. The proposed rule was two-fold and encompassed:

> (1) a "Prohibition Rule," which banned road construction and reconstructions in IRAs, and (2) a "Procedural Rule," which required forest managers to identify additional roadless areas during the forest planning process and determine whether such areas warranted protection under individual forest plans.

Wyoming v. United States Dep't Agric., 661 F.3d at 1223-24 (10th Cir. 2011) (citing 65 Fed. Reg. at 30,288).

In November 2000, the Forest Service issued a Final Environmental Impact Statement. 65 Fed. Reg. 69, 512 (Nov. 17, 2000). The Final Environmental Impact Statement included changes to the proposed rule that were not included in the Draft Environmental Impact Statement. On January 12, 2001, the Forest Service issued the final Roadless Rule applicable to the 58.5 million acres identified in the final environmental impact statement. 66 Fed. Reg. 3244-01 (Jan. 12, 2001). The rule was to be implemented on March 13, 2001. Generally, the Roadless Rule banned road construction subject to limited exceptions.

In its brief, the United States contends numerous communications between North Dakota officials and the United States, as well as notices within the Federal Register during the Roadless Area Review Evaluation, put North Dakota on notice of the United States' claim to exclusive control over the thirty-three feet on either side of section lines within the Dakota Prairie Grasslands. The United States' contention hinges on publication in the Federal Register of notice that the twelve roadless areas in the Little Missouri National Grassland were to be evaluated during RARE II.

### 1)    Federal Register Notice of Roadless Area Evaluation

According to the United States, the identification of these twelve roadless areas for consideration in the RARE II Draft Environmental Statement (including the North Dakota supplement), articulated the Forest Service's position it "did not consider constructed roads to exist within" these areas and that the twelve areas "were devoid of public roads." See Docket No. 90, pp. 63, 67.   Accordingly, following the United States' reasoning, the Forest Service did not consider the right-of-way along section lines to be "public roads."   However, the North Dakota Supplement to the Draft Environmental Statement indicates "[l]ocal governments would likely challenge the closing of *existing roads*." See Docket No. 90, Ex. A, Attach. 22c, p. 36 (emphasis added).   The North Dakota Supplement also contained a table of "Existing Improvements in RARE II Areas," with the table including "*improved roads*." Id. at p. 38 (emphasis added).

North Dakota urges the Court to follow the 10th Circuit's decision of *Kane County*, in which the court discussed that a "road" for the purposes of the Wilderness Act is not coterminous with a "road" under R.S. 2477, referring to a BLM memorandum:

> The wilderness inventory process uses a definition of a road that is distinct from the definition of "public" road contemplated by R.S. 2477 (43 U.S.C. § 932) and is a definition for inventory purposes only, not for establishing rights of counties, etc.   A determination that an area should not be excluded from wilderness review because the area does not have any "roads" as defined in the Bluebook is not a determination that a road is or is not a "public" road.   This is a factual determination that does not relate to wilderness.

772 F.3d at 1216.   The Court finds the discussion of the term "road" used during the inventory process and the term "road" contemplated by R.S. 2477 in *Kane County* persuasive.   Although it may seem oxymoronic, an area with 'roads' may have certainly been classified as "roadless" under RARE II.   This conclusion is supported by statements within the Draft Environmental Statement referencing *existing* or *improved* roads within "roadless areas" in North Dakota.   In this instance,

publication in the Federal Register of notice that the twelve roadless areas in the Little Missouri National Grassland were to be evaluated during RARE II, in and of itself, is insufficient to put North Dakota on notice of the United States' claim to exclusive control of the thirty-three feet on either side of the section lines in the Dakota Prairie Grasslands. One may not contend a designation of "roadless" area means one does not recognize any improved/existing roads in such area and in the next breath state there are improved and existing roads in the same area.

In its brief, the United States disagrees and instead urges the Court to follow the reasoning outlined in *Catron County v. United States*, 934 F. Supp. 2d 1298, in which the court concluded designation of an area as "roadless" in the Federal Register pursuant to RARE II constituted an adverse interest to an alleged right-of-way within the "roadless area." 934 F. Supp. 2d, 1298, 1305-07 (D. N.M. 2013). To reach its holding, the *Catron County* court relied upon the decision of *S.W. Four Wheel Drive Assoc. v. Bureau of Land Management*, in which the court concluded publication in the Federal Register of the designation of a Wilderness Study Area provided sufficient notice of the United States' claim to the area and that the United States did not recognize any alleged right-of-way. 271 F. Supp. 2d 1308, 1312 (D. N.M. 2003).

In *S.W. Four Wheel Drive Assoc.*, the Bureau of Land Management ("BLM") conducted a number of wilderness inventories in New Mexico, followed by a public report entitled "New Mexico Wilderness Review Initial Inventory Decision." Id. at 1310. This report identified 38,670 acres in the Robledo Mountains as "roadless." The BLM then produced two documents: "Wilderness Study Area Proposals" and "Wilderness Study Area Decisions." Id. The BLM ultimately designated 11,640 acres out of the 38,670 acres as the Robledo Mountains Wilderness Study Area in 1980. This designation was published in the Federal Register. Based upon the designation of the Robledo Mountains Wilderness Study Area, the court concluded the plaintiffs

and the public were on notice in 1980 that the BLM "claimed all of the area and did not recognize any alleged rights-of-way . . . ." Id. at 1312.

Relying upon the holding of *S.W. Four Wheel Drive Assoc.,* the *Catron County* court similarly concluded publication in the Federal Register of the designation of an area as "roadless" was sufficient notice of the United States' claim to the area. The *Catron County* court did not distinguish between the legal effect of the designation of an area as a "Wilderness Study Area" and the designation of an area as an inventoried roadless area under RARE II. Instead, the court found the designations synonymous. The undersigned finds the designation of an area as a "Wilderness Study Area" and the designation of an area as an inventoried roadless area under RARE II distinct, as described in the Federal Register notice of RARE II:

> The goal [of RARE II] is to develop a comprehensive inventory, in tabular and map form, of all areas in the National Forest System that meet minimum criteria as wilderness candidates under the Wilderness Act, as manifested by Congress through its actions in adding to the National Wilderness Preservation System. *Whether or not any areas should be wilderness was not considered in the inventory phase*.

42 Fed. Reg. 59,688, 59,688 (Nov. 18, 1977) (emphasis added). This description of RARE II demonstrates the designation of an area as "roadless" does not equate to designation as a Wilderness Study Area. Accordingly, the Court is not persuaded the *Catron County* court's reliance on *S.W. Four Wheel Drive Assoc.* was appropriate and declines to follow its rationale here.

Moreover, the Court further finds the *Catron County* court's conclusion disjointed. The court began its analysis by defining a "roadless area" as "an area of undeveloped Federal land within which there are no improved roads maintained for travel by means of motorized vehicles intended for highway use." 271 F. Supp. 2d at 1312. The *Catron County* court later noted members of the public continued to use the "road" within the "roadless area" after it was designated as such. Id. at 1305. As mentioned above, one may not contend a designation of "roadless" area

means the area is devoid of any improved/existing roads and, at the same time, be fully aware a "road" exists in the same area. Of course, under these circumstances the issue becomes what "roads" are considered by the United States to be "roads" - an inquiry that reaches the substantive issue. Without more, designation of an area as "roadless" under RARE II does not alone constitute an adverse claim of the United States sufficient to trigger the QTA limitation period.

### 2) Communications During RARE II

The United States not only contends publication in the Federal Register of notice that the twelve roadless areas in the Little Missouri National Grassland were to be evaluated during RARE II served as notice to North Dakota of the United States' claim to exclusive control of the thirty-three feet on either side of the section line, but the United States contends the communication between North Dakota officials and Forest Service officials, as well as inter-office memoranda, during RARE II put North Dakota on notice of the United States' claim.

The Court has thoroughly reviewed the letters, memoranda, and other communications which the United States contends constitute notice to North Dakota of its adverse claim. The most notable communication to which the United States directs the Court is a 2000 opinion by the North Dakota Attorney General. On January 26, 2000, then North Dakota Attorney General Heidi Heitkamp issued an opinion discussing "[w]hether federal land in North Dakota can be burdened by public roads established by prescription under state law and by the state's section line law." ND Att'y Gen. Op. 2000-F-05 (January 26, 2000). It was the opinion of then Attorney General Heitkamp that federal land, including National Forest Service lands, can be burdened by public roads established by North Dakota's "section line law." Id. at 1. The United States contends the

opinion, along with media coverage of the opinion, is evidence North Dakota, as well as the Counties, were aware the United States did not recognize section line rights-of-way.

These communications occurred during the RARE II process, before the January 12, 2001 Record of Decision (Final Roadless Rule). Generally, the communications discuss the potential effects on North Dakota *if* any areas were designated as wilderness. Some communications address a potential conflict between the public right-of-way running along section lines and wilderness designation that may arise upon the issuance of a final decision. At the time of these communications, it was unclear which areas, if any, would be designated as wilderness. Both the Draft Environmental Statement and the Final Environmental Statement include "Alternative A," in which no action would be taken and activities in inventoried roadless areas would continue as if RARE II did not exist. See Docket No. 90, Ex. A, Attach. 22a, p. 5, and Attach. 22b, pg. 5. However, no final decision was issued as to wilderness designations because the Forest Service abandoned RARE II after a successful challenge to the procedures employed in the evaluation process. See California v. Block, 690 F.2d 753, 758 (9th Cir. 1982). North Dakota's alleged rights-of-way along section lines were never effectively limited by the Forest Service's designation of areas as "roadless" under RARE II. Under these circumstances, the Court cannot conclude the communications between North Dakota officials and Forest Service officials, as well as inter-office memoranda (including the 2000 Attorney General opinion), during RARE II were sufficiently specific as to be reasonably calculated to put North Dakota on notice of the United States' claim to exclusive control over the thirty-three feet on either side of the section lines within the Dakota Prairie Grasslands.

Moreover, the United States' arguments that the designation of an area as "roadless" and/or communications between officials during RARE II, prior to a final decision, triggers the QTA

limitation period would implicitly allow a plaintiff to file a quiet title action before a final decision issued. See Cnty. of Shoshone v. United States, 912 F. Supp. 2d 912, 925 (D. Idaho 2012). As the *County of Shoshone* court correctly noted, this may lead to premature suits and compel a claimant to bring suit to protect the claimant's interest against the mere possibility that the United States may claim an adverse interest in the future. Id. at 926. The Quiet Title Act "should not create such an undesirable result." Id. (quoting Middle Fork Holding Co. v. United States, 2010 U.S. Dist. LEXIS 1025, 2010 WL 107380 at *3). Although the Court does not read the QTA to require the United States to place gates across all section lines (*but c.f. McFarland*, 425 F.3d at 724), placing signs limiting access along all section lines, and physically removing individuals from travel along section lines to trigger the limitation period, the statute requires more than notice of a mere possibility, in the future, a right-of-way may be limited or access denied.

### 3) <u>Interim Rule</u>

The United States contends that even if publication in the Federal Register of notice that the twelve roadless areas in the Little Missouri National Grassland during RARE II evaluation, or communications between North Dakota officials and Forest Service officials, including inter-office memoranda, were insufficient notice of the United States' claim, the "Interim Roadless Rule" of February 12, 1999, suspending road construction in certain previously inventoried roadless areas served as notice to North Dakota of United States' claim to exclusive control over the thirty-three feet on either side of section lines. See 64 Fed. Reg. 7290, 7290 (Feb. 12, 1999). The Interim Roadless Rule went into effect on March 1, 1999. Id. at 7290. The Interim Roadless

Rule suspended "new road construction projects, including temporary road construction, and road reconstruction" within some inventoried roadless areas.[16]

According to the United States, the 1999 Interim Rule "proscribed any construction or improvement to facilitate public travel on the thirty three feet bordering section lines in all roadless area in the Little Missouri National Grasslands." See Docket No. 90, p. 86. However, based upon the Court's review of the Interim Rule published in the Federal Register, the suspension of road construction and reconstruction did not apply to *all* inventoried roadless areas, but applied to specified "unroaded" portions of the inventoried areas as well as other "unroaded" areas of the National Forest System. Besides the blanket statement by the United States that the Interim Rule applied to "all roadless areas in the Little Missouri National Grasslands," neither party has presented any evidence to the Court of the applicability of the Interim Rule to the Dakota Prairie

---

[16] The Interim Roadless Rule suspended "new road construction projects, including temporary road construction, and road reconstruction" within the following areas of the National Forest System:

(1) All remaining unroaded portions of RARE II inventoried roadless areas within the National Forest System, and all other remaining unroaded portions of roadless areas identified in a land and resource management plan prepared pursuant to the National Forest Management Act (16 U.S.C. 1604) that lie one-quarter mile or more beyond any existing classified road as of March 1, 1999;

(2) All National Forest System unroaded areas of more than 1,000 acres that are contiguous to remaining unroaded portions of RARE II inventoried roadless areas or contiguous to areas inventoried in land and resource management plans. For purposes of implementing this category of suspension, areas of 1,000 acres of more must have a common boundary of considerable length, provide important corridors for wildlife movement, or extend a unique ecological value of the established inventoried area;

(3) Roadless areas listed in Table 5.1 of the Southern Appalachian Area Assessment, Social/Cultural/Economic Technical Report, Report 4 of 5, July 1996;

(4) All National Forest System unroaded areas greater than 1,000 acres that are contiguous to congressionally-designated wilderness areas or that are contiguous to Federally-administered components of the National Wild and Scenic River System (16 U.S.C. 1274) which are classified as Wild; and

(5) All National Forest System unroaded areas greater than 1,000 acres that are contiguous to unroaded areas of 5,000 acres or more on other federal lands.

64 Fed. Reg. 7290,7304 (Feb. 12, 1999).

Grasslands in North Dakota. The United States simply relies upon the holding of *Catron County* in which the court concluded publication of the Interim Rule in the Federal Register triggered the QTA limitations period. See Catron County, 934 F. Supp 2d. at 1306-07. The *Catron County* court found the Interim Rule "proscribed Catron County's right to construct or reconstruct its alleged right-of-way," thereby triggering the QTA limitations period. Id. at 1307.

The Court does not question the *Catron County* court's determination the Interim Rule can trigger the QTA limitation period because it limits construction and reconstruction in certain areas. However, the Interim Rule cannot trigger the QTA limitations period for lands not subject to the Interim Rule. Here, the Court questions the application of the Interim Rule to all previously inventoried roadless area lands within the Dakota Prairie Grasslands. Based upon an absence of any evidence in the record, the Court is not convinced the Interim Rule applied to North Dakota's claimed right to the thirty-three feet on either side of section lines in the Dakota Prairie Grasslands. Therefore, the Court cannot say the publication of the Interim Rule in the Federal Register was sufficiently specific as to put North Dakota on notice of the United States' claim of exclusive control of the thirty-three feet on either side of section lines within the Dakota Prairie Grasslands.

### d.      1980 Travel Plan for Sheyenne National Grassland

According to the United States, the "1980 Sheyenne Plan," along with notices of additional travel restrictions within the Sheyenne National Grassland sufficiently put North Dakota on notice of the United States' claim to exclusive control over the thirty-three feet on either side of section lines within the Dakota Prairie Grasslands. The United States reasons that Table 1 ("Major and Supportive Activities") in a document entitled "Record of Decision: Final Environmental Impact Statement, Sheyenne National Grassland Land Management Plan, Amendment to Sheyenne Part I Land Management Plan" which indicates "roads under 24' wide" put North Dakota on notice of

its adverse claim. The Court finds such an ambiguous reference to the width of roads is insufficient to trigger the statute of limitations.

The Record of Decision as to the Sheyenne National Grassland also summarized the then-current travel plan:

> On those areas containing the choppy sandhill and savanna ELU's (generally analysis areas 1, 6 and 9), wheeled motorized vehicles are restricted to existing roads. However, during the North Dakota upland bird and big game seasons, motorized vehicles may also be used for ingress and egress to temporary campsites within 300 feet of an existing road or to retrieve big game animals by the most practical direct route.

See Docket No. 90, Ex. C, Attach. 13, p. 56. Then, in 1982, "Special Restrictions" were posted for the Hankinson Unit of the Sheyenne National Grassland, prohibiting the possession or use of a motor vehicle off of an existing roadway, with some exceptions. See Docket No. 90, Ex. C, Attach. 14a. A subsequent, nearly identical Public Notice as to the Hankinson Unit was signed on October 5, 1984. [17] See Docket No. 90, Ex. C, Attach. 14c. Additionally, a Public Notice was also issued on October 5, 1984, for the portion of the Sheyenne National Grassland north of Highway 13.[18] See Docket No. 90, Ex. C, Attach. 14b. The October 5, 1984 Public Notice stated: "All motorized vehicles, except snowmobiles, are restricted to existing roads." Id. at p. 1. The Public Notice then defines "existing road" as

> a route traveled by four-wheeled vehicles that is not signed as closed and that shows recurring use or more than one year's duration with soil displacement and compacting present to the extent that vegetation is sparse or absent from wheel tracks.

---

[17] The 1982 "Special Restrictions" and the 1984 Public Notice were to remain in effect "until rescinded or revoked." See Docket No. 90, Ex. C, Attachs. 14a & 14c. It is unclear from the record when the 1982 "Special Restrictions" or 1984 Public Notice were rescinded or revoked.

[18] The 1984 Public Notices was effective "until December 31, 1985, unless otherwise extended or rescinded." See Docket No. 90, Ex. C, Attach. 14b.

Id.  A similar notice at to the portion of the Sheyenne National Grassland north of Highway 13 was again issued on February 29, 1988, restricting motorized vehicles to existing roads.[19]  See Docket No. 90, Ex. C, Attach. 14d.

The language of the October 5, 1984, Public Notice and February 29, 1988 Public Notice as to the portion of the Sheyenne National Grassland north of Highway 13 mimics the language of the 1976/1977 Travel Plan and Public Notice for the Little Missouri National Grassland discussed above.  For the same reasons the Court found the 1976/1977 Travel Plan and accompanying Public Notice sufficiently specific as to be reasonably calculated to put North Dakota on notice of the United States' claim to exclusive control over the thirty-three feet on either side of section lines in the Little Missouri National Grassland, the Court finds the Public Notices issued by the Forest Service in 1982, 1984, and 1988 as to the Sheyenne National Grassland triggered the QTA limitation period.[20]  The definition of "existing road" used in the 1982, 1984, and 1988 Public Notices intrinsically serves to exclude travel within the thirty-three feet on either side of section lines when recurring use with soil displacement and compaction are not present and demonstrates the United States' claim to exclusive control over the thirty-three feet on either side of section lines within the Sheyenne National Grassland.

### e.  1986 Custer Plan & 1987 Record of Decision

In 1987, the Forest Service issued a Record of Decision approving the implementation of the Custer National Forest Land and Resources Management Plan ("Forest Plan").  See Docket

---

[19] The 1988 Public Notice was effective "until December 31, 1988, unless otherwise extended or rescinded." See Docket No. 90, Ex. C, Attach. 14d.

[20] The Court notes it would reach the same conclusion as to the Public Notices issued by the Forest Service in 1982 and 1984 for the Sheyenne National Grassland under the pre-1986 "knew of should have known" standard.

No. 90, Ex. A, Attachs. 23a & 23b.  According to the United States, the Forest Plan was sufficiently specific to put North Dakota on notice of the United States' claim to restrict and prohibit travel along section lines in the Dakota Prairie Grasslands.  The Off-Road Vehicle Use Management Standard for the Forest Plan states:

> c. Off-Road Vehicle Use
>
> 1) Travel restrictions will be developed and maintained to meet land management objectives.  These restrictions will provide reasonable access for public recreation, hunting and range maintenance/administration, but will confine motorized vehicles to specific roads, trails, or areas identified on a map.  Vehicular access off these designated locations will be prohibited, except by permit.  A map and information showing closures, restrictions, and opportunities on the Forest for motorized and nonmotorized use will be provided to the public.
>
> 2) Travel restrictions will consider:
>    a)  adjacent state, local, and other Federal agency regulations
>    b)  authority for implementation and enforcement
>    c)  compatibility with nonrecreational use on the same area
>    d)  needs for resource protection and concerns of the adjacent landowners, the other users, and cooperating agencies or units of Government.
>
> 3) Restrictions and maps will be reviewed annually and updated as needed.
>
> 4) Route and area closures will be properly signed and located to allow adequate parking and/or safe turnarounds.

See Docket No. 90, Ex. A, Attach. 23b, p. 17.  In addition, the Forest Plan provides management goals for each of twenty management areas within the Custer National Forest.  Some of these management goals purport to restrict travel or road construction within the areas.  For example, the Forest Plan dictates that in specified management areas "[r]oads will not be constructed on slopes 40 percent or greater," with exemptions permitted.  Id. at 51, 60, and 64.  In other management areas, road construction is limited, motorized vehicle use is restricted to existing roads, and road closures are suggested or permitted.  See id. at pp. 45-103.

The Court has carefully reviewed the Custer National Forest Land and Resources Management Plan. The Forest Plan outlines different guidelines related to off-road vehicle use, road construction, and road closures applicable to the twenty different management areas. The unique combination of multiple guidelines for off-road vehicle use, road construction, and road closures applicable to each management area creates a detailed web of guidelines cast over the Custer National Forest. The guidelines greatly vary between management areas, sometimes with minute changes to the wording of guidelines in different management areas.

The intricate web of guidelines affecting off-road vehicle use, road construction, and road closure in Custer National Forest as a whole, does not appear to the Court as notice of the United States' claim to exclusive control over the thirty-three feet on either side of section lines in the Dakota Prairie Grasslands. Instead, the more reasoned, objective interpretation is that these guidelines arise from the Forest Service's intrinsic power to regulate land use within national grasslands. The Court finds these regulatory actions do not trigger the QTA limitations period. In *McFarland*, the 10th Circuit Court of Appeals described the relationship between the government, as owner of the servient estate, and an easement grantee:

> The government, in its capacity as the owner of the servient tenement, has the right to reasonable use of its land, and its rights and the rights of easement owners are mutually limiting, though of course easements are burdensome by their very nature, and the fact that a given use imposes a hardship upon the servient owner does not, in itself, render that use unreasonable or unnecessary. It follows that mild interference with the use of an easement pursuant to the government's own property interests will not start the statute of limitations running.

425 F.3d at 727 (internal citations and quotations omitted). It is presumed the federal government has the power to regulate land use as the owner of the servient estate. Thus, the Court distinguishes between regulatory actions that do not trigger the limitation period and actions that trigger the statute of limitations because they deny the existence of an easement. It can be difficult "to

distinguish reasonable regulations that happen to restrict use of the easement from actions taken incident to the government's claim of exclusive ownership." Id. If the Court were to assume any regulatory action by the government that affects the easement triggers the statute of limitations, easement grantees and the government may be forced into premature and unnecessary suits. See id.; Michel, 65 F.3d. at 132.

The Court is convinced the web of guidelines affecting off-road vehicle use, road construction, and road closures in the Custer National Forest Land and Resources Management Plan are reasonable regulations the happen to potentially restrict the use of the public's right of way along section lines. These regulations, standing alone, do not amount to claim of exclusive control of the thirty-three feet on either side of section lines. None of the multitude of guidelines applicable to the twenty management areas directly prohibit travel along section lines, with the most restrictive regulations prohibiting construction of roads on slopes of 40 percent or greater and closing some areas to "motorized vehicle use" with many exceptions or qualifications. The guidelines are broad in scope and some are vague as to implementation (e.g. "Portions of big game range will be closed to off-road vehicles seasonally as determined by on-the-ground evaluation," "Generally, roads will not be constructed in riparian areas except as needed to cross areas.").

The Off-Road Vehicle Use Management Standard for the Forest Plan does not morph the Forest Plan from a statement of reasonable regulations to a claim of exclusive control to the thirty-three feet on either side of section lines. The Off-Road Vehicle Use Management Standard is similarly broad, stating "[t]ravel restrictions *will be* developed and maintained to meet land management objectives." See Docket No. 90, Ex. A, Attach. 23b, p. 17 (emphasis added). Nothing contained within the Forest Plan suggests to the Court the Forest Plan is anything more than reasonable regulations that happen to have the potential to reasonable restrict some aspects of the

public's right to travel along section lines within the Dakota Prairie Grasslands. Therefore, following the court's rationale in *McFarland*, this Court finds the Forest Plan is not sufficiently specific as to be reasonably calculated to put North Dakota on notice of the United States' claim of exclusive control over the thirty-three feet on either side of section lines within the Dakota Prairie Grasslands.[21]

## f.    Draft Off-Highway Vehicle Plan

In January 2001, the Forest Service issued an "Off-Highway Vehicle Plan" as Record of Decision "Amendment to Nine National Forest Land and Resource Management Plans In Montana, North and South Dakota: Management Direction Related to Off-Highway Vehicles." See Docket No. 90, Ex. A, Attach. 25a. According to the United States, although the Record of Decision occurred less than twelve years from the date North Dakota filed its complaint, the draft "Off-Highway Vehicle Environmental Impact Statement and Plan Amendment for Montana, North Dakota and Portions of South Dakota" ("Draft OHV Plan"), released in October 1999, as well as contemporaneous communications between North Dakota and the BLM and Forest Service, provided North Dakota notice of its claim to exclusive control of the thirty-three feet on either side of section lines within the Dakota Prairie Grasslands. Specifically, the United States indicates "[a]ll action alternatives in the 1999 Draft OHV Plan would prohibit cross country travel,

---

[21] The Court's conclusion that the Custer National Forest Land and Resources Management Plan did not trigger the QTA's limitation period is bolstered by a 1992 "Decision Notice and Finding of No Significant Impact" (Environmental Assessment) regarding the implementation of the Maah-Daah-Hey Trail. The Environmental Statement affirms the Court's impression the Forest Plan was a set of broad regulations that had the potential to effect the public's right of way along section lines, stating:

> Much of the badlands is readily accessible by vehicle. *Travel Plans for the Medora and McKenzie Ranger Districts have not been prepared. Thus, off-road vehicle travel is permitted as long as the individual is on lands administered by the US Forest Service.*

See Docket No. 104, Ex. BB, Attach. 16, p. 15 (emphasis added).

meaning travel off of designated roads and trails, in the Dakota Prairie Grasslands." See Docket No. 90, p. 88. It then follows that since all action alternatives in the Draft OHV Plan limit travel, the Draft OHV provided sufficient notice to North Dakota to trigger the QTA limitations period.

The Draft OHV Plan included a "No Action Alternative" and four action alternatives for consideration. See Docket No. 90, Ex. A, Attach. 25c, p. 6. The No Action Alternative, if selected, would maintain current management and did not prohibit cross-country travel. Id. at p. 11. The United States has not directed the Court to any case in which a court found a draft environmental impact statement commences the running of the QTA's limitation period. In fact, in *County of Shoshone,* the court concluded the QTA's limitation period was not triggered by publication of an Environmental Assessment, but instead triggered when the Forest Service issued a final decision. 912 F. Supp. 2d at 925. Until a final decision, the government does not select a particular course of action, leaving all alternatives – including a "No Action Alternative" – as possible courses of action by the government. Accordingly, only a final decision, as opposed to other non-decisional documents, of the Forest Service can commence the QTA limitations period. The Draft OHV plan did not commence the QTA limitation period.

### g. July 2002 Record of Decision for Dakota Prairie Grasslands

In July of 2002, the Forest Service issued a "Record of Decision for Dakota Prairie Grasslands: Final Environmental Impact Statement and Land and Resource Management Plan." See Docket No. 90, Ex. A, Attach. 24f. This July 2002 Record of Decision purports to restrict motorized traffic to designated routes and otherwise prohibit motor vehicle travel in certain areas of the Dakota Prairie Grasslands. Id. Although the Record of Decision was issued within twelve years of North Dakota filing its lawsuit, the United States contends the Forest Service's public

communications in the planning process of the Record of Decision put North Dakota on notice of the United States' claim to exclusive control of the thirty-three feet on either side of section lines within the Dakota Prairie Grassland.

Throughout its brief, the United States attempts to prematurely begin the QTA limitations clock by asking the Court to find sufficient notice was provided to North Dakota based upon communications, inventories, and proposals arising before final decisions by the Forest Service. The Court reaches the same conclusion as to the communications during the planning process of the July 2002 Record of Decision as the Court previously reached regarding other communications, inventories, and proposals that arose prior to final decision. Holding that communications during the planning process, before any final decision, triggers the QTA limitation period would implicitly allow a plaintiff to file a quiet title action before a final decision was issued. See Cnty. of Shoshone v. United States, 912 F. Supp. 2d 912, 925 (D. Idaho 2012). As previously discussed, the statute requires more than notice of a mere possibility, in the future, a right-of-way may be limited or access denied to trigger the QTA limitation period. Accordingly, communications in the planning process of the July 2002 Record of Decision did not trigger the QTA limitations period. Only upon issuance of the July 2002 Record of Decision, could the QTA limitation period possibly be triggered. Assuming, *arguendo*, the July 2002 Record of Decision triggered the statute of limitations to begin, North Dakota filed its complaint within twelve years of the Record of Decision and dismissal pursuant to Fed. R. Civ. P. 12(b)(1) is unwarranted.

h.    **Travel Restrictions in the Theodore Roosevelt National Park**

The United States contends the travel restrictions in place in the Theodore Roosevelt National Park since 1966 are notice of the United States' "claim the Grasslands are free and clear

of Plaintiffs' claimed section line rights-of-way." <u>See</u> Docket No. 90, pp. 68-70. North Dakota's complaint seeks to quiet title to all section lines managed by the Forest Service within the Little Missouri National Grassland, Sheyenne National Grassland, and Cedar River National Grassland. <u>See</u> Docket No. 17. North Dakota does not seek to quiet title to section line easements within the Theodore Roosevelt National Park or the Elkhorn Ranch Site within the Theodore Roosevelt National Park. <u>Id.</u> The United States directs the Court to North Dakota's complaint, in which North Dakota does not allege its claim to section line rights-of-way does not apply to other federal lands. It then follows, according to the United States, travel restrictions in Theodore Roosevelt National Park (other federal land) put Plaintiffs on notice of the United States' claim to exclusive control of the thirty-three feet on either side of the section line within the Dakota Prairie Grasslands.

North Dakota is not required to allege its section line law does not apply to other federal lands. The plaintiff is the master of his complaint and may choose to limit his claims. <u>C.f.</u> <u>M. Nahas & Co., Inc. v. First Nat'l Bank</u>, 930 F.2d 608, 611 (8th Cir. 1991). In fact, North Dakota may "limit the scope of its claim to avoid both untimely claims and issues irrelevant" to the rights it seeks to protect. <u>San Jaun Cnty.</u>, 754 F.3d at 794-95 (10th Cir. 2014). Thus, the Court is unpersuaded travel restrictions in place on federal lands outside the scope of the complaint can sufficiently serve as notice of the United States' claim.

### i.      <u>Use, Occupancy, or Improvements as Notice</u>

Pursuant to 28 U.S.C. § 2409a(k), North Dakota may receive notice of the United States' claim by "the use, occupancy, or improvement of the claimed lands which, in the circumstances, is open and notorious." 28 U.S.C. §2409a(k)(2). As previously discussed at length, the United

States, through the Forest Service and the Soil Conservation Service, has made investments and improvements as well as conducted substantial activities in the Dakota Prairie Grasslands in North Dakota. The United States contends these improvements, particularly those within the thirty-three feet on each side of section lines, in conjunction with multiple land use plans and regulations, constitute notice to North Dakota of the United States' claim. In support of its argument, the United States directs the Court to the Fifth Circuit's decision of *Calhoun County v. United States*, 132 F.3d 1100 (5th Cir. 1998).

In *Calhoun County*, the Fifth Circuit Court of Appeals determined the United States' action, namely "landing planes and dropping bombs on the island from the 1940's until the 1970's", was openly and notoriously inconsistent with any claims Calhoun County may have had to the land. 132 F.3d at 1104. Calhoun County claimed it had valid title to the lands at issue, specifically claiming the right to "use, maintain and enjoy all of the public roads, beaches, historic sites and shrines, cemeteries, and other real estate interests" Calhoun County had and maintained on the lands at issue. Id. at 1102-03.

When considering whether the United States' management activities in the Dakota Prairie Grasslands qualify as "use, occupancy, or improvement of the claimed land" which is "open and notorious" to put North Dakota on notice of its claim, the Court looks to the relationship between North Dakota's claim and the United States' interest in the disputed lands. Unlike the plaintiff in *Calhoun County*, North Dakota does not claim fee title to the thirty-three feet on either side of section lines in the grasslands. North Dakota claims only rights-of-way for public travel along section lines. As owners of the servient tenement, the United States is entitled to reasonable use the lands. See McFarland, 425 F.3d at 727. When the interest of the claimant is for a right-of-way or easement, assuming any reasonable use of the lands by the United States that tangentially

affects the claimed right-of-way qualifies as notice under 28 U.S.C. § 2049a(k)(2) may force right-of-way grantees and the government into premature and unnecessary suits. See id.; Michel, 65 F.3d. at 132. In fact, a right-of-way grantee's interest is not always inconsistent with the government's fee title interest, but the two interests may peaceably coexist. McFarland, 425 F.3d at 727. Accordingly, in this matter, the Court cannot say the Forest Service or Soil Conservation Service's management activities in the Dakota Prairie Grasslands qualify as "use, occupancy, or improvement of the claimed lands which, in the circumstances, is open and notorious" to put North Dakota on notice of the United States' claim to exclusive control over the thirty-three feet of each side of section lines. See 28 U.S.C. §2409a(k).

In summary, after the Court's exhaustive and painstaking review each of the Forest Service management activities claimed by the United States to have put North Dakota on notice of the United States' claim to exclusive control of the thirty-three feet on either side of section lines in the Dakota Prairie Grasslands, the Court concludes as a matter of law that North Dakota was on notice of the United States' claim to exclusive control over the thirty-three feet on either side of the section lines. See 28 U.S.C. § 2049a(k)(1). Specifically, the Court finds the 1976/1977 Travel Plans for Sheyenne National Grassland and Little Missouri National Grassland and accompanying "Public Notice" and signage, as well as the Public Notices issued by the Forest Service in 1982, 1984, and 1988, as to the Sheyenne National Grassland, triggered the QTA limitation period. The Court further finds that North Dakota received notice of the United States' claim more than twelve years prior to the commencement of its action. Consequently, 28 U.S.C. § 2409a(i) bars North Dakota's claim and divests the Court of jurisdiction over the matter.

**B.**     <u>QTA Statute of Limitations and the Counties' Claims</u>

Subsection (g) of 28 U.S.C. § 2409a, describes the statute of limitations applicable to claims brought by persons or entities other than the states:

> Any civil action under this section, except for an action brought by a State, shall be barred unless it is commenced within twelve years of the date upon which it accrued. Such actions shall be deemed to have accrued on the date the plaintiff or his predecessor in interest knew or should have known of the claim of the United States.

28 U.S.C. § 2409a(g). In *Spirit Lake Tribe*, the Eighth Circuit discussed the operation of the statute of limitations of subsection (g). Specifically the Eighth Circuit stated that subsection (g) does not require the government to provide explicit notice of its claim. <u>Spirit Lake Tribe</u>, 262 F.3d at 738. In fact, the government's claim need not be "clear and unambiguous." <u>Id.</u> (citing <u>North Dakota *ex rel.* Bd. of Univ. & Sch. Lands v. Block</u>, 789 F.2d 1308, 1313 (8th Cir. 1986). "Knowledge of the claim's full contours is not required. All that is necessary is a reasonable awareness that the Government claims some interest adverse to the plaintiff's." <u>Id.</u> (quoting <u>Knapp v. United States</u>, 636 F.2d 279, 283 (10th Cir. 1980)).

For essentially the same reasons outlined in the Court's lengthy discussion of North Dakota's claims, the Court finds the Counties knew or should have known of the United States' claim to exclusive control of the thirty-three feet on either side of section lines in the Little Missouri National Grassland more than twelve years before the commencement of their action. The Court concludes the Counties knew or should have known of the United States' claim based upon the 1976/1977 Travel Plans for Sheyenne National Grassland and Little Missouri National Grassland and accompanying "Public Notice" and signage, as well as the Public Notices issued by the Forest Service in 1982, 1984, and 1988 as to the Sheyenne National Grassland. Nonetheless, the Counties posit that even if the Court finds the Counties were on notice of the United States'

claim more than twelve years before the commencement of their action, the Counties' action is timely. The Counties contend the United States abandoned any claim "in the settlement stipulation signed by the Department of Justice in *Billings County, et al. v. Veneman . . . .*" See Docket No. 141, p. 29.

The United States may abandon its interest in land. Spirit Lake Tribe, 262 F.3d at 739. To do so, the government must "clearly and unequivocally abandon its interest." Id. The Counties believe the terms of a settlement agreement entered into by the United States, North Dakota, and the Counties in 2006, later amended in 2007, demonstrates the United States clearly and unequivocally abandoned any interest in the thirty-three feet on each of side of section lines within the Dakota Prairie Grasslands in North Dakota. Assuming, *arguendo*, the United States could have abandoned any interest to the disputed lands in the settlement agreement, the statute of limitations for the Counties' claim had already run.

As discussed in detail above, the Court concluded the Counties knew or should have known of the United' States claim based upon documents issued in 1977, 1982, 1984, and 1988. Pursuant to 28 U.S.C. § 2409a(g), the Counties had twelve years to brings its action from the date the Counties knew of should have known of the United States' claim. Looking only to the most recent trigger of the limitations period, the Counties were required to bring their claim by 2000, if not sooner. The settlement agreement that the Counties argue demonstrates abandonment of the United States' claim was only executed in 2006. Even if the United States could have abandoned any claims in the settlement agreement, the QTA limitations period had expired at least six year prior. Abandonment cannot resurrect claims that have already been killed by the limitations period. Consequently, the Court concludes as a matter of law that 28 U.S.C. § 2409a(g) bars the

Counties' First Cause of Action in the its Third Amended and Supplemental Complaint and divests the Court of jurisdiction over the claim.


## IV.   <u>CONCLUSION</u>

The Court has carefully scrutinized, considered, and weighed each of the hundreds of documents in the record. The Court has also carefully read the parties' respective historical narratives, offered through the reports or declarations of those employed to trace the history the grasslands. The parties' briefing has been pondered at length.  For the reasons set forth above, "The United States of America's Amended Motion to Dismiss North Dakota's Amended Complaint for Lack of Jurisdiction" (Docket No. 88) and "The United States of America's Motion to Dismiss the First Cause of Action in the Counties' Third Amended and Supplemental Complaint for Lack of Jurisdiction" (Docket No. 169) are **GRANTED**.  The Court also **FINDS AS MOOT** "The United States of America's Amended Motion to Dismiss the First Cause of Action in the Counties' Second Amended Complaint for Lack of Jurisdiction" (Docket No. 89).

**IT IS SO ORDERED**.

Dated this 26th day of June, 2017.

*/s/ Daniel L. Hovland*
Daniel L. Hovland, Chief Judge
United States District Court