# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| North Dakota, ex rel. Wayne Stenehjem,<br>Attorney General for the State of<br>North Dakota,<br><br>       Plaintiff,<br><br>   vs.<br><br>United States of America,<br><br>       Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER FOR JUDGMENT**

Case No. 1:12-cv-125
(lead case)

| | |
|---|---|
| Billings County, North Dakota;<br>Golden Valley County, North Dakota;<br>McKenzie County, North Dakota; and<br>Slope County, North Dakota, municipal<br>entities,<br><br>       Plaintiffs,<br><br>   vs.<br><br>United States of America,<br><br>       Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. 1:12-cv-102
(consolidated case)

This matter was tried before the Court on November 18-20, 2019, in Bismarck, North Dakota. See Doc. No. 304. This case originated on July 30, 2012, when Billings County, McKenzie County, Slope County, and Golden Valley County initiated an action against the Defendant United States of America ("United States") to quiet title to their claims of section line rights-of-way in the Little Missouri National Grassland as well as six individual roads claimed by McKenzie County. See Doc. No. 1 (Case No. 1:12-cv-102). Shortly thereafter, the State of North Dakota filed a complaint against the United States to quiet title to its claim of section line rights-

of-way within the Little Missouri National Grassland, the Sheyenne National Grassland, and the portion of the Cedar River National Grassland located in North Dakota, all of which are a part of the Dakota Prairie Grasslands.  See Doc. No. 1 (Case No. 1:12-cv-125).  The Court eventually consolidated the two actions.  See Doc. No. 24.  After consolidation, the Counties twice more amended their complaint.[1]  See Doc. Nos. 163 and 229.  On June 26, 2017, this Court granted the United States' motions to dismiss North Dakota's claim to quiet title to section line rights-of-way in the Dakota Prairie Grasslands and the Counties' claim to quiet title to section line rights-of way in the Little Missouri National Grassland, holding that it lacked jurisdiction over the claims because the Quiet Title Act limitation period had run before the actions were commenced.  See Doc. No. 190.

After dismissing the State of North Dakota's claims, the causes of action brought by the Counties, as alleged in the Counties' fourth amended and supplemental complaint, remained in dispute.  These claims sought to quiet title to: (1) County Road #193, (2) Township Road #172/Road #1, (3) Road #2, (4) Road #3, (5) Township Road #169, and (6) County Road #30.  See Doc. No. 229.

On October 31, 2019, the Court granted summary judgment in favor of the Counties as to Township Road #169.  See Doc. No. 271.

On November 13, 2019, the United States notified the Court of its intent, under 28 U.S.C. § 2409a(e), to disclaim any interest it may have adverse to the Plaintiff Counties' claimed rights-of-way over three (3) roads:  a portion of County Road #193, also known as Long X Divide Road; Township Road #172, also known as Dassenko Road; and County Road #30, also known as Divide

---

[1] On September 16, 2019, the Counties requested leave of court to file a fifth amended complaint.  See Doc. No. 261.  The Court denied the Counties' request on October 1, 2019, finding that if the Court were to permit the Counties to file a fifth amended complaint, such would cause undue delay and prejudice to the United States.  See Doc. No. 265.

Road.   See Doc. No. 291.   Based on these representations, the Court excluded from trial any evidence which may relate to the United States' claimed adverse interest in County Road #193, Township Road #172, and County Road #30, or parts thereof.   See Doc. No. 296.

On November 25, 2019, the Counties filed a statement withdrawing their claims to Road #1.   See Doc. No. 311.   Therefore, only three (3) Quiet Title Act road claims remained for trial: Plaintiff McKenzie County seeks to quiet title to Road #2 (Achenbach Road), and Road #3 (Corral Creek Road), and the segment of County Road #193 (Long X Road) not disclaimed by the United States.   All of the roads are located in McKenzie County within the Little Missouri National Grasslands.   McKenzie County asserts these roads were established as county roads by 20 years of public use under R.S. 2477 and N.D.C.C. § 24-07-01 prior to the federal government reacquiring the underlying lands in the later 1930s.   See Doc. No. 229, p. 20-21, 31-39.   The Court heard the testimony presented at trial, carefully reviewed the deposition testimony submitted to the Court, and considered all of the evidence.   Both parties were well-represented by experienced counsel. The Court makes the following findings of fact and conclusions of law.

## I.   **FINDINGS OF FACTS**

### A.   **THE PARTIES**

1)   Billings County is a municipal entity established pursuant to North Dakota law.

2)   Golden Valley County is a municipal entity established pursuant to North Dakota law.

3)   McKenzie County is a municipal entity established pursuant to North Dakota law.

4)   Slope County is a municipal entity established pursuant to North Dakota law.

5)   Defendant United States owns the land through which the claimed rights-of-way in the action lie.

### B.     PROCEDURAL HISTORY

6)      On June 26, 2017, the Court issued an order granting the Defendant's Motion to Dismiss

the Plaintiffs' first cause of action, which asserted title over all of the section lines in the

Little Missouri National Grassland.  See Doc. No. 190.

7)      The Court held that the 1976/1977 Travel Plans for the Sheyenne National Grassland and

the Little Missouri National Grassland, as well as the 1980 Travel Plan for the Sheyenne

National Grassland, triggered the statute of limitations under the Quiet Title Act ("QTA"),

28 U.S.C. § 2409a(g), because the travel plans restricted all motorized vehicles to existing

roads within certain portions of the National Grasslands. See Doc. No. 190, pp. 43-48, 58-

60, 70.  The Court held the restrictions on use provided both North Dakota and the Counties

notice of the United States' adverse claim to the section line rights-of-way because the

definition of "existing road" in the Travel Plans served to exclude travel within the thirty-

three (33) feet on either side of a section line when recurring use with soil displacement

and compaction was not present.  Id. at 46.  The Court further held that since both North

Dakota and the Counties received notice of the United States' claim more than twelve (12)

years before the commencement of their actions, their section line rights-of-way claims

were barred under 28 U.S.C. §§ 2409a(g) and (i) and divested the Court of jurisdiction over

the claims.  Id. at 48, 70.

8)      On October 31, 2019, the Court issued an Order ruling on the parties' respective motions

for partial summary judgment on the Plaintiffs' claims for title for rights-of-way over the

remaining six individual roads: (1) County Road #193, (2) Township Road #172/Road #1,

(3) Road #2, (4) Road #3, (5) Township Road #169, and (6) County Road #30.  The Court

granted in part and denied in part the Counties' motion for partial summary judgment and denied the United States' motion for partial summary judgment.  <u>See</u> Doc. No. 271.

9)      In the October 31, 2019 Order, the Court held that the fencing of the Theodore Roosevelt National Park did not trigger the statute of limitations as to County Road #193 and Road #2 because the disputed portions of these two roads outside of the Park had independent utility and remained in use by local farmers, ranchers, hunters, and recreationists.  <u>See</u> Doc. No. 217, pp. 15-17.  The Court left for trial the issue of whether the 1976/1977 Travel Plan triggered the QTA statute of limitations for McKenzie County's claims to quiet title to Township Road #172/Road #1 and Road #3 – the issue being whether Township Road #172/Road #1 and Road #3 were "existing roads" under the Travel Plan.  <u>Id.</u> at 12-13.

10)     In the October 31, 2019 Order, the Court granted the Counties' motion for partial summary judgment as to Township Road #169 because the parties agreed that the road was established by petition and road order prior to the United States' reacquisition of the land surrounding the roads, and that such reacquisition was subject to McKenzie County's interest in the roads.  <u>See</u> Doc. No. 271, p. 23.  The Court further held that there were genuine issues of material fact in dispute as to McKenzie County's claim to quiet title to County Road #30, County Road #193, Township Road #172/Road #1, Road #2, and Road #3 and, therefore, summary judgment was not appropriate.  <u>Id.</u> at 21-23.

11)     On November 13, 2019, and days before the trial, the United States notified the Court of its intention to disclaim any adverse interest in three (3) claimed roads at issue – Road #30, Road #193, and Road #172 – that had been established by petition under North Dakota law.  <u>See</u> Doc. No. 291.  The United States filed a disclaimer of interest on January 3, 2020. <u>See</u> Doc. No. 316.

12)     On November 15, 2019, the Court entered an Order excluding from trial any evidence that may relate to the United States' claimed adverse interest in County Road #193, Township Road #172, and County Road #30.  See Doc. No. 296.  The Court also directed the United States to expeditiously finalize the QTA disclaimers as well as supporting documentation needed to quiet title in favor of McKenzie County to the rights-of-way to the three roads.  Id. at 2.

13)     On November 14, 2019, the Court entered an Order denying the United States' Motion in Limine to Exclude Expert Testimony Inferring Adverse Use of Roads.  See Doc. No. 294. The Court held that it could draw reasonable inferences based upon the evidence presented to determine whether the public's use of a road was adverse.  Id. at 3.  In a bench trial, there is little reason to exclude potentially irrelevant evidence because the Court is capable of determining what evidence is relevant in reaching its decision.  The Court also denied the United States' request to exclude the Counties' historical expert report for the same reason.  Id.

14)     On November 15, 2019, the Court entered an Order denying the United States' Motions in Limine to Exclude the April 3, 2000 U.S. Forest Service Map and April 7, 2000 Spike Thompson Letter, and Evidence of Use of Roads After United States' Reacquisition.  See Doc. No. 298.  The Court held there is little reason to exclude potentially irrelevant evidence because the Court is capable of determining what evidence is relevant in reaching its decision.

15)     At trial, the Plaintiffs notified the Court they would withdraw their claims for Road #1 and also withdraw their reliance on a section line theory to quiet title to Roads #2 and #3.  The

Plaintiffs filed a motion to dismiss these claims on November 25, 2019.  See Doc. No. 311.

16)   The Court heard live testimony from the Counties' experts William Haddick and Dr. Jennifer Stevens, as well as from two (2) ranchers from the area, Benjamin Lange and Eugene Pojorlie.  The Court also heard live testimony from the United States' expert, Dr. Christopher S. Baker, and two U.S. Forest Service employees, Phillip J. Sjursen and Robert Dennee.  In addition to live testimony and trial exhibits admitted into evidence, the Court also considered designated testimony from the depositions of Morris Tarnavsky, Ronald Anderson, Curtis Glasoe, and Curt Grudniewski.

### C.   THE LITTLE MISSOURI NATIONAL GRASSLAND AND THE LONG X AREA

17)   The land that now comprises the Little Missouri National Grassland ("LMNG") lies in western North Dakota.  It is administered by the United States Forest Service ("Forest Service").  Trial Exhibit No. 400 is a map of the northern portion of the LMNG, which lies in McKenzie County, North Dakota.  Trial Transcript. 425:1-9 ("Tr.").  The northern half of the LMNG is administered by the Forest Service's McKenzie Ranger District.  Id.

18)   The Long X Area is an area of McKenzie County in the northern half of the LMNG.  Tr. 324-25.  It lies southeast of the North Unit of the Theodore Roosevelt National Park and the Little Missouri River.  Two recreational trails—the Maah Daah Hey Trail and the Long X Trail run through the Long X Area.  Tr. 429.  The Forest Service currently prohibits the operation of motor vehicles in the Long X Area.  The prohibition does not apply to grazing permittees, emergency response vehicles, and Forest Service personnel who manage the area.  Tr. 429.

19)   All of the roads at issue in this litigation lie in one or both of two cadastral townships within the Long X Area:  Township 147N, R99W (hereinafter "147-99") and Township 147N, R100W (hereinafter "147-100").  Each of these cadastral townships is thirty-six square miles.  Tr. 177:11-14.

20)   Throughout the period of early settlement of western North Dakota, the Long X Area remained isolated and sparsely populated.  Settlement in the Long X Area was less stable than in other areas in western North Dakota, because the Long X Area lacked railroad infrastructure or a nearby town.  Tr. 325-26.  Around the turn of the twentieth century, the towns that were closest to the Long X Area were Medora and Dickinson.  Tr. 349-50.

21)   Settlement in the Long X Area began during the open range grazing era of the mid-1880s, when the Reynolds Brothers drove cattle from Texas to North Dakota, and established the Long X Ranch in McKenzie County, north of the Little Missouri River.  Tr. 70:18-23; 327.  By the late 1880s, the open-range cattle industry in North Dakota had entered a state of crisis.  Tr. 327:1-7.  By 1898, the Reynolds Brothers had sold off the last of their livestock to the Converse Cattle Company and left the area.  Tr. 71:1-5; 179:15-17; 327:7-9.  The departure of the Reynolds Brothers represented the end of the Long X era of open range grazing in the Little Missouri Region.  Tr. 179:23-180:10.

22)   Between 1898—when the Reynolds Brothers sold off their cattle and departed the Long X Area—and 1904—when General Land Office ("GLO") surveyors surveyed the Long X Area—there was a six year period during which there was scant evidence of any person having lived or worked in the Long X Area.  Tr. 183:13-21; 327; 347:7-15.  The Plaintiffs' historian expert, Jennifer Stevens, acknowledges that "[i]t was a lull," and that "[i]t was a

8

transition period, and I don't necessarily have any specific evidence" of any presence in the Long X area during those six years.  Tr. 183:13-21; 222.

23)   In 1899, the GLO began to survey the meridian lines between townships and then later the section lines within each of those townships. Trial Tr. at 62-63, 71. The GLO surveyors were given specific instructions on what to mark on their surveys and include in the corresponding plats.  Tr. at 64.  They were told to survey township lines and section lines, but would also denote roads that crossed the section lines and note the direction the road traveled.  Tr. at 64-65.  The field notes and corresponding plats also documented any settlers living on the land. Exs. 7-9, 265; see Tr. at 223-225. Once the surveys were completed, the United States started the process of patenting those lands to homesteaders. Tr. at 62.

24)   In 1899, the GLO federal surveyors conducted a survey of the meridian lines of Townships 147 and 148 North, which included the survey of the township line between Township 147 North Range 99 West and Township 147 North Range 100 West.  Tr. at 62-63; Ex. 14. The GLO surveyors then surveyed the section lines within these townships in 1904 and 1905. Exs. 11-13, 15. The information from the GLO surveyors' field notes were documented on GLO plats, which were finalized in 1907.  Exs. 8-10, 265.

25)   In 1908 and 1910, the Northern Pacific Railway ("NPR") received some of the first land patents for the odd-numbered sections of land in Township 147 North, Range 99 and 100 West. See Exs. 19, 25.  These sections were granted to the railroad by the United States.

26)   Settlers followed and patented land southeast of the claimed roads in Township 147 North Range 99 West starting in 1908 and extending north and west into the Long X area by 1910.  Tr. at 72-73; Ex. 17 (Map of Long X Settlement); Ex. 18 (Summary of Patent Files

and Patents); <u>see</u> Exs. 20-24, 26-29, 30-32, 33-35a, 36-36a, 37-37a, 39-40a, 42-42a (Patent Files and Patents).   The settlers acquired land under settlement laws, including the Homestead Act of 1862, ch.75, 12 Stat. 392-93 (1862) (codified at 43 U.S.C. §§ 161-284) (repealed Oct. 21, 1976), which authorized a patent for up to 160 acres to anyone who settled and cultivated the public lands, and the 1916 Stock-Raising Homestead Act, ch.9, 39 Stat. 862, 862-865 (codified at 43 U.S.C. §§ 291 et seq.) (repealed Oct. 21, 1976), which allowed a patent for 320 acres.  <u>See</u> Tr. at 72-74.

27)    In response to "dust bowl" conditions in the 1930s, the United States Department of Agriculture ("USDA") made North Dakota a priority to relocate the failed farmers and buy back their land for conversion from cultivation to grassland agriculture.  Tr. at 79-80; <u>see</u> Ex. 5 at 41-51. Pursuant to the National Industrial Recovery Act of 1933, Pub. L. 73-67, Title II, 48 Stat. 200 (1933) and the Emergency Relief Appropriations Acts of 1935 and 1936, respectively Pub. L. 74-11, 49 Stat. 115 (1935) and Pub. L. 74-739, 49 Stat. 1608 (1936), the USDA reacquired land in McKenzie County by deed from individual landowners or by condemnation from the Counties, which had foreclosed the land due to nonpayment of taxes.  <u>See</u> Ex. 5 at 44-50.  Parts of the federal recovery program were implemented through land utilization projects.

28)    The land utilization projects were established to achieve the following:

> To provide for the prevention and control of soil erosion; conservation and development of water resources; establishment of a demonstrational area for the public grazing of livestock; control of destructive animal life; and relief of unemployment by providing useful work in the reseeding, terracing and fencing of said land and the construction thereon of roads and structures necessary and appropriate to said project.

Ex. 134 at ¶ 3; <u>see</u> Exec. Orders 7673 and 7674, 2 Fed. Reg. 1512 (July 19, 1937).

29)     The USDA condemned the lands that it reacquired from McKenzie County to extinguish the private landowner rights of redemption for nonpayment of taxes.  <u>see</u> <u>also</u> e.g. Exs. 134-135, 138-139.

30)     On July 27, 1937, Congress enacted the Bankhead Jones Farm Tenant Act to establish a more permanent status for the land utilization projects and to "promote more secure occupancy of farms and farm homes," to "correct the economic instability resulting from some present forms of farm tenancy," and for other purposes.  Preamble, Pub. L. 75-210, 50 Stat. 522 (July 22, 1937); <u>see</u> Ex. 5 at 50.  The Act authorized the USDA Secretary "to acquire by purchase, gift, or devise . . . submarginal land and land not primarily suitable for cultivation, and interests in and options on such land."  Act of 1937, ch. 517, §32(a) (codified at 7 U.S.C. §1011(a)) (repealed Pub.L. 87-703, Title I, § 102(b), Sept. 27, 1962, 76 Stat. 607.).  Property acquired was "subject to any reservations, outstanding estates, interests, easements, or other encumbrances." <u>Id</u>.; <u>see</u> <u>also</u> 36 C.F.R. §213.3(b).

31)     Following the enactment of the Bankhead Jones Farm Tenant Act, President Franklin D. Roosevelt signed orders that reserved the remaining public domain lands within the same area of the Little Missouri National Grassland for the same objectives as the land utilization projects.  <u>See</u> Exec. Orders 7673 and 7674, 2 Fed. Reg. 1512 (July 19, 1937).  The reservations were explicitly subject to valid existing rights. <u>Id.</u>

### D.     <u>ESTABLISHMENT OF ROADS</u>

#### i.     <u>County Road #193 (Long X Divide Road)</u>

32)     The 1899 GLO federal survey notes first documented the Long X Trail or County Road
#193 as a road bearing northwest and southeast from the section line between Section
13-147-100 and Section 18-147-99.  Tr. at 157-158; Ex. 14 at CNTY-011825.  The road was
in existence for some time prior to the 1899 survey, and likely in existence since the mid-
1880s during the first years of the Long X Cattle Company's presence in the area.  <u>See</u> Ex.
6 at 7; Tr. at 170



Figure  1. Excerpt of Exhibit 7 to Dr. Stevens' Report at Ex. 5 depicting disputed roads from 2016 Survey.

33)     When the GLO federal surveyor conducted a survey of the section lines within
Township 147 North, Range 99 West in 1905, it documented the existence of County Road
#193. <u>See</u> Tr. at 158-159; Ex. 15 at CNTY-002845.  The segment crossing Section 17-147-
99, is shown as a wagon road  bearing northwest from the section line between Sections 17
and 20-147-99.  Tr. at 158-159; Ex. 15 at CNTY-002845.  The 1907 GLO plat for this

township illustrates the 1904 federal surveyor field notes and depicts the entire Long X Trail

or County Road #193, including that segment of the road at issue - the diagonal through the

southwest corner of Section 17-147-99.  Tr. at 158-159; Ex. 8.

34)    The 1907 GLO plats also documented settlers within the townships where the original Long X

Trail traversed from 1904-1905.  Exs. 7-9, 265; <u>see</u> Tr. at 223-225.  Dr. Stevens noted John

Goodman, Emil Kollros, John Moon, Jacob Buhl, William Crist, and the Boehm Ranch

within Township 147 North, Ranges 99 and 100 West.  Tr. at 223-225.  These settlers

would have traveled northwest along the Long X Trail, including across the Section 17

diagonal, to reach the Little Missouri River and the county seat on the north side of the

River.  Tr. at 223-225.  The Long X Trail led to the Long X Crossing on the Little Missouri

River and connected to what is known as the Squaw Creek Road on the north side of the

River.  Tr. at 229; Ex. 5 at 24-25; Ex. 10.

35)    In 1906, William Crist filed an application to establish the Mary Post Office on Section

25-147-99 to serve about 50 to 75 people living in the area before the lands were patented.

Tr. at 98-99; Ex. 254 at CNTY-010135.  The settlers traveled along County Road #193

to receive mail.  <u>See</u> Tr. at 98, 106.  In Thomas Ustenko's patent file for the south half of

Section 18-147-99, there was an affidavit from Ustenko stating he received his mail at the

Mary Post Office.  Tr. at 106; Ex. 27 at CNTY-005527.

36)    By 1910, the NPR received a patent for the odd-numbered sections of land, including Section

17-147-99, in the townships that County Road #193 traverses.  <u>See</u> Ex. 25.  Settlers patented

land southeast of the claimed County Road #193 starting in 1908 and extending north into

the Long X area starting in 1910.  Tr. at 72-73; <u>see</u> Exs. 17-18, 20-24, 26-29, 30-32, 33-

35a, 36-36a, 37-37a, 39-40a, 42-42a.

37)     The Northwestern Improvement Company, which managed the NPR land, entered into a
        sales contract with Herbert Jenner in 1913 to purchase certain tracts of land in the Long
        X area.  See Ex. 163.  The contract file notes that NPR had leased some of its land to a
        Mike Koller in 1912.  Tr. at 140-141; Ex. 163 at CNTY-011106.  Herbert Jenner
        completed his purchase of the NPR lands by 1918. Ex. 163a. Thomas and Andry Tarnovsky
        also signed a contract to purchase Section 17-147-99 from the NPR in 1917, and completed
        the purchase in 1921. Tr. at 228; Ex. 165.

38)     The Long X area was never heavily populated. Tr. at 325-328. The area also lacked a lot of
        infrastructure, aside from the three roads, County Road #193, Roads #2, and Road #3, that
        connected landowners and the public to the Long X Area and the towns to the north and
        south.  The roads also provided access to water sources at Achenbach Springs on Road #2
        and Corral Creek on Road #3, and to purchase logs from the sawmill on Road #3.  Tr. at
        125, 133, 194; Ex. 6 at 48.  These roads linked the public to post offices and schools.  Tr.
        at 75, 219, 334.  These roads were important because of the remoteness of the Long X area.
        Tr. at 246.

39)     Under North Dakota law, landowners could establish township governments to build and
        maintain roads within a township or larger area. N.D. Cent. Code §§ 58-02-01, 58-03-01, 53-
        03-07(12)-(13); 24-07-04.  The Long X Area was originally in the Rhoades Township.  Ex.
        5 at 20.  By 1925, the landowners in the area voted to establish the Long X Township, which
        included lands south of the Little Missouri River mostly in Township 147 North Ranges 98,
        99, 100 and 101 West.  See Ex. 5 at 41.

40)     The census data for this area shows that resident numbers remained relatively constant until
        1940.  In 1925, the North Dakota Census identified about 152 people or 35 families

residing in the Long X Township.  Tr. at 484-486; Ex. 281.  The 1930 census showed that the number of families in the Long X Township remained consistent, identifying 34 families, totaling 143 people. Tr. at 487; Ex. 282.  The effects of the Depression and reacquisition were not seen until 1940 when the population dropped to 78 people.  Tr. at 488; Ex. 283.

41)   The homesteaders in the Long X area traveled along County Road #193, including the Section 17 diagonal, to reach the communities of Schafer, Grassy Butte and Watford City, haul grain and supplies, travel to the Mary Post office for mail, travel to schools, and visit other settlers in the area.  Tr. at 156-157, 161-169, 228-230, 232-233.   Dr. Stevens documented examples of settlers' travels in the Long X area, which would require the use of County Road #193, as reported in homestead applications and local newspapers during the relevant time period.  Tr. at 156-157, 160-169; Ex. 5 at 57-64; see Ex. 45 (summaries of newspaper articles documenting travel patterns of settlers in the Long X area); see e.g. Exs. 47a, 55a, 61a.

42)   A 1933 USDA Soil Survey Map of McKenzie County shows that by 1933 there were two schools serving the Long X area:  (1) the Clifton School in Section 20-147-99 and (2) the Schmidtke School in Section 6-147-99.  Ex. 433.  The Schmidtke School had been in operation since at least 1920.  Tr.  95; Ex. 255a (The Grassy Butte News article from July 15, 1920 - seeking bids to furnish coal and wood to the Schmidtke School, among others).  The public would have traveled along County Road #193 to reach these two schools.

43)   The absence of the Section 17 diagonal on the 1933 USDA Soil Survey Map, which depicts County Road #193, does not provide clear and convincing evidence that the diagonal was abandoned.  The Section 17 diagonal was documented as a "County Grade"

road on two different USDA Little Missouri Land Adjustment Project Development Maps from 1935 and 1936 that show structural improvements on the land.  Tr. at 166-167, 341-342; Exs. 127, 435A; <u>see</u> <u>also</u> Ex. 5 at 48-49 (these maps are included as "Figures" in Dr. Stevens' report).  The two maps also show a car pass or cattle guard on County Road #193 where it crossed the section line between Sections 17 and 20-147-99.  Tr. at 166-167, 342; Exs. 127, 435A; <u>see</u> Ex. 5 at 48-49. These maps and improvements support the continued use of the Section 17 diagonal.

44)    The federal government reacquired Section 17-147-99 (Tract 506) in 1937 through condemnation and "[s]ubject to and excepting all existing public roads, public utility easements and rights-of-way."  <u>S e e</u>  Ex. 134 at CNTY-001175 - 001176.  The judgment granted all existing public roads to McKenzie County and this grant would have included the diagonal through Section 17.

45)    After reacquisition, the Section 17 diagonal of County Road #193 is visible on a 1939 Aerial Photograph of the Long X area that was taken on August 3, 1939.  Tr. at 436; Ex. 469.

46)    The public continued to use County Road #193, including the Section 17 diagonal, after the federal government reacquired the underlying lands.  <u>See</u> Tr. at 411 (Dr. Baker testified that "the Section 17 diagonal certainly did exist once reacquisition occurred.").  The Section 17 diagonal also appears on numerous maps (<u>see</u> Ex. 465) from the 1940s to the present, and was identified by the U.S. Forest Service as a County Road in 2000 (Exs. 154-154c; Curtis Glasoe Dep. Tr. at 50:13 - 52:4, Ex.2).

ii.        **Road #2 (Achenbach Road)**

47)     The 1904 GLO federal surveyor field notes document the subdivision and meander lines

of Township 147 North Range 100 West and identify Road #2 as a "wagon road" as it

crossed section lines.  Tr. at 134-136; Ex. 9; Ex. 11 at CNTY-002568, 002576-002577,

002586.  Because the road existed by 1904 when it was recorded by the USGS surveyor,

Road #2 would have predated the survey by some period of time to have become sufficiently

traveled to warrant mention on the federal survey.  See Tr. at 136, 170; see also Ex. 6 at 7.

The 1907 GLO Survey Plat of Township 147 North, Range 100 West reflects the field notes

and shows Road #2 traveling west and north through Sections 12, 11, 10, and 3-147-100.

Ex. 9.  The field notes and plat also show that Road #2 led to one of the first houses in the

area occupied by John Goodman and by 1904 the road ended at an important water source,

the Achenbach Springs.  Ex. 9; Ex. 11 at CNTY-002586, 002623.

48)     The United States issued patents to NPR in 1908 for the odd-numbered sections of land,

including Sections 3 and 11-147-100, in the township that Road #2 traverses. Ex. 19.  The

NPR leased Sections 3 and 11-147-100 to Mike Koller in 1912 and then sold these

sections, and other land to Herbert Jenner in 1913. Tr. at 139-141; Exs. 163, 163a. By 1914,

other settlers began to file homestead applications on the lands traversed by Road #2.  Tr. at

136-147; see Exs. 34, 34a, 37, 37a, 39, 39a, 42, 42a.

49)     Road #2 provided the primary route to access to homesteads, water at the Achenbach

Springs, graze livestock and cultivate the lands, visit neighbors, to schools, travel to the

Mary Post Office for mail, and to County Road #193 to travel to areas such as Grassy

Butte, Killdeer, Alexander, Schafer, and Watford City.  Tr. at 147, 149-151, 154, 219; see

e.g. Ex. 64a.  Dr. Stevens documented in her report the settlers' travels in the Long X area, which would require the use of Road #2, as reported in homestead applications and local newspapers during the relevant time period.  Ex. 5 at 75-76; see Ex. 45 (summaries of newspaper articles documenting travel patterns of settlers in the Long X area); see e.g. Ex. 64a.

50)   The establishment and public use of Road #2 predated the settlement which occurred from 1913 to 1922.  The existence and use of the road was clearly visible and never interrupted with gates or fences.  The public use of the road was inconsistent with the land rights of the owners and settlers along the road.

51)    By 1933, the USDA Soil Survey Map shows Road #2 extending northwest to the Little Missouri River where it connected to the road located on the west side of the River.  Tr. at 491; Ex. 433.

52)   As to the segment of Road #2 through Section 12 and part of Section 13-147-100, the federal government reacquired the underlying lands in 1939 and 1940 through condemnation and "subject to and excepting all existing public roads, easements and rights-of-way."  Exs. 138, 139. The judgment granted to McKenzie County all existing public roads, rights-of-way and easements, which included Road #2.

53)   Road #2 remained in use after the federal government reacquired the underlying lands. See Tr. at 420 (Dr. Baker testified that he "did not find a 20-year period where Road 2 was not used, that is correct.").  Road #2 appears in various maps (Exs. 154-154c, 465) from the 1940s to the present and was visible on aerial imagery from 1975 (Tr. at 443-444). Road #2 also saw continuous public use by ranchers, recreationists, and hunters, and was

maintained by the Grazing Association as a fireguard road.  Tr. at 267-269, 299-301; Morris

Tarnavsky Dep. Tr. at 81:23 - 84:22, 88:4 - 21, 91:13 - 92:12.


      **iii.**        **<u>Road #3 (Corral Creek Road)</u>**

54)    Road #3 overlaps Township Road #172 for ½ mile on the section line in Section 20-147-99.

<u>See</u> Ex. 3a; Doc. No. 316-1.  The United States disclaims all interest in this road segment,

which was part of the 1922 order approved by the Rhoades Township.  Doc. Nos. 316,

316-1.  Road #3 continues west into Section 19-147-99, Section 23-147-100 and a small

segment in Section 24-147-100.  <u>See</u> Ex. 3a. See Figure 2.


Figure 2. Excerpt of Exhibit 7 to Dr. Stevens' Report at Ex. 5 depicting Road #3 from 2016 Survey.

55)    The 1905 GLO federal surveyor's field notes first documented Road #3 as a "Road" at three

different places where Road #3 crossed the section line between Sections 18 and 19-147-99.

Tr. at 85, 101-103; Ex. 15 at CNTY-002844, 002846.  Because the road existed by 1904

when it was recorded by the USGS surveyor, Road #3 would have predated the survey for

some period of time to have become sufficiently traveled to warrant mention on the federal

survey.  <u>See</u> Tr. At 85, 170; <u>see also</u> Ex. 6 at 7.  The 1907 GLO Plat reflected the field notes

and shows the segment of Road #3 through Sections 20, 19, and 18-147-99.  Tr. at 84-85; Ex. 8.

56)     The NPR received patents for the odd-numbered sections near and traversed by Road #3 in 1908 and 1910.  Tr. at 106-109; Exs. 19, 25.  The NPR sold Section 19-147-99 and Sections 13 and 23-147-100 to Henry Simons in 1916 and contracted to sell Section 17-147-99 to the Tarnovsky brothers in 1917.  Tr. 109-111; Exs. 164, 165.

57)     Road #3 extended west to provide access to a sawmill on Charles Lange's property in Section 24-147-100 (Ex. 6 at 48) and to the settlers who homesteaded the adjacent and underlying parcels.  From 1909 through 1922, other settlers filed homestead applications and proved up their homesteads on the lands traversed by Road #3.  Tr. at 86-91, 103-116; Ex. 5 at 80; see Exs. 17, 26, 27, 27a, 32, 36, 36a, 40, 40a.  The settlers immediately adjacent to Road #3 included Charles Lange, Emma Lange Westrum, Florence Carson Lange, Tomas Ustenko and Thomas Clifton.  See Ex. 17.  Other settlers in the area included H. Cierkevny, Carl Carson, Hugh Leeper, Walter Clifton, and Fred Anderson.  See Ex. 17.  The east half of the northwest quarter of Section 24-147-100 was never patented and remained in the public domain.  See Ex. 17.

58)     The Langes logged cedar and operated a sawmill near the Corral Creek in 1915 and in 1930. Ex. 6 at 48.  Corral Creek also provided a reliable source of water for settlers who did not have well water.  Road #3 was the only existing route to take, considering the topography of the land, to reach the homesteads and to reach County Road #193 and Township Road #172.  See Exs. 8, 9; see also Trial Tr. at 415-416.  Dr. Baker testified that he found no evidence of any other roads coming from the south to access Charles Lange's land in Section 24-147-100.  Tr. at 415-416.

59)     The settlers used Road #3 to reach their homesteads, graze livestock and cultivate the land,

visit neighbors, take their kids to school, travel to the Mary Post Office for mail, and access

County Road #193 to travel to areas such as Grassy Butte, Killdeer, Alexander, Schafer, and

Watford City.   Tr. at 104-120, 167-170.   Dr. Stevens documented the settlers' travels in

the Long X area, which would require the use of Road #3, as reported in homestead

applications and local newspapers during the relevant time period.   Tr. at 104-120; Pls.

Ex. 5 at 80; Ex. 45 (summaries of newspaper articles documenting travel patterns of

settlers in the Long X area); see e.g. Exs. 63a, 68a, 94a.

60)     The Long X Township census data from 1930 and 1940 reveals that many of the original

homesteaders and their families along Road #3 did not leave, including Charles Lange,

Andrew Tarnvasky, Thomas Clifton, and Walter Dassenko.        See Exs. 282, 283.

Florence Carson/Lange appears to have left the Long X Township some time between

1925 and 1930 (compare Ex. 281 with Ex. 282), but "Don" G. Simpson acquired her land

in Section 14-147-100 after she left.   Ex. 434; see Ex. 282 ("John" G. Simpson lived in

the Long X Township in 1930).

61)     Descendants of the original homesteaders, including Benjamin Lange, Eugene Pojorlie,

and Morris Tarnvasky, remain in the area to this day, suggesting that the sale of the farms

did not equate with relocation or non-use of Road #3.   Tr. at 250-251, 254, 270, 284-285;

Morris Tarnavsky Dep. Tr. At 13:14 - 24, 23:13 - 26:6.   The Township census data

show that residents stayed until 1940 after the USDA condemned or purchased the land.

Ex. 283.

62)     The United States first reacquired land traversed by Road #3 in 1935, when it purchased

Section 18-147-99 from the Dassenkos by private deed.   Ex. 131.   The other land parcels

were reacquired from 1937 to 1939 by the United States through condemnation and "subject to and excepting all existing public roads, easements and rights-of-way."  Exs. 134, 135, 137, 138.  The condemnation orders granted to McKenzie County the "existing public roads, easements and rights- of-way" as well as a 6¼ percent royalties on all minerals that may be developed.  Id.

63)   After reacquisition, the public continued to use Road #3 even after the Theodore Roosevelt National Park boundary was fenced.  Benjamin Lange testified that his first uses of Road #3 were in the late sixties, early seventies, and he traveled Road #3 by horseback, snowmobile, pickup, and four-wheeler.  Tr. at 260-261, 282.  Eugene Pojorlie testified to first traveling Road #3 in the late sixties by Jeep, as well as by snowmobile and motorcycle. S e e  Trial Tr. at 295, 298. Morris Tarnavsky testified at his deposition that he traveled on Road #3 in the early 1970s by snowmobile and at that time there was a wooden plank bridge across the creek channel before the road reached the Park boundary.  Morris Tarnavsky Dep. Tr. at 105:22 - 107:8.  Ranchers have used and continue to use Road #3 to access Pasture 8-1, and other public uses include hunters, Boy Scout troops, mountain bikers, and other recreationists.  Tr. at 253-255, 260-265, 272, 298-299.

64)   Road #3 was also well maintained by the Grazing Association as a fireguard road, which is also known as a "black" road, about 12 to 15 feet wide, with no grass between the tire tracks and is used both for access to fires and to help stop the spread of fires on the Grasslands. Tr. at 261-262, 297-298; Morris Tarnavsky Dep. Tr. at 110:2 - 111:4.  The Grazing Association also installed water pipelines, stock tanks, and wells along Road #3 in the mid-1970s. Trial Tr. at 263-265, 293; Morris Tarnavsky Dep. Tr. at 108:13 - 110:1; see Ex.

280.   Water lines were placed "where the easiest routes are, and that's where - -  they're not right on the road in all cases, but in some cases they are right in the road."  Tr. at 273.

65)   With respect to a 1975 aerial image of the Long X Area, Phil Sjursen testified to seeing segments of Road #3 on the enlarged version of this aerial.  Tr. at 443-446; Ex. 503R.  Sjursen testified that he would have had to have seen the road on the ground in 1975 to make a final determination as to whether Road #3 was continuous.  Tr. At 445-446.  The tail end of Road #3 cannot be seen on this aerial because the aerial photo excluded the western lands that Road #3 transverses.  Tr. at 445-446; Ex. 503R.  Road #3 is also visible on a 1981 aerial image of the Long X Area.  Tr. at 125, 244-245; Ex. 147.

66)   Road #3 is also documented as a "Trail" in Sections 18 and 19-147-99 in a 1968 annotated aerial map of the Long X area that is attached to a 1971 Range Management Plan for Allotment #437 of Pasture 8-1.  Tr. at 242-243, 390-391; Ex. 450 at MCG-000456.

67)   Road #3 is also documented on a 2000 Forest Service Map.  Tr. at 129-130; Exs. 154-154c.


E.      **1977 LITTLE MISSOURI TRAVEL PLAN**

68)   In 1977, the Forest Service adopted a temporary travel management plan for the Little Missouri National Grassland.  Tr. at 454.  Exhibit 458 is the 1977 Travel Plan Map for the northern portion of the Little Missouri National Grasslands, which includes a public notice overlaying the map.  Tr. at 454.

69)   The 1977 Travel Plan only applied to lands owned by the Federal government within the Little Missouri National Grassland.  Tr. at 452; Ex. 458.  Dennee testified that "any restrictions and controls that are adopted in travel plans apply to land areas and roads and

23

trails on the National Forest and Grasslands and not to private roads or roads that may be recognized as federal highways or state roads or county roads." Tr. at 452. The 1977 Travel Plan restrictions did not apply to "State or County roads systems." Ex. 458.

70)    The Plan restricted travel by all motorized vehicles to existing roads in areas designated as Map Code 1. Tr. at 458; Ex. 458. Other areas, including the Long X Area, were designated Map Code 2, which prohibited off-road vehicle use only during the North Dakota upland bird and big game hunting season, but otherwise did not change or restrict travel on existing roads, even during hunting season. Tr. at 458. The upland bird and big game hunting season lasted from about September to end of December or early January. Tr. at 461.

71)    The Map Code 2 seasonal restriction adopted North Dakota law that prohibits off- road vehicle use for big game and upland bird hunting. See Ex. 458. North Dakota Century Code § 20.1-01-07 (1975) prohibited off-road motor vehicle use except in certain cases:

> [N]o person, while hunting big game, shall use a motor-driven vehicle on any other than an established road or trail, unless he has reduced a big game animal to possession and cannot easily retrieve said big game animal, in which case a motor-driven vehicle may be used to retrieve the big game animal, provided that after such retrieval, such motor-driven vehicle is again returned to the established road or trail along the same route it originally departed.

72)    The 1977 Travel Plan did not close any roads in Map Code 2 and allowed motorized travel on all existing roads, which were broadly defined as "a route traveled by four-wheeled vehicles that shows recurring use of more than one year's duration with soil displacement and compaction present to the extent that vegetation is sparse or absent from wheel tracks." Tr. at 459; Ex. 458.

73)     The 1977 Travel Plan Map shows some roads (i.e. County Road #193 and Road #2), but not all roads and trails.  Tr. at 459-460.  There is no evidence this map purported to show or was intended to show all roads and trails.  Indeed, the Map states "[c]losures or restrictions for roads not shown on the map will be posted on the ground." Ex. 458.  Road #3 was never posted as closed after the 1977 Travel Plan was issued.

74)     The 1977 Travel Plan went into effect on May 25, 1977, and was to terminate on December 31, 1978.  Ex. 458.  It was extended for a few months.


II.     **CONCLUSIONS OF LAW**

1)      This Court has jurisdiction of the subject matter and the parties.  Jurisdiction and venue are proper in this Court because this involves Quiet Title Act ("QTA"), 28 U.S.C. § 2409a, claims to title to rights-of-way crossing lands owned by the United States in McKenzie County, North Dakota.

2)      This Court has broad discretion to weigh the evidence and the credibility of the witnesses in reaching findings of facts, and may accept or reject any or all of the testimony of the witnesses.  In a bench trial, the Court, as the trier of fact, is the sole judge of the credibility of witnesses and the weight to be given their testimony. Anthony v. Louisiana & Arkansas Ry. Co., 316 F.2d 858, 861 (8th Cir. 1963).

3)      The QTA allows a party to sue the United States to adjudicate disputed title to real property in which the United States claims an interest. 28 U.S.C. § 2409a(a); Block v. North Dakota ex rel. Bd. of Univ. & Sch. Lands, 461 U.S. 273, 286 (1983). "Because the QTA waives the government's sovereign immunity from suit, a plaintiff must comply with the limitations period to effectuate that waiver.  Any civil action brought under the QTA must

be brought within 12 years of the date upon which it accrues.  28 U.S.C. § 2409a(g). A QTA action accrues "on the date the plaintiff . . . knew or should have known of the claim of the United States." 28 U.S.C. § 2409a(g).  The courts look to whether the plaintiff should have had a "reasonable awareness that the Government claims some interest adverse to [his own]." Spirit Lake Tribe, 262 F.3d 732 at 738 (quoting North Dakota v. Block, 789 F.2d 1308, 1312-13 (8th Cir. 1986)).

4)   The United States contends this Court does not have jurisdiction to hear McKenzie County's claim to Road #3 because the 1977 Little Missouri Travel Plan off-road vehicle travel restrictions provided McKenzie County with notice of the United States' adverse claim to the road. The Court concludes as a matter of law that Pojorlie and Lange's testimony at trial, and the deposition testimony of Tarnavsky, show that Road #3 was an "existing road" as defined by the Plan. In the 1970s, Road #3 was a traveled road and bladed by the McKenzie County Grazing Association, thus free of any vegetation growing between the wheel tracks. Therefore, the Court concludes the 1977 Travel Plan did not provide McKenzie County with notice of the United States' adverse claim to Road #3 because it was an existing road under the Plan not subject to the off-road vehicle travel restriction.

5)   The Court concludes as a matter of law that the temporary restrictions to off-road vehicle travel during the hunting season, which is only four months each year, was not sufficient to trigger the statute of limitations.  Road #3 was an existing road and any restriction on off-road travel did not apply to Road #3.  Further, in *McFarland v. Norton*, the court noted that "mild interference with the use of an easement pursuant to the government's own property interests will not start the statute of limitations running." 425 F.3d at 727 (Park

Service banning snowmobile use and closing the road to winter motor vehicle use was not notice of an adverse claim to a road.).

6)   The construction of the fence on the Theodore Roosevelt National Park boundary and installation of locked gates also did not trigger the statute of limitations for Road #2 or County Road #193. <u>See</u> Doc. No. 271 at 13-17. The unrebutted testimony at trial established the remainder of County Road #193 and Road #2 have been used by the public, including the ranchers, for the past 40 years.  The roads provide important commercial and recreation access and have independent utility.

7)   Since McKenzie County's Quiet Title Act claims are not barred by the statute of limitations, the Court has jurisdiction to determine who has title to Road #2, Road #3, and the Section 17 diagonal for County Road #193.  McKenzie County has claimed these three roads are county roads established across public domain and private land pursuant to N.D. Cent. Code § 24-07-01, which allows the establishment of a road by 20 years of public use.

8)   A party claiming a public road by prescription must prove it "by clear and convincing evidence."  <u>Wagner v. Crossland Constr. Co.</u>, 840 N.W.2d 81, 87 (N.D. 2013) (quoting <u>Home of Econ. v. BNSF</u>, 736 N.W.2d 780, 785 (N.D. 2007)). This is "evidence which leads to a firm belief or conviction that the allegations are true." <u>Zander v. Workforce Safety and Ins.</u>, 672 N.W.2d 668, 671 (N.D. 2003). The evidence "need not be undisputed to reach the clear and convincing standard."  <u>Id.</u> (quoting <u>Zundel v. Zundel</u>, 278 N.W.2d 123, 129-30 (N.D. 1979)).


A.  <u>**THE PLAINTIFF'S R.S. 2477 CLAIMS**</u>

9)      In 1866, Congress passed the Mining Law, which provided: "the right of way for the construction of highways over public lands, not reserved for public purposes, is hereby granted." Act of July 26, 1866, ch. 262, § 8, 14 Stat. 251, 253 (codified at 43 U.S.C. § 932) (repealed by Pub. L. 94-579, Title III, § 706(a), 90 Stat. 2793 (1976)).  This provision, known as R.S. 2477, granted public access across unreserved public domain lands by granting rights-of-way for highways. The establishment of an R.S. 2477 right-of-way required no administrative formalities: "no entry, no application, no license, no patent, and no deed on the federal side; no formal act of public acceptance on the part of the state or localities in whom the right was vested." S. Utah Wilderness All. v. BLM, 425 F.3d 735, 741 (10th Cir. 2005), as amended on denial of reh'g (Jan. 6, 2006).

10)     R.S. 2477 "did not itself create R.S. 2477 roads; rather, it authorized the states to construct highways over public lands." Lyon v. Gila River Indian Cmty., 626 F.3d 1059, 1077 (9th Cir. 2010).  "The mere existence of [a road] is not enough to make [it] 'public highways'" for purposes of R.S. 2477. Id.  "Rather, [the state] must have taken some affirmative act to accept the grant represented by R.S. 2477." Id.

11)     In determining what is required for acceptance of a right-of-way under R.S. 2477, federal law "borrows" from principles of state law, but only to the extent that state law provides "convenient and appropriate principles for effectuating congressional intent." S. Utah Wilderness All. v. Bureau of Land Mgmt., 425 F.3d 735, 768 (10th Cir. 2005), as amended on denial of reh'g (Jan. 6, 2006).  "[S]tate law ceases to provide 'convenient and appropriate principles' when it contravenes congressional intent." San Juan Cty., Utah v. United States, 754 F.3d 787, 798 (10th Cir. 2014) (internal citation omitted).

12) The North Dakota Supreme Court has held that there are two ways by which an R.S. 2477 acceptance can occur: (1) a showing of "some positive act on the part of the public authorities authorized to establish and maintain highways showing a clear intent on the part of such authorities as agents for the public to accept the grant"; or (2) public use for such a period of time "sufficient to ripen into a right by prescription as defined by the laws of the state or territory where such highway is located." Koloen v. Pilot Mound Twp., 157 N.W. 672, 675 (N.D. 1916) (citations omitted).

13) The North Dakota Supreme Court's ruling in *Koloen* is not binding on this Court, as the interpretation of federal R.S. 2477 law is the province of federal courts. However, this Court borrows the principles of North Dakota state law insofar as they provide convenient and appropriate principles.

14) To the extent that the "public use" prong of *Koloen* provides convenient and appropriate principles for recognizing the acceptance of an R.S. 2477 grant, the Plaintiffs must show clear and convincing evidence of public use for the time period that would be required to establish a public road under North Dakota law.

15) The time period of continuous use required to establish a prescriptive road in North Dakota is twenty years. Wagner v. Crossland Constr. Co., 2013 ND 219, ¶ 16, 840 N.W.2d 81, 87 (N.D. 2013).

16) The acceptance of the R.S. 2477 right-of-way grant is governed by state law. The Dakota Territorial Legislature and later the State of North Dakota accepted the R.S. 2477 grant of a right-of-way from the federal government by declaring that public roads could be established across the public domain by 20-years of public use. Walcott Twp. v. Skauge, 71 N.W. 544, 546 (N.D. 1897); 1877 Dak. Terr. Laws, ch.13, § 33 (codified at 1877 Dak.

Terr. Rev. Code, ch. 29, § 37); 1897 N.D. Laws, ch.112, § 1; see N.D. Cent. Code § 24-07-01. All that was required was continuous public use for 20 years, regardless of "whether the use is with the consent, or over the objections, of the landowner." Skauge, at 546.

17)     The same section of North Dakota law allows roads to be established by 20 years of public use across public domain land and private land.  The period of public use is continuous and tacked as the burdened estate changes ownership. See James v. Griffin, 626 N.W.2d 704, 708 (N.D. 2001) ("As in adverse possession, the principle of tacking is applicable to claims of acquiescence" in property boundary line disputes.). In *Skauge*, the North Dakota Supreme Court held the 20-year prescriptive use period may begin when the underlying land was part of the public domain subject to R.S. 2477, and continue to run after the federal government issues a patent to private landowners.  71 N.W. at 545-46.

18)     There was a period of time when North Dakota did not recognize prescriptive roads.  For a little over one year, with the enactment of N.D. Revised Code 1895, § 1050, a public road could no longer be established by 20 years of public use.  Burleigh County v. Rhud, 136 N.W. 1082, 1083-84 (N.D. 1912).    By 1897, the statute was revised to allow for establishment of roads by 20 years of public use.  Id.; N.D. Laws of 1897, ch. 112. Therefore, to prove a road was established by 20 years of public use, such use must have dated back for 20 years prior to January 1, 1896, when N.D. Revised Code 1895, § 1050 went into effect, or have been established by continuous use for 20 years after March 29, 1897, when N.D. Laws of 1897, ch. 112 went into effect. Rhud, 136 N.W. at 1083-84.

19)     Since the enactment of the 1897 prescriptive road statute, North Dakota case law governing prescriptive roads over private lands has followed the common-law rule. Berger v. Morton County, 221 N.W. 270, 271 (N.D. 1928).  In North Dakota, "[m]ere use[] of the land by

the public as a highway is insufficient of itself to establish a highway by prescription."

Berger v. Berger, 88 N.W.2d 98, 100 (N.D. 1958). A party claiming a public road by

prescription must show "by clear and convincing evidence the general, continuous,

uninterrupted and adverse use of a road by the public under a claim of right for 20 years."

Wagner, 840 N.W.2d at 87 (quoting Home of Econ., 736 N.W.2d at 785); accord Berger,

88 N.W.2d at 100.

20)     The North Dakota Supreme Court has not clearly defined "continuance and uninterrupted."

However, North Dakota Century Code § 24-07-01 embodies the fundamental requirements

to establish a highway by prescription in North Dakota:

> All public roads and highways within this state which have been or which
> shall be open and in use as such, during twenty successive years, hereby are
> declared to be public roads or highways and confirmed and established as
> such whether the same have been laid out, established, and opened lawfully
> or not.

N.D. Cent. Code § 24-07-01.

21)     Whether there is public use of a road for 20 years depends on the locality where the road

is located. See Burleigh County, 136 N.W. at 1083.

22)     North Dakota has never required a certain number of users or frequency of use in

determining if a road has been established by prescription. It is not the frequency of use or

the number of people using the road that controls.  Instead, it is the character of the road use

- whether the public had the free and unrestricted right to use the road.  Breiner v. Holt

Cnty., 581 N.W.2d 89, 94-96 (Neb. Ct. App. 1998) ("Considering the road is an isolated

ranching area, the infrequency and sporadic nature of travel upon it is not controlling.");

Matter of Request of Lafayette Dev. Corp. To Open 18th Ave. S., 567 N.W.2d 743, 745

(Minn. Ct. App. 1997) ("Use by 'a comparatively small number of persons' may establish public use of a roadway.").

23)     The public use of the road must be adverse, which is use of the land inconsistent with the owner's right to exclusive use and that "imports an assertion of right on the part of those traveling the road." <u>Berger</u>, 88 N.W.2d at 101. However, "[i]t does not imply enmity or ill will and is consistent with friendly relations between user of the road and landowner."  <u>Id.</u>

24)     North Dakota courts have not articulated a bright line between adverse use and permissive use.  Other states have held that once a party has proven that public use is open, continuous, and uninterrupted for the requisite period of time, then the use of another's land is presumed to be adverse. <u>See</u> <u>Walker v. Phillips</u>, 427 P.3d 92, 100 (Mont. 2018); <u>Hamad Assam Corp. v. Novotny</u>, 737 N.W.2d 922, 925 (S.D. 2007).  The presumption of adverse use can be rebutted by proof that the use was by permission or not under a claim of right.  The Restatement of Property also defines "adverse use" as being under a claim of right, wrongful to the owner of the interest affected, and open and notorious.  Restatement (First) of Property, § 458 (1944).

25)     In cases where a prescriptive road by 20 years of public use has been established in North Dakota, the courts have highlighted the facts showing that the contesting landowner never objected to the public using the road.  <u>Morton County</u>, 221 N.W. at 271-72; <u>see also</u> <u>Gajewski v. Taylor</u>, 536 N.W.2d 360, 362 (N.D. 1995).

26)     The width of the prescriptive road is determined by the actual use over the prescriptive period and may include part of the land needed to support and maintain the road, including ditches and shoulders.  <u>Reichman</u>, 812 N.W.2d at 343-44 (citing <u>Keidel v. Rask</u>, 290 N.W.2d 255, 258-60 (N.D. 1980), and <u>Keidel v. Rask</u>, 204 N.W.2d 402, 408-09 (N.D.

1981)).   Once established, a prescriptive road is only abandoned after 20 years of continuous non-use by the public.  N.D. Cent. Code §§ 24-07-01, 47-05-12(4); Casey v. Corwin, 71 N.W.2d 553, 556 (N.D. 1955).

### B.  COUNTY ROAD #193 (LONG X DIVIDE ROAD)

27)      The Court concludes as a matter of law that the Counties have proven by clear and convincing evidence that the Section 17 diagonal of County Road #193 was established as a prescriptive road through 20 years of open, notorious, continuous, and adverse use from at least 1905 to 1937, when the federal government reacquired the underlying land. County Road #193 first appeared as an R.S. 2477 right-of-way when the lands were part of the public domain as documented by the 1889 and 1904 GLO federal surveyor field notes and the corresponding 1907 GLO plat.  It provided settlers living to the southeast part of Township 147 North, Range 99 West access to the Little Missouri River and a means to reach the county seat at the time – Schafer. The prescriptive public use period continued as the lands were patented to private landowners starting in 1908.  See Skauge, 71 N.W. at 545-46 (prescriptive periods are additive as lands moved from public domain to private ownership).  Newspaper clippings and maps show that County Road #193 and its Section 17 diagonal provided the public and residents of the Long X Township a route to the Little Missouri River, to the towns of Schafer, Alexander, and Watford City to the north, and to the towns of Dickinson and Killdeer to the south.   Before the government reacquired Section 17, it had documented the road traveling through the southwest corner of the section in 1935 and 1936 Development Project Maps. The Court concludes that the Section 17 diagonal was established by 20 years of public use.

28)  The Court concludes as a matter of law that evidence supporting open, notorious, and continuous public use of the Section 17 diagonal for County Road #193 shows the public use was adverse. The Section 17 diagonal predated settlement of the lands and settlers homesteaded the land with full knowledge that the public had been traveling on County Road #193.  Although the burden is on the Counties to present evidence of adverse use, the United States failed to offer any evidence that landowners' granted permission to the public to travel the Section 17 diagonal, or at any point prevented the public from traveling on the road.  The petitioned portion of County Road #193 and Township Road #172 excluded the Section 17 diagonal, which does indicate an intent to encourage the public to travel along the section line.  Maps dated after the petitioned roads were officially opened prove that the public continued to use the Section 17 diagonal.  This supports the conclusion that the public was claiming the right to travel on the Section 17 diagonal, hostile to that of the landowner, despite attempts to encourage travel elsewhere.  There was no evidence presented supporting the claim that use of the Section 17 diagonal was by permission only. Any period of non-use was less than 20 years so the segment was not abandoned. The public use of the Section 17 diagonal as the lands were homesteaded was open and continuous and under a claim of right, which conflicted with the landowners' property rights, including the right to graze and cultivate the land.

### C.  ROAD #2 (ACHENBACH ROAD)

29)  The Court concludes as a matter of law that the Counties have proven by clear and convincing evidence that Road #2 was established as a prescriptive road through 20 years of open, notorious, continuous, and adverse use from at least 1904 to 1939 when the federal

government reacquired the underlying lands. Road #2 first appeared across public domain lands in 1904 as an R.S. 2477 right-of-way as documented by the GLO surveys and plats. It provided key access to the home of one of the first settlers in the area - Goodman, and provided other settlers living to the southeast in the adjacent township access to the Achenbach Springs. The prescriptive use period continued as the lands were patented to private landowners starting in 1908. Road #2 provided the landowners access to their homesteads, and was part of a network of roads in the area that provided access to other roads and places (i.e. schools, post office, towns).  In 1933, the Soil Conservation Service documented the road extending northwest past the Springs to the Little Missouri River where it met a road that continued southwest on the west side of the River.  Based on this evidence, the Court concludes that Road #2 was established by 20 years of public use.

30)   The Court concludes that the evidence supporting open, notorious, and continuous public use of Road #2 was also adverse to the landowners of the servient estate. Road #2 predated settlement of the lands and settlers homesteaded the land with full knowledge that the public had been traveling on Road #2.  The United States' contends that the public use was permissive because some of the landowners along Road #2 were related or had a business relationship.  However, adverse use does not require a hostile relationship and is consistent with friendly relations between the user of the road and the landowner.  There is no evidence supporting the claim that use of Road #2 was by permission only or that the landowners prevented the public from traveling on the road. The public use of Road #2 as the lands were homesteaded was open and continuous and under a claim of right, which conflicted with the landowners' property rights, including the right to graze and cultivate the land.

31)     The United States granted to McKenzie County the existing roads and rights-of-way in Section 12 and 13-147-100 when it condemned the land as Tract 52, At Law 1013 and Tract 237, At Law 1002.  See Pls.' Ex. 134, 138, 139.  Road #2 was a public road existing at the time of condemnation and by judgment the United States conveyed all interest in the right-of-way to McKenzie County.

### D.  ROAD #3 (CORRAL CREEK ROAD)

32)     The Court concludes as a matter of law that the Counties have proven by clear and convincing evidence that Road #3 was established as a prescriptive road through 20 years of open, notorious, continuous, and adverse use from at least 1904 to 1935 when the federal government began to reacquire the underlying lands. Road #3 first appeared across over one mile of public domain lands in 1904 as an R.S. 2477 right-of-way as documented by the GLO surveys and plats. The prescriptive use period continued as the lands were patented to private landowners starting in 1908. The public use of Road #3 became apparent as the lands were patented and settlers constructed their homes along Road #3. Road #3 traveled across five settler's homesteads and provided access to timber that was in the draw off the road. Evidence of one settler logging the area and operating a sawmill proves this was not just local access. Road #3 provided the landowners access to their homesteads and was also part of a network of roads in the area that provided access to water in the Corral Creek, other roads, and places (i.e. schools, post office, towns). The original homesteaders remained into the 1930s and would have continued need to use Road #3 to access the lands. The Court concludes as a matter of law that Road #3 was established by 20 years of public use. The 20 years is measured from 1905 for the segment of Road #3

located in Sections 18 and 19-147-99, and from 1916 for the segment of Road #3 located in Sections 23 and 24-147-100.

33)   The Court concludes the evidence supporting open, notorious, and continuous public use of Road #3 proves that the public use was also adverse. Road #3 predated settlement of the lands and settlers homesteaded the land with full knowledge that the public had been traveling on Road #3.  The United States' claims that the public use was permissive because some of the landowners along Road #3 were related. However, adverse use does not require a hostile relationship and is consistent with friendly relations between the user of the road and the landowner.  Further, the family members (i.e. the Langes) would have had to travel across four other settler's homesteads to get to their homesteads.  There is no evidence showing that any of the settlers granted the public permission to travel across their land on Road #3 or prevent the public from traveling on the road.  The public use of Road #3 as the lands were homesteaded was open and continuous and under a claim of right, which conflicted with the landowners' property rights, including the right to graze and cultivate the land.

34)   The Court concludes as a matter of law that the Counties have shown by clear and convincing evidence that County Road #193's Section 17 diagonal, Road #2, and Road #3 were established as prescriptive roads by 20 years of open, continuous, uninterrupted, and adverse use. The Court finds that such use started when the lands were part of the public domain and continued as the lands were patented to private landowners.  The 20-year period vested for each road before the federal government reacquired the underlying lands.

35)   When the United States reacquired lands upon which County Road #193 Section 17 diagonal, Road #2, and Road #3 traverse, by condemnation judgment such acquisition was

subject to the existing roads.  When the United States acquired land upon which County

Road #193 Section 17 diagonal, Road #2, and Road #3 traverse from private landowners

by deed, the land remained burdened by the County's public roads and rights-of-way that

existed when the land was sold to the United States.  Kritzberger v. Traill County, 242

N.W. 913, 916 (N.D. 1932); see Bird Bear v. McLean Cnty., 513 F.2d 190, 192 (8th Cir.

1975) (public land subject to Highway Act of 1866 later conveyed as part of Fort Berthold

Reservation was still subject to rights-of-way on section lines); Skauge, 71 N.W. at 546;

see also N.D. Cent. Code § 24-07-33 (Any person acquir[ing] the title to government land

over which any road has been or hereafter may be laid out ..., shall assert the person's claim

for damages ... and such roads must remain and be public highways ...").


## III.    ORDER FOR JUDGMENT

Based upon the foregoing Findings of Fact and Conclusions of Law and the record in this

matter, it is **ORDERED** that Judgment shall be entered as follows:

(1) Title to Road #2, Road #3, and the Section 17-147-99 diagonal of County Road #193

     as described in the Counties Fourth Amended Complaint is quieted in favor of Plaintiff

     McKenzie County;

(2) Title to Township Road #169 as described in the Counties Fourth Amended Complaint

     is quieted in favor of Plaintiff McKenzie County pursuant to the Court's Order dated

     October 31, 2019 (Doc. No. 271); and

(3) Plaintiff's claims to County Road #30, County Road # 172, and County Road # 193, with

     the exception of Section 17-147-99 diagonal of County Road #193, as described in the

     Counties Fourth Amended Complaint be **DISMISSED** for lack of jurisdiction as the

     Court confirmed the United States' disclaimer of interest in these roads (Doc. No. 330).

**IT IS SO ORDERED**.

Dated this 2nd day of October, 2020.

_/s/ Daniel L. Hovland_
Daniel L. Hovland, District Judge
United States District Court